**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **AIG SPECIALTY INSURANCE** | § | **NO: 6:21-CV-04191-RRS-CBW** |
| **COMPANY (f/k/a CHARTIS** | § | |
| **SPECIALTY INSURANCE** | § | **JUDGE ROBERT S SUMMERHAYS** |
| **COMPANY** | § | |
| | § | **MAG. CAROL B WHITEHURST** |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KNIGHT OIL TOOLS, INC.** | § | |
| | § | |
| | § | |
| | § | |

---

**ACE AMERICAN INSURANCE COMPANY'S**
**MOTION FOR LEAVE TO FILE COMPLAINT-IN-INTERVENTION**

---

ACE American Insurance Company ("ACE"), as issuer of Commercial General Liability Policy No. HDO G24940214 ("Policy") to Knight Oil Tools, Inc. ("KOT"), moves this Court for leave to file the Complaint-in-Intervention against Rippy Oil Company ("Rippy Oil"), attached as Exhibit "1."

This action was originally commenced by AIG Specialty Insurance Company (f/k/a Chartis Specialty Insurance Company), which sought a determination of coverage under its Commercial Umbrella Liability Policy issued to Knight Oil Tools, Inc. ("KOT"), for claims arising out of an incident on or about May 11, 2010. Because there are common questions of law or fact regarding potential coverage under ACE's own policy issued to KOT, General Liability Policy No. HDO G24940214 ("Policy"), ACE seeks leave to intervene as an interested party in the disposition of this action. Pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. §§2201 *et seq.* and Rule



57 of the Federal Rules of Civil Procedure, ACE requests a declaration of whether ACE has coverage or any obligation to indemnify or defend KOT under the Policy.

In accordance with Local Rule 7.6, undersigned counsel confirms that he has: (1) presented this proposed pleading to all parties who have an interest to oppose; and (2) he is informed that Plaintiff opposes the granting of this motion.

**Considering the forgoing**, Intervenors pray that this Motion for Leave to File Complaint-in-Intervention be granted, and that the clerk be instructed to accept the Complaint-in-Intervention for filing and to issue all appropriate process forthwith.

Respectfully submitted,

**BROWN SIMS, PC**

BY: */s/ Thear J. Lemoine*
      Thear J. Lemoine (# 26383)
      Gregory M. Burts (#39133)
      1100 Poydras St., 39th Floor
      New Orleans, LA 70163
      P: (504) 569-1007
      F: (504) 569-9255
      E: *tlemoine@brownsims.com*
      *gburts@brownsims.com*
      **Attorneys for ACE American Insurance Company**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served on all counsel of record by the court's electronic notification system, or by fax, email, United States Mail (postage prepaid) and/or hand delivery on February 10, 2022.

*/s/ Thear J. Lemoine*
Thear J. Lemoine

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| **AIG SPECIALTY INSURANCE** | § | **NO: 6:21-CV-04191-RRS-CBW** |
| **COMPANY (f/k/a CHARTIS** | § | |
| **SPECIALTY INSURANCE** | § | **JUDGE ROBERT S SUMMERHAYS** |
| **COMPANY** | § | |
| | § | **MAG. CAROL B WHITEHURST** |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KNIGHT OIL TOOLS, INC.** | § | |
| | § | |
| | § | |
| | § | |

---

## ACE AMERICAN INSURANCE COMPANY'S COMPLAINT-IN-INTERVENTION AND REQUEST FOR DECLARATORY RELIEF

---

TO:  **The Honorable Judges of the United States District Court,**
**Western District of Louisiana**

ACE American Insurance Company ("ACE") files this Complaint-in-Intervention and Request for Declaratory Relief, pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. §§2201 *et seq*. and Rule 57 of the Federal Rules of Civil Procedure. This action was originally commenced by AIG Specialty Insurance Company (f/k/a Chartis Specialty Insurance Company), which sought a determination of coverage under its Commercial Umbrella Liability Policy issued to Knight Oil Tools, Inc. ("KOT"), for claims arising out of an incident on or about May 11, 2010, as more fully described below. Because there are common questions of law or fact regarding potential coverage under ACE's own policy issued to KOT, General Liability Policy No. HDO G24940214 ("Policy"), ACE sought and received leave to intervene as an interested party in the disposition of this action. ACE requests a declaration of whether ACE has coverage or any

EXHIBIT
1

obligation to indemnify or defend KOT under the Policy. For support, ACE respectfully shows the Court the following:

### 1.

An actual case or controversy exists between ACE and Knight Oil Tools, Inc. ("KOT").

### PARTIES

### 2.

A.  Intervenor, ACE American Insurance Company, is a foreign insurance company organized under the laws of Pennsylvania with its principle place of business in Philadelphia, Pennsylvania.

B.  Defendant-in-Intervention, KOT, was, at all relevant times, organized and incorporated under the laws of Louisiana with its principal place of business in Lafayette, Louisiana. At all relevant times, KOT conducted business in Louisiana and maintained a registered office and principal business establishment in Louisiana.

### JURISDICTION AND VENUE

### 3.

This Complaint for Declaratory Relief is brought under 28 U.S.C. §2201 et seq. and Rule 57 of the Federal Rules of Civil Procedure, for the purpose of determining a question of actual controversy between the parties, as hereinafter more fully set forth. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 based upon the diversity of citizenship between ACE and KOT, and the amount in controversy which exceeds $75,000, exclusive of interest and costs.

### 4.

Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because ACE's Policy was issued in the State of Louisiana, and a substantial part of the events or omissions giving rise to the

underlying lawsuit occurred in the Western District of Louisiana, where KOT is also domiciled at all relevant times.

## FACTUAL AND PROCEDURAL HISTORY

### The Underlying Litigation

**5.**

The lawsuit underlying this Complaint-in-Intervention arises out of the malfunction of a drill pipe allegedly sold by KOT to Rippy Oil Company, for use in its Easterling No. 1-H well located in Leon County, Texas ("the Well").

**6.**

Rippy Oil Company, joined by Rippy Interest, LLC, The Genecov Group, Inc., and John D. Proctor (collectively, "Rippy Oil"), filed suit on December 28, 2010, in the 12th Judicial District Court in Leon, Texas ("the Underlying Litigation"). *See*, Exhibit A. An Amended Petition was subsequently filed by Rippy Oil on October 26, 2016. *See*, Exhibit B.

**7.**

Rippy Oil alleged in the Underlying Litigation that, on or about May 11, 2010, Pioneer Drilling Company was utilizing the drill pipe supplied by KOT on drilling operations on the Well when the pipe catastrophically failed, allegedly harming a portion of the Well and preventing its economic completion and production of oil reserves.

**8.**

Rippy Oil alleged in the Underlying Litigation that it attempted to mitigate the harm by attempting to retrieve the failed pipe, separated drill string, bottom-hole assembly, and drill bit, and that, despite these efforts, it "could not reproduce [the Well] with resulting loss of use of well bore and hydrocarbon reserves . . ."

**9.**

In the Underlying Litigation, Rippy Oil alleged claims denominated as "negligence and negligent misrepresentation"; "strict liability/product liability"; "breach of express warranty of goods"; "breach of implied warranty of merchantability and fitness for a particular purpose"; "violation of the Texas Deceptive Practices Act"; "gross negligence"; "breach of contract"; "fraud"; and "aiding and abetting, civil conspiracy, concert of action, spoliation, and successor liability."

**10.**

In the Underlying Litigation, Rippy Oil quantified damages at cash market value for the destruction of the relevant portion of the Well, which was the market value of the Well minus salvage value, because reproducing the affected portion of the Well was practically impossible and the cost would have exceeded its value. Rippy Oil alternatively sought recovery for the reasonable and necessary cost to reproduce the Well if it was found to be reproducible. Rippy Oil also sought direct and/or consequential damages, including loss profits, loss of use, loss of the lateral well bore and hydrocarbon reserves, additional drilling costs incurred by the drill pipe failure, and the total loss of the drill bit, bottom-hole assembly, and other rental equipment lost downhole – all of which was allegedly caused by the failure of the drill pipe supplied by KOT. Finally, Rippy Oil also sought punitive damages and attorney's fees.

**Rippy Oil's Relief from Automatic Bankruptcy Stay**

**11.**

On or about August 8, 2017, KOT filed for Chapter 11 bankruptcy in the United States District Court, Western District of Louisiana. Rippy Oil filed for relief from the automatic bankruptcy stay, which was granted on October 24, 2017, for the limited purpose of allowing

Rippy Oil to pursue its claims against KOT inasmuch as such claims were covered by any of KOT's applicable insurance policies. Pursuant to the Order of the Bankruptcy Court, KOT's liability was limited to the extent of any coverage available under its insurance policies. *See*, Exhibit C.

**Underlying Litigation Judgment**

**12.**

The Underlying Litigation proceeded to trial by jury on May 1, 2018. After the close of evidence at trial on May 10, 2018, the jury issued its verdict finding that KOT had breached its contract, breached its implied warranty of fitness for a particular purpose, and negligently misrepresented material conditions of the drill pipe. The jury found no fault for the incident on the part of Rippy Oil and Gyrodata. *See*, Exhibit D.

**13.**

The jury also found that the Well was incapable of reproduction and that the reasonable and necessary expenses for equipping the Well were $1,500,000. The jury also determined that the fair market value of the Well before the pipe failure was $5,900,000 and that its fair market value after the failure was $0.00. Finally, the jury found that Rippy Oil failed to pay KOT $361,356.87 in outstanding invoices.

**14.**

After Rippy Oil filed a Motion for Judgment on June 4, 2018, the court entered a Final Judgment against KOT for $5,538,643.13, plus $2,056,855.14 in interest through June 1, 2017, as well as an additional $758.72 per day until the day before the final judgment was signed, with additional 5% annually compounded post-judgment interest. *See*, Exhibit E.

**15.**

KOT filed a Motion to Disregard Certain Jury Findings and for Entry of Judgment and also a Motion for New Trial and Alternative Motion for Remittitur on July 3, 2018. *See*, Exhibit F; *see also*, Exhibit G. None of these motions were granted by the court.

### 16.

KOT appealed the Judgment to the Court of Appeals, Tenth District of Texas, Case No. 10-18-00284-cv. The appellate court affirmed the trial court's Judgment on December 30, 2020. *See*, Exhibit H. KOT moved for rehearing which was reaffirmed by the appellate court on November 10, 2021. *See*, Exhibit I.

### ACE's Policy

### 17.

ACE issued Commercial General Liability Policy No. HDO G24940214 to KOT for the policy period of March 31, 2010 to March 31, 2011. *See*, Exhibit J. The terms, conditions and exclusions of the ACE Policy are adopted herein by reference.

### 18.

The Policy is subject to a $1,000,000 per occurrence limit with a general aggregate limit of $10,000,000 and a product/completed operations aggregate limit of $2,000,000. Pursuant to Endorsement No. 2, the Policy is also subject to a $350,000 deductible which is subject to allocated loss adjustment expenses.

### 19.

Endorsement 37 of the ACE Policy, which modified Paragraph 1.a. of Section I of the Insuring Agreement, states in pertinent part:

A. Paragraph **1.a.** of **Section I – Coverages, Coverage A – Bodily Injury And Property Damage Liability** is replaced with the following:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage **A** or **B** or medical expenses under Coverage **C.** However, using up the Medical Expense Limit does not end our right and duty to defend.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**20.**

Paragraph 1.b. of Section I of the Insuring Agreement provides:

b. This insurance applies to "bodily injury" and "property damage" only if:

    (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    (2) The "bodily injury" or "property damage" occurs during the policy period; and

    (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**21.**

The ACE Policy contains the following exclusions:

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

. . .

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

. . .

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

. . .

**22.**

Endorsement 36 also modified the ACE Policy, stating in pertinent part:

> The **Legal Action Against Us** Condition (Section IV –
> Conditions) is replaced by the following.
>
> **Legal Action Against Us**
>
> A person or organization may bring a "suit" against us
> including, but not limited to, a "suit" to recover on an
> agreed settlement or on a final judgment against an
> insured; but we will not be liable for damages that are
> not payable under the terms of this Coverage Part or
> that are in excess of the applicable limit of insurance.
> An agreed settlement means a settlement and release
> of liability signed by us, the insured and the claimant
> or the claimant's legal representative.

### 23.

Additionally, the ACE Policy includes the following definitions:

> **8.** "Impaired property" means tangible property, other
> than "your product" or "your work", that cannot be
> used or is less useful because:
>
> **a.** It incorporates "your product" or "your work"
> that is known or thought to be defective, defi-
> cient, inadequate or dangerous; or
>
> **b.** You have failed to fulfill the terms of a contract
> or agreement;
>
> if such property can be restored to use by the re-
> pair, replacement, adjustment or removal of "your
> product" or "your work" or your fulfilling the terms
> of the contract or agreement.

> . . .

> **13.** "Occurrence" means an accident, including con-
> tinuous or repeated exposure to substantially the
> same general harmful conditions.

> . . .

**16.** "Products-completed operations hazard":

  **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    **(1)** Products that are still in your physical possession; or

    **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      **(a)** When all of the work called for in your contract has been completed.

      **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  **b.** Does not include "bodily injury" or "property damage" arising out of:

    **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

    **(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

. . .

**21.** "Your product":

   **a.** Means:

      **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         **(a)** You;

         **(b)** Others trading under your name; or

         **(c)** A person or organization whose business or assets you have acquired; and

      **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      **(2)** The providing of or failure to provide warnings or instructions.

   **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

"Your work":

   **a.** Means:

      **(1)** Work or operations performed by you or on your behalf; and

      **(2)** Materials, parts or equipment furnished in connection with such work or operations.

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

      **(2)** The providing of or failure to provide warnings or instructions.

## 24.

Endorsement 15 changed the ACE Policy by adding a "Professional Liability Exclusion," stating the following:

This insurance does not apply to any damages arising out of any professional services, including, but not limited to,

A. The rendering or failure to render:

1. Medical, surgical, dental, x-ray, nursing, or any other health service or treatment, or the related furnishing of food or beverages;

2. Any cosmetic, ear piercing, tonsorial, massage, physiotherapy, chiropody, hearing aid, optical or optometrical service or treatment;

3. Any legal advice or legal service;

4. Any service or advice relating to physical fitness, including services or advice in connection with diet, cardio-vascular fitness, body building or physical training program; or

5. Any accounting, architectural, or engineering service.

B. The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances; or

C. The handling or treatment of dead bodies and remains, including autopsies, organ donation or other procedures.

### 25.

Endorsement 23 changed the ACE Policy by adding a "Professional Liability Exclusion," stating the following:

> The following exclusion is added to Paragraph **2.,** **Exclusions** of Section I – Coverage A – **Bodily Injury And** Property **Damage Liability** and Paragraph **2., Exclusions** of Section I – Coverage **B – Personal And Advertising Injury Liability:**:
>
> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.
>
> Professional services include:
>
> **1.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
>
> **2.** Supervisory, inspection, architectural or engineering activities.

## REQUEST FOR DECLARATORY RELIEF

### 26.

The forgoing provisions, fully incorporated herein by reference, may preclude or limit coverage, and ACE avers that a real and justiciable controversy exists between ACE and KOT with respect to ACE's obligations under the Policy.

### 27.

Coverage under the ACE Policy's Coverage A (Bodily Injury and Property Damage Liability) is subject to the Policy's terms, conditions, exclusions, and endorsements.

### 28.

In pertinent part, the Policy's insuring agreement requires "bodily injury" or "property damage" caused by an "occurrence" or "accident" in order to trigger coverage. To the extent the alleged loss fails to meet these requirements, coverage is not triggered.

### 29.

The Policy excludes coverage for "property damage" expected or intended from the standpoint of the insured. To the extent KOT expected or intended any property damage, coverage is excluded under the ACE Policy.

### 30.

Pursuant to "Exclusion M. Damage to Impaired Property or Property Not Physically Injured," the Policy excludes coverage for claims of "property damage" to "impaired property" arising out of a defect in "[KOT's] product" or of KOT's failure to perform a contract in accordance with its terms. To the extent the alleged loss meets these criteria, Exclusion M is triggered and excludes coverage.

### 31.

By Endorsement No. 15, the ACE Policy excludes coverage for "any damages arising out of any professional services, including but not limited to . . . [a]ny accounting, architectural, or engineering service." To the extent the loss arises out of the negligent rendering of professional services as defined, coverage is excluded under the ACE Policy.

**32.**

By Endorsement No. 23, the ACE Policy excludes coverage arising out of the "rendering of or failure to render any professional services," including "preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and …supervisory, inspection, architectural or engineering activities." To the extent the loss arises out of the negligent rendering of professional services as defined, coverage is excluded under the ACE Policy.

**33.**

On informed belief, KOT contends or will contend that the Policy affords coverage for these claims.

**34.**

If the ACE Policy provisions set forth above preclude coverage, ACE will have no obligation to continue to participate in or pay for KOT's defense or to indemnify KOT in connection with the Judgment entered in in the Underlying Litigation.

**35.**

Nevertheless, ACE advised KOT that it would participate in KOT's defense, subject to a full reservation of rights, including the right to disclaim or deny coverage for the allegations against KOT in the Underlying Litigation.

## RELIEF REQUESTED

### 36.

An actual, present and existing controversy has arisen between ACE and KOT with respect to the existence and scope of ACE's indemnity and defense obligations, if any, in connection with the Underlying Litigation, making this a justiciable action.

### 37.

ACE is not a party to the Underlying Litigation.

### 38.

ACE seeks a judicial declaration of its rights and duties as to KOT with respect to the claims asserted in the Underlying Litigation.

### 39.

The requested declaration will confer certainty on the parties with respect to their rights and obligations under ACE's Policy. Upon presentation of due proof, ACE requests a judgment declaring whether there is coverage or coverage is excluded or limited with respect to the claims asserted in the Underlying Litigation. The requested declaration would serve the interests of justice.

### 40.

In addition to the foregoing provisions, ACE pleads all other conditions, terms, warranties, limits, definitions and exclusions of the Policy or other insurance policies or contracts which may be applicable, and reserves the right to amend its Complaint-in-Intervention for Declaratory Judgment as additional and/or more specific information becomes available.

**Considering the forgoing**, ACE prays for declaratory judgment as follows:

1. Whether ACE American Insurance Company Commercial General Liability Policy No. HDO G24940214 affords insurance coverage or coverage is excluded or limited for the matters asserted in the Underlying Litigation.

2. Whether ACE has a defense or indemnity obligation to KOT in connection with the Underlying Litigation.

3. For all such other and further relief as equity and the justice of this cause may require and permit, including attorney's fees and costs, to the extent permitted by law.

Respectfully submitted,

**BROWN SIMS, PC**

BY: */s/ Thear J. Lemoine*

Thear J. Lemoine (# 26383)
Gregory M. Burts (#39133)
1100 Poydras St., 39th Floor
New Orleans, LA 70163
P: (504) 569-1007
F: (504) 569-9255
E: *tlemoine@brownsims.com*
  *gburts@brownsims.com*
**Attorneys for ACE American Insurance Company**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served on all counsel of record by the court's electronic notification system, or by fax, email, United States Mail (postage prepaid) and/or hand delivery on February 10, 2022.

*/s/ Thear J. Lemoine*
Thear J. Lemoine

12/29/2021 2:02 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 60372053
By: Monica Jackson
Filed: 12/29/2021 11:36 AM

CAUSE NO. _____

| | | |
|---|---|---|
| RIPPY OIL COMPANY | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ACE AMERICAN INSURANCE | § | |
| COMPANY, CHARTIS SPECIALTY | § | |
| INSURANCE COMPANY N/K/A AIG | § | |
| INSURANCE COMPANY | § | |
| SPECIALTY INSURANCE COMPANY, | § | |
| AND RISK SPECIALISTS COMPANIES | § | |
| INSURANCE AGENCY, INC. | § | |
| *Defendants.* | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE AND JURY OF SAID COURT:

COMES NOW, Plaintiff Rippy Oil Company ("Rippy Oil"), on its own behalf, and on behalf of all working interest owners, to-wit: Rippy Interest, LLC, the Genecov Group, Inc. and John D. Proctor (hereinafter sometimes referred to as "Plaintiff Rippy Oil" or Plaintiffs) file this Original Petition against Defendant ACE American Insurance Company ("ACE"), Chartis Specialty Insurance Company, now known as, AIG Specialty Insurance Company ("AIG"), and Risk Specialists Companies Insurance Agency ("Risk Specialists"), and for cause of action would show the Court as follows:

### I.

### DISCOVERY PLAN

1.    Pursuant to Texas Rule of Civil Procedure 190.1, Plaintiff requests that this case be designated as a Level 3 case in accordance with the discovery control plan tailored to the circumstances of this specific suit.



EXHIBIT
A

2.     Pursuant to Texas Rule of Civil Procedure 194, Plaintiff requests that Defendants tender required disclosures pursuant to Texas Rules of Civil Procedure 194.1, 194.2, 194.3, and 194.4.

## II.

## PARTIES

3.     Plaintiff Rippy Oil Company is a Texas Corporation with its principal place of business in Tyler, Smith County, Texas. Rippy Oil Company brings suit on its own behalf and on behalf of all working interest owners, to wit: Rippy Interest, LLC, the Genecov Group, Inc. and John D. Proctor.

4.     Rippy Interest, LLC is a Texas limited liability company with its principal place of business in Tyler, Smith County, Texas.

5.     The Genecov Group, Inc. is a Texas corporation with its principal place of business in Tyler, Smith County, Texas.

6.     John D. Proctor is an individual residing in Tyler, Smith County, Texas.

7.     Defendant ACE American Insurance Company ("ACE") is a fire and casualty insurance company incorporated in the state of California, with its principal place of business in Pennsylvania. Defendant ACE is admitted, authorized, and licensed by the Texas Department of Insurance to write general liability insurance policies, providing commercial general liability insurance coverage in the state of Texas, including issuing general liability policy No. HDO G24940214, providing commercial general liability insurance coverage to Knight Oil Tools, Inc. now known as Knight Oil Tools, LLC and all its operations in Texas. Defendant ACE is engaged in the business of insurance in this state and designated an agent for service of process in Texas. Defendant ACE American Insurance Company may be served with process by serving

2

its designated registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136. Issuance of citation and service of process by certified mail, return receipt requested, is requested at this time.

8. Defendant Chartis Specialty Insurance Company, now known as, AIG Specialty Insurance Company ("Defendant AIG"), is an insurance company incorporated in the state of Illinois with its principal place of business in the state of New York. Defendant AIG is not admitted, authorized, or licensed to issue liability insurance in the state of Texas. On information and belief, Chartis Specialty Insurance Company, was not eligible in 2010 and 2011 to issue surplus lines liability insurance, including the surplus lines commercial general liability coverage, issued by policy No. BE 13074559 in Texas under Chapter 981 of the Texas Insurance Code and therefore was an unauthorized insurer. Defendant AIG nevertheless engaged in the business of insurance in this state, including issuing surplus lines commercial umbrella liability policy No. BE 13074559 providing surplus lines commercial general liability insurance coverage to Knight Oil Tools, Inc. now known as Knight Oil Tools, LLC. and all it operations in Texas. Defendant AIG's policy was issued through Patrick Dwayne David and Knox Insurance Agency Group LLC. On information and belief Mr. David was not a licensed surplus lines agent in Texas and Knox Insurance Agency Group LLC was not a licensed surplus lines agency in Texas. Defendant AIG is engaged in the business of insurance in this state, but has not designated an agent for service of process in Texas. Defendant AIG, as an ineligible and therefore unauthorized surplus lines carrier issuing policies in Texas, is deemed to have designated the Commissioner of Insurance of the Texas Department of Insurance as its agent for service pursuant to Texas Insurance Code 804.201. Indeed, Defendant AIG pursuant to Paragraph O titled "Service of Suit" under IV headed "Conditions" in its commercial umbrella liability policy

No. BE 13074559, agreed that service of process may be made upon Counsel, Legal Department, Chartis Specialty Insurance Company (now known as AIG Specialty Insurance Company), 175 Water Street, New York, New York 10038, or his or her representative. Further Defendant AIG agreed in Condition VI(O) headed "Service of Suit" to designate the Commissioner of Insurance as its true and lawful attorney upon whom may be served any lawful process and further designated the above-named counsel as the person to whom the Commissioner of Insurance of the Texas Department of Insurance is authorized to mail such process.

9.      Accordingly, Defendant AIG may be served with process by serving the Commissioner of the Texas Department of Insurance at 333 Guadalupe, Austin, Texas 78701, who is thereafter requested to mail process including Citation and this Petition to Counsel, Legal Department, Chartis Specialty Insurance Company, 175 Water Street, New York, New York 10038. Issuance of Citation and service of process by certified mail, return receipt requested, is requested at this time. The mailing address for Counsel, Legal Department, Chartis Specialty Insurance Company is 175 Water Street, New York, New York 10038 should be typed on the face of the Citation.

10.      Defendant Risk Specialists Companies Insurance Agency, Inc. ("Defendant Risk Specialists"), is a managing general agent incorporated in the state of Massachusetts with it principal place of business in Houston, Harris County Texas. Defendant Risk Specialists is engaged in the business of insurance in this state and designated an agent for service of process in the state of Texas. Defendant Risk Specialists may be served with process by serving its designated registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin Texas, 78701-3218. Issuance of citation and service of process by certified mail, return receipt requested, is requested at this time.

4

## III.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this lawsuit because the amount in controversy and damages sought are within the jurisdictional limits of this Court. Pursuant to Texas Rule of Civil Procedure 47(c), Plaintiffs seek monetary relief over $1,000,000.00. Additionally, the district court has residual jurisdiction of suits for declaratory relief pursuant to the Texas Uniform Declaratory Judgment Act set out in Tex. Civ. Prac. & Rem. Code §§ 37.001 – 37.011, as the amount in controversy is in excess of the minimum jurisdictional limits of this Court.  The Court has both general and specific personal jurisdiction over Defendants.    Defendant ACE is an authorized and admitted fire and casualty insurance carrier approved and licensed by the Texas Department of Insurance to issue general liability insurance policies with commercial general liability insurance coverage to Texas insureds and Louisiana insureds doing substantial business in the State of Texas like judgment debtor Knight Oil Tools, Inc. now known as Knight Oil Tools, LLC ("KOT"). Defendant AIG is not an authorized or admitted liability insurance carrier, but is currently an eligible surplus lines carrier subject to Chapter 981 of the Texas Insurance Code and regulation by the Texas Department of Insurance pursuant to Chapter 15 of the Texas Administrative Code.  Defendant AIG has issued surplus lines general liability insurance policies with commercial general liability coverage to Texas insureds and Louisiana insureds like KOT doing business in Texas.  Defendant ACE and AIG's business activities were purposefully directed to the state of Texas and the disputes between Plaintiff and Defendant ACE arise from and are related to those business activities, including defense of and indemnification of KOT pursuant to ACE policy No. HDO G24940214 and Chartis Specialty Insurance Company policy No. BE 13074559 in the underlying Texas state

5

court lawsuit brought by Plaintiff against KOT. Further, the contacts of Defendants ACE and AIG with Texas are purposeful, continuous, and systematic in that the insurance company Defendants have issued numerous liability insurance policies to multiple Texas insureds since they began conducting the business of insurance in Texas, including the issuance of general liability insurance policies with commercial general liability insurance coverage to KOT, who conducts business in the state of Texas.

12.     Venue is proper in Harris County, Texas pursuant to the provisions of Section 15.002(a)(3) of the Texas Civil Practice & Remedies Code as Defendant Risk Specialist has a principal office in Houston, Harris County, Texas as defined by Section 15.001(a). Venue is also proper in Harris County, Texas or in the alternative  Leon County, Texas pursuant to the provisions of Section 15.002(a)(1) of the Texas Civil Practice & Remedies Code because all or a substantial part of the events giving rise to this insurance dispute occurred in  Harris or Leon County, Texas. The surplus lines policy No. BE 13074559, issued on behalf of  Chartis Specialty Insurance Company, was bound and issued by Defendant Risk Specialists in Houston, Harris County Texas. The occurrence of property damage sustained by Plaintiffs occurred in Leon County, Texas. The underlying lawsuit asserting the claims of Plaintiff against Defendants ACE and AIG's named insured KOT, was filed in the 278th Judicial District Court of Leon County, Texas. Defendants ACE and AIG retained defense attorneys located in Houston, Harris County Texas and  directed the defense of KOT in Leon County, Texas.  A final judgment was entered in favor of Plaintiffs against KOT, in the 278th Judicial District Court of Leon County, Texas after a fully adversarial trial and jury verdict in favor of Plaintiff.  Subsequent to discharge from bankruptcy, KOT moved its principal office and principal place of business from Lafayette Louisiana to Houston, Harris County Texas.  Plaintiff, as judgment creditor and third-party

6

beneficiary of the Defendants ACE and AIG liability insurance policies in question, seek to recover the full amount of the final judgment entered in the 278th Judicial District Court of Leon County, Texas from Defendants ACE and AIG. Venue is also proper in Harris or Leon County, Texas pursuant to 15.005 of the Texas Civil Practice Remedies Code because Plaintiff has established proper venue against one or more of the Defendants in Harris or Leon County, and therefore Plaintiff has venue over all of the Defendants and all claims or actions arising out of the same transaction, occurrence, or series of transactions or occurrences. Finally, under IV "Conditions" Paragraph O, headed "Service of Suit," Defendant AIG agreed "in the event of our failure to pay any amount claimed to be due hereunder, we, at the insured's request, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Harris County or in the alterative Leon County, Texas District Courts qualify as courts of competent jurisdiction to which Defendant AIG has submitted to the jurisdiction.

IV.

<u>CHOICE OF LAW</u>

13. The dispute between Plaintiff and Defendants is directly related to policies of general liability insurance with commercial general liability insurance coverage issued by Defendants and concerns whether the policies of liability insurance are required to pay the final judgment obtained by Plaintiff against KOT. Plaintiff is a judgment creditor and third-party beneficiary under the policies issued by Defendants ACE and AIG. Defendant ACE's policy No. HDO G23740214 issued to KOT provides in pertinent part at Section IV headed "Commercial General Liability Conditions," Paragraph 3 titled "Legal Action Against Us," "a person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured".

14.     Likewise, Defendant AIG policy No. BE 13074559 issued to KOT provides in pertinent part at Section VI titled "Conditions," in Paragraph J that "a person or organization may sue us to recover on an agreed settlement or on a final judgment against an Insured;....". Plaintiff is a Texas company with its principal place of business in Texas that obtained a jury verdict and final judgment in Cause No. 0-10-498 styled Rippy Oil Company, et al. vs. Knight Oil Tools, Inc., et al., in the 278th Judicial District Court of Leon County, Texas, after a fully adversarial trial in which Defendants ACE and AIG hired Texas attorneys to vigorously defend and contest the allegations against Defendants ACE and AIG's named insured KOT. As a Texas judgment creditor of KOT and third-party beneficiary under the policies issued by Defendants ACE and AIG, Plaintiff brings a declaratory judgment and breach of contract action to recover the amount of the final judgment, interest and costs, from Defendants ACE and AIG under Texas law. Article 21.42 of the Texas Insurance Code provides:

(a) Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this state or at the home office of the company or corporation issuing same.

15.     The Texas Insurance Code therefore directs that Texas law applies when: (1) the insurance proceeds were paid or are payable to a citizen or inhabitant of Texas; (2) the policy was issued by a company doing business in Texas; and (3) the policy was issued in the course of the company's insurance business in Texas. Scottsdale Ins. Co. v. National Emergency Services,

Inc., 175 S.W.3d 284, 292 (Tex. App.—Houston [1st Dist.] 2004, no pet.). All three elements are met here.

16.     Additionally, Plaintiffs seek a declaration that Chartis Specialty Insurance Company policy No. BE 13074559 is unauthorized insurance pursuant to Texas Insurance Code §§ 981.103-981.105, 981.202-981.203, 981.211, 981.213 and 981.216. Anyone who assists in procuring unauthorized insurance like Defendant Risk Specialist is individually liable for unpaid claims under the policy pursuant to Texas Insurance Code §101.201. Likewise an unauthorized insurer cannot enforce policy exclusions in an attempt to avoid coverage pursuant to Texas Insurance Code §101.201

17.     Accordingly, Texas law governs this dispute between Plaintiff and Defendants.

## V.

## FACTUAL BACKGROUND

18.     KOT rents steel drill pipe delivered from storage facilities in Houston, Alice, and Odessa, Texas as well as Broussard, Louisiana and locations in other states. On or about May 11, 2010, Pioneer Drilling was utilizing the drill pipe rented, supplied and represented to have been API inspected and API Premium Class by KOT during normal drilling operations to finish drilling the horizontal leg of the Easterling No. 1-H well in Leon County, Texas. The drill pipe was being utilized on that date well within the capacity, capabilities, and operating parameters of API Premium Class drill pipe, when the drill pipe supplied by Defendant KOT catastrophically failed physically damaging and destroying a valuable portion of the Easterling No. 1-H well which prevented its completion and subsequent production of oil reserves from the target intervals Plaintiff had successfully penetrated with the Easterling No. 1-H well bore. Plaintiff made every effort to mitigate their damages by attempting to fish the failed drill pipe, separated

9

drill pipe string, bottom-hole assembly, and drill bit damaged and lost in the hole after notifying Defendant KOT of the drill pipe failure. Despite efforts to salvage the Easterling No. 1-H well, the jury found that the Easterling No. 1-H well could not be reproduced resulting in physical damage to and loss of well bore, the oil bearing formation the well bore had penetrated, and hydrocarbon reserves, the drilling equipment damaged and lost down hole and charged to Plaintiffs, all of which tangible property damage was caused by the failed drill pipe delivered by KOT. After days of technical evidence, in a fully adversarial trial, a jury found for Plaintiff Rippy Oil on all liability issues submitted. A true and correct copy of the jury's charge is attached hereto as Exhibit A.

19.     In response to Question 5 the jury found that Easterling No. 1-H well could not be reproduced finding that the KOT drill pipe failure ruined the well beyond repair and beyond the ability to replicate. In other words, the jury found that the Easterling No. 1-H well was totaled.

20.     If KOT had totaled someone's pickup, the measure of damages would have been the value before minus the value after: "The ordinary measure of damage for injury to property is the difference between the value of that damage before the damage was done and its value after injury…." *Texas & P. Ry. Co. v. Levi & Bro., 59 Tex. 674, 679 (1883); see Gilbert Wheeler, Inc. v. Enbridge Pipelines (E.Texas), L.P., 449 S.W.3d 474,481 (Tex. 2014)* .

The same concept applies to a lost oil and gas well, *i.e.* a well that cannot be reproduced:

> If the well cannot be reproduced or if the cost of reproduced exceeds the value of the well, the proper measure of damages is the difference in the reasonable cash market value of the well, as equipped, immediately before and immediately after the tubing collapse.

*Atex Pipe & Supply, Inc. v. Sesco Prod. Co., 736 S.W. 2d 914, 917 (Tex. App.—Tyler 1987, writ denied).*

This rule from *Atex* has been the law for years in Texas and remains good law today. *Dowell v. Cichowski*, 640 S.W.2d 342,350 (Tex. Civ. App. – San Antonio 1976, no writ); *Whitson Co. v. Bluff Creek Oil Co.*, 278 S.W.2d 339, 346 (Tex.Civ. App.–Fort Worth 1955), *aff's* 293 S.W. 2d488 (Tex. 1956); *Hazlewood Patterson Co. v. Hancock*, No. 10-03-00274-CV, 22004 WL 2903861, at*2 (Tex. App. –Waco Dec. 15, 2004. Pet. denied). *"Atex* sets forth the measure of damages for a damaged well."

21. All the evidence produced during the fully adversarial trial showed that the Easterling No. 1-H well was not reproducible as a result of the KOT drill pipe failure. KOT brought no witnesses who testified that the well could be reproduced. The jury found that KOT ruined the well- beyond repair and beyond the ability to replicate-so KOT and Defendants ACE and AIG justly ought to pay the value of the destroyed property which the jury found in Question 7 to be $5.9 million dollars.

22. The judge of the 278th entered a Final Judgment in Plaintiff Rippy Oil's favor against KOT in the amount of $5,538,643.13. Additionally, the Court awarded prejudgment interest on "these past damages in the amount of $2,056,885.14 through June 1, 2017 and an additional $758.72 per day until the day before final judgment was signed" on June 4, 2018. The Court further ordered that the Final Judgment would bear post-judgment interest at the rate of 5% compounded annually, from the date of the Final Judgment on June 4, 2018 until paid. A copy of the Final Judgment is attached as Exhibit B.

23. KOT had previously filed for Chapter 11 bankruptcy on August 8, 2017. Plaintiff Rippy Oil filed a Motion for an Order Granting Relief From the Automatic Stay in the bankruptcy court, which Motion was granted by then United States Bankruptcy Judge Robert Summerhays by Order signed October 24, 2017. A copy of the Bankruptcy Court's Order is

attached hereto as Exhibit C. As set out in the attached Order, the automatic stay was modified for the purpose of allowing the prosecution of the underlying lawsuit. The Order further allowed Plaintiff Rippy Oil to seek recovery on the claims asserted in the underlying lawsuit solely from applicable insurance policies of Defendant KOT and the other non-debtor defendants. The Order further set forth that Defendant KOT's liability in the underlying lawsuit and for any claims or causes of action that were or could have been raised in that lawsuit, shall be limited to the extent of any coverage provided by Defendant KOT's applicable insurance policies.

24.     KOT was a named insured on general liability insurance policies providing commercial general liability coverage to KOT in force and effect on the May 11, 2010 date of occurrence issued by ACE American Insurance Company ("ACE") policy No. HDO G24940214 and Chartis Specialty Insurance Company now known as AIG Specialty Insurance Company ("AIG") policy No. BE13074559. ACE and AIG retained attorneys to vigorously defend  KOT and contest Plaintiff Rippy Oil's claims, causes of actions, and damages in the above-captioned lawsuit through jury trial, verdict, and Final Judgment signed June 4, 2018. Plaintiff Rippy Oil believes on information and belief that just before, during, or shortly after the fully adversarial trial of this case, ACE tendered its policy limit of $1 Million to AIG, and that AIG accepted same. After the verdict and entry of Final Judgment, AIG retained attorneys to appeal the Final Judgment in favor of Plaintiff Rippy Oil against Defendant KOT.

25.     On December 30, 2020, the Waco Court of Appeals initially affirmed this Court's Final Judgment. The attorneys retained by AIG filed a Motion for Rehearing on behalf of Defendant KOT. On November 10, 2021, the Waco Court of Appeals once again affirmed this trial court's Final Judgment. A copy of the Waco Appellate Court's Opinion is attached hereto as Exhibit D.

26.     On December 7, 2021, AIG filed a Declaratory Judgment against KOT in the United States District Court for the Western District of Louisiana despite the fact that KOT principal office and principal place of business was by that date Houston, Harris County, Texas, seeking a Declaration that the AIG policy is not triggered until the limits of liability of the ACE policy had been exhausted by payment, as well as a Declaration that AIG has no coverage for KOT's liability under the Final Judgment. A true and correct copy of AIG's Complaint for Declaratory Judgment without exhibits is attached hereto as Exhibit E.

27.     KOT's Joint Chapter 11 Plan of Reorganization as of November 29, 2017 was confirmed December 1, 2017, KOT was previously discharged from bankruptcy, and the bankruptcy proceeding terminated on June 17, 2019. Based upon information and belief, Plaintiff Rippy Oil asserts that neither ACE, nor AIG asserted claims of no-coverage against KOT in Bankruptcy Court or otherwise attempted to reserve no-coverage defenses before KOT was discharged in bankruptcy. Although the ACE and AIG policies were produced in discovery as required by the Texas Rules of Civil Procedure, no denials of coverage letters or reservation of rights to deny coverage for ACE or AIG were produced by KOT or Defendants ACE and AIG. A true copy of the ACE and AIG policies produced by KOT and ACE in discovery pursuant to the Texas Rules of Civil Procedure, bates labeled Knight 000001 to Knight 000198, are attached as Exhibits F and G. Accordingly, it is doubtful that there is any case or controversy between Defendant KOT and AIG which is ripe for determination by the United States District Court for the Western District of Louisiana. On the other hand, it is clear that AIG's conduct in waiting until December 7, 2021 to attempt to deny coverage to Defendant KOT by filing and requesting a Declaratory Judgment that it has no coverage raises potential claims and causes of action by KOT of estoppel and waiver and for breach of the AIG policy contract, breach of the

common law duty of good faith and fair dealing, violations of Chapter 541 and 542 of the Texas Insurance Code, and violations of the Texas Deceptive Trade Practice Act. It is unknown at this point whether KOT intends to vigorously defend AIG's allegations as KOT has not been served in the Declaratory Judgment action pending in the United States District Court for the Western District of Louisiana. Likewise, it is further unknown at this time whether KOT has entered into a fraudulent and collusive agreement or understanding with AIG to buy back the policy or otherwise to lay down and not vigorously defend the AIG Declaratory Judgment action in an effort to prevent Plaintiff Rippy Oil from satisfying the Final Judgment from the ACE and AIG policy proceeds. To prevent any fraudulent or collusive agreement between KOT and AIG, Plaintiff Rippy Oil intends to file an Application for Turnover Order pursuant to Section 32.001 of the Texas Civil Practice & Remedies Code in the 278th Judicial District Court of Leon County Texas where the Final Judgment was entered.

28.      Since being discharged from bankruptcy KOT currently operates its drill pipe rental business at its principal office and principal place of business in Houston, Harris County, Texas.

VI.

## BREACH OF CONTRACT AGAINST DEFENDANTS ACE & AIG

29.      Plaintiff Rippy Oil Company incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

30.      Plaintiff Rippy Oil has standing to sue ACE and AIG under their policies issued to named insured and judgment debtor KOT, as a judgement creditor after a fully adversarial jury trial defended by ACE and AIG, favorable jury verdict, and final judgment ( see Supra, paragraphs 18 to 22 and Exhibits A and B) and third-party beneficiary under the ACE and AIG

policies ( see Supra, paragraphs 13 and 14 and Exhibits G and F). Under the ACE and AIG policies, Defendants ACE and AIG had a duty to defend and indemnify and protect KOT against the property damage claims asserted by the Plaintiffs against named insured KOT in the underlying lawsuit by paying those sums that the insured KOT becomes legally obligated to pay as damages because of property damage to which their respective policies apply. (Exhibit G, Knight 000009; Exhibit F, Knight 000112). Pursuant to the ACE and AIG policies, Defendants ACE and AIG have an obligation to pay Plaintiff Rippy Oil as judgment creditor of KOT and third-party beneficiary under the ACE and AIG policies up to their respective policy limits to satisfy the final judgment in favor of Plaintiff Rippy Oil against KOT (Exhibit F, Knight 000019; Exhibit G, Knight 000126).

31.     KOT made proper notification to and demand for coverage, defense and indemnification upon Defendant ACE and AIG. KOT has complied with all necessary conditions and other terms of the policies or is otherwise excused from the performance of those conditions and terms on the basis of waiver and/or estoppel. All conditions precedent to coverage under the ACE and AIG policies have been performed.

32.     Defendant ACE and AIG's liability policies provide coverage for KOT against all property damage claims asserted against KOT by Plaintiffs and no exclusions apply or the exceptions to those exclusions apply to bring the property damage claims back within the policies coverage. The burden of proof is on Defendants ACE and AIG to establish that any exclusion or limitation of coverage applies. See Texas Insurance Code § 554.002.

33.     Both the ACE and AIG policies provide coverage for an "occurrence" causing "property damage", meaning injury to tangible property. See *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23-24 (Tex. 2008). There can be no doubt that physical

damage to and loss of the Easterling No. 1-H well bore, the oil bearing formation the well bore had penetrated, and the oil reserves from that formation are in fact injury to tangible property.

34. Both the ACE and AIG policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions (Exhibit F, Knight 000022; Exhibit G, Knight 000133)." An accident is generally understood to be a fortuitous, unexpected, and unintended event. See *Lamar Homes, Inc. v. Mid-Continental Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007). There can be no doubt that the catastrophic failure of the KOT drill pipe and resulting injury to Plaintiffs' tangible property was a fortuitous, unexpected, and unintended event from the point of view of both Plaintiff Rippy Oil and KOT and conclusively qualifies as an "occurrence" of property damage.

35. Both the ACE and AIG policies define "property damage" to mean:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

There is likewise no doubt that after a fully adversarial jury trial in which the defense of KOT was controlled by Defendants ACE and AIG, the jury in the underlying lawsuit returned a verdict and findings that demonstrate conclusively an "occurrence" causing "property damage", meaning injury to tangible property. Defendants ACE and AIG are bound by the findings by the jury in the underlying lawsuit which verdict became the basis of the final judgment in favor of Plaintiff Rippy Oil against KOT. See *Getty Oil Co., Inc. v. Ins. Co. of N. Am.*, 845 S.W. 2d 794, 802 (Tex. 1992).

36. The duty to indemnify owed by Defendants ACE and AIG means that ACE and AIG are obligated to "pay all covered claims and judgments against an insured (KOT)". See *D.R. Horton—Texas v. Markel Intern. Ins.*, 300 S.W. 3d 740, 743 (Tex. 2009).

37. Defendants ACE and AIG breached their policies by wrongfully denying coverage to KOT including indemnification against and payment of the final judgment in favor of Plaintiff Rippy Oil for property damages resulting from the failure of KOT's drill pipe.

38. As a proximate result of Defendant ACE's breach of contract, Plaintiff Rippy Oil has been damaged in an amount in excess of the minimum jurisdictional limits of the Court.

39. As a proximate result of Defendants' breach of contract, Plaintiff Rippy Oil has been required to retain attorneys and incur fees and expenses to prosecute its rights as a judgment creditor and third party beneficiary including asserting the claims in this action. Plaintiff Rippy Oil has previously made demand on Defendants ACE and AIG to satisfy the final judgment in its favor against KOT but Defendants ACE and AIG refused to do so. Accordingly, Rippy Oil seeks to recover all attorneys' fees and expenses to prosecute this breach of contract cause of action against Defendants pursuant to Tex. Civ. Prac. & Rem. Code § 38.001

## VII.

## DAMAGES

40. As a result of Defendant ACE and AIG's breach of their policies of liability insurance to indemnify KOT and pay Plaintiff Rippy Oil's final judgment against KOT up to the policy limits of the ACE and AIG policies, Plaintiffs have suffered damages in the full amount of the final judgment plus post judgment interest until the final judgment is paid in full.

41. As a proximate result of Defendant ACE and AIG's breach of contract, Plaintiff Rippy Oil has been required to retain attorneys and incur fees and expenses to prosecute its rights

and recover its damages. Plaintiff has previously presented its demands to Defendants including demands for satisfaction of the final judgment. Accordingly, Plaintiff Rippy Oil seeks to recover all attorneys' fees and expenses to prosecute its breach of contract calls of action against Defendant pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code

## VIII.

## DEFENDANT RISK SPECIALIST IS INDIVIDUALLY LIABLE FOR UNPAID CLAIMS UNDER THE AIG POLICY

42.     Plaintiff Rippy Oil Company incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

43.     Defendant AIG's policy issued by Chartis Specialty Insurance Company is a surplus lines policy and Defendant AIG is an unlicensed carrier in the state of Texas and therefore an unauthorized insurer subject to regulation under the Texas Insurance Code. See *Mid-American Indemnity Insurance Co. v. King*, 22 S.W. 3d 321, 326 (Tex. 1995); *Lexington Insurance Company v. Strayhorn*, 209 S.W. 3d 83 (Tex. 2006).

44.     Both the surplus lines and unauthorized insurance statutes include among their purposes a concern that many insureds in this state hold insurance policies issued by insurers who are not authorized to do business in this state and who are not qualified as eligible surplus lines insures under Chapter 981 of Texas Insurance Code. See Texas Insurance Code §§ 101.001 (b) and 981.001 (b). Accordingly, a licensed surplus lines agent and eligible surplus lines carrier are mandatory prerequisites for issuance of all surplus lines policies covering Texas risks. Texas Insurance Code §§ 981.002 (3), 981.004 (a). Failure to meet the statutory requirements renders Defendant AIG surplus lines policy unauthorized insurance. Moreover anyone who assists in procuring unauthorized insurance is individually liable for unpaid claims under the policy. See Texas Insurance Code §§ 981.103-981.105, 981.202-981.203, 981.211, 981.213, & 981.216; §

18

101.201. Moreover, an unauthorized insurer cannot enforce its policies while an eligible surplus line carrier may do so except in cases of a material and intentional Texas Insurance Code violation. See Texas Insurance Code § 101.201; § 981.005. Unauthorized insurers cannot even defend themselves in Texas without filing a bond. See Texas Insurance Code §§ 101.352-101.354.

45.     Defendant Risk Specialist is a Houston, Texas located and domiciled managing general agent who bound and issued Chartis Specialty Insurance Company policy No. BE 130774459. Defendant Risk Specialist assisted Patrick DeWayne David and Knox Insurance Agency Group, LLC with procuring the Chartis Specialty Insurance Company policy in question to cover KOT including KOT's Texas based facilities, business, and liability risks. On information and belief, Mr. David was not a licensed surplus lines agent in Texas and Knox Insurance Agency Group, LLC was not a licensed surplus agency in Texas and Defendant Risk Specialist did not comply with the requirements of Chapter 981 and the Texas Administrative Code Chapter 15.

46.     Accordingly, Defendant Risk Specialist is individually liable for any unpaid claims under the Chartis Specialty Insurance Company policy in question.

## IX.

## DECLARATORY JUDGMENT AGAINST DEFENDANTS

47.     Against all Defendants, Plaintiff Rippy Oil alleges the following cause of action.

48.     Plaintiff Rippy Oil incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

49.     Pursuant to Tex. Civ. Prac. & Rem. Code, Chapter 37, Plaintiff Rippy Oil as judgment creditor of KOT under the June 4, 2018 final judgment and third party beneficiary

under the ACE and AIG policies requests that the Court declare rights, status and other legal relations as between Plaintiff Rippy Oil and Defendants under the liability insurance policies and applicable Texas Insurance Code provisions with respect to coverage for, indemnity against, and payment of the final judgment in Plaintiff Rippy Oil's favor against KOT after a fully adversarial trial controlled by Defendants ACE and AIG and jury verdict in favor of Plaintiff Rippy Oil.

50.   Specifically, Plaintiff Rippy Oil requests a declaration that:

a.   KOT is a named insured under Defendant ACE's Policy No. HDO G 24940214 and Defendant AIG Policy No. BE 13074559 entitled to coverage for defense, indemnification against, and payment of the final judgment signed and entered on June 4, 2018 in favor of Plaintiff Rippy Oil against KOT;

b.   Property damage claims caused by an occurrence asserted and established by Plaintiff Rippy Oil against KOT after a fully adversarial trial, jury verdict, and final judgment are covered under the provisions of Defendant ACE's policy No. HDO G 24940214 and Defendant AIG's policy No. BE 13074559;

c.   No exclusions or endorsements in the ACE and AIG policies apply to deny coverage to KOT or payment of the final judgment entered June 4, 2018 in favor of Plaintiff Rippy Oil, including exclusions D and K or endorsements 10, 24, or 28;

d.   Defendants ACE and AIG waived conditions in their policies and are estopped to assert same;

e.   Chartis Specialty Insurance Company is an unauthorized insurer and Chartis Specialty Insurance Company policy No. BE 13074559 is unauthorized insurance under the Texas Insurance Code and Defendant AIG is prohibited from asserting exclusions or limitations of coverage contained in the unauthorized policy pursuant to Texas Insurance Code § 101.201;

f.   Chartis Specialty Insurance Company materially and intentionally violated the Texas Insurance Code Chapter 981 and / or Chapter 225 in issuing Chartis Specialty Insurance Company policy No. BE 13074559;

g.  Defendant AIG is required to put up a bond to defend Plaintiffs claims and causes of action in Court pursuant to Texas Insurance Code §§ 101.352 – 101.354;

h.  Defendant Risk Specialists assisted directly and / or indirectly in the procurement of Chartis Specialty Insurance Company policy No. BE 13074459 and is liable for the full amount of a claim or loss under the terms of the policy if Defendant AIG fails to pay the full amount of the June 4, 2018 final judgment to Plaintiff Rippy Oil.

51.  Plaintiff Rippy Oil further requests a declaration that it is entitled to court costs, together with reasonable and necessary attorneys' fees as are equitable and just, pursuant to Tex. Civ. Prac. & Rem. Code § 37.009 and for such other declaratory judgment or decree as may be necessary and proper.

## X.

## SELF-AUTHENTICATION OF DOCUMENTS

52.  Pursuant to Texas Rule of Civil Procedure 193.7, Plaintiffs hereby gives notice of its intent to utilize documents produced by Defendants at pre-trial proceedings and at trial as self-authenticated documents.

## XI.

## DEMAND FOR JURY

53.  Pursuant to Texas Rule of Civil Procedure 216(a), Plaintiffs respectfully requests a trial by jury. A jury fee is being paid by Plaintiff simultaneously with this request for jury trial.

## XII.

## CONCLUSION AND PRAYER

54.  Plaintiffs respectfully requests that Defendants be cited to appear and answer, and that upon final jury trial, Plaintiff have judgment against Defendants for all relief requested.

Further, Plaintiffs seek an award of reasonable attorneys' fees as well as pre-judgment and post-judgment interest at the maximum rate allowed by law together with taxable court costs.

55.     Finally, Plaintiffs demand a judgment for such other and further relief, whether in law or at equity, to which it shows itself justly entitled.

Respectfully submitted,

**LAW OFFICE OF KENNETH TEKELL, SR. PLLC**

By: *_Kenneth Tekell Sr._
            Kenneth Tekell, Sr.
            State Bar No. 19764000
            ktekell@balagiatekell.com
            6 Broad Oaks Lane
            Houston, Texas 77056
            Telephone: 713-823-6558

* Signed by Mike Morris with permission

**TAYLOR, BOOK, ALLEN & MORRIS, L.L.P.**

By: _Mike Morris_
            Mike Morris
            State Bar No. 14495800
            1221 McKinney, Suite 4300
            Houston, Texas 77010
            (713) 222-9542
            (713) 655-7727 - Fax
            mmorris@taylorbook.com

ATTORNEYS FOR PLAINTIFFS,
RIPPY OIL COMPANY INDIVIDUALLY
AND ON BEHALF OF ALL WORKING
INTEREST OWNERS, TO-WIT: RIPPY
INTEREST, LLC, THE GENECOV GROUP,
INC. AND JOHN D. PROCTOR

22

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Denise Nesbitt on behalf of Michael Morris
Bar No. 14495800
dnesbitt@taylorbook.com
Envelope ID: 60372053
Status as of 12/29/2021 3:21 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Morris | | mmorris@taylorbook.com | 12/29/2021 2:02:38 PM | SENT |

Filed 10/20/2016 4:49:37 PM
Beverly Wilson
District Clerk
Leon County, Texas
Alex Earley

NO. 0-10-498

| | | |
|---|---|---|
| RIPPY OIL COMPANY, RIPPY INTEREST LLC,THE GENECOV GROUP, INC., And JOHN D. PROCTOR, | § § § § | IN THE DISTRICT COURT OF |
| PLAINTIFFS | § § | |
| VS. | § § | LEON COUNTY, TEXAS |
| KNIGHT OIL TOOLS, INC., And PIONEER DRILLING COMPANY, | § § § | |
| DEFENDANTS | § | 278th JUDICIAL DISTRICT |

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, RIPPY OIL COMPANY ("RIPPY OIL") on its own behalf, and on behalf of all working interest owners, to-wit: Rippy Interest LLC; and The Genecov Group, Inc., and John D. Proctor (hereinafter sometimes referred to as Plaintiffs) complaining of KNIGHT OIL TOOLS, INC. now known as Knight Oil Tools LLC ("KNIGHT OIL TOOLS") and PIONEER DRILLING COMPANY ("PIONEER") hereinafter sometimes referred to as Defendants, and for cause of action, would show the Court the following:

I.

### DISCOVERY PLAN

Plaintiffs request that the discovery in this case be conducted under Level 3.

II.

### PARTIES



EXHIBIT
B

Plaintiff, RIPPY OIL, is a Texas corporation with its principal place of business in Tyler, Smith County, Texas. Rippy Oil brings suit on its own behalf and on behalf of all working interest owners, to-wit: Rippy Interest LLC; The Genecov Group, Inc., and John Procter.

Plaintiff, RIPPY INTEREST LLC, is a Texas limited liability company with its principal place of business in Tyler, Smith County, Texas.

Plaintiff, THE GENECOV GROUP, INC., is a Texas corporation with its principal place of business in Tyler, Smith County, Texas.

Plaintiff, John D. Proctor, is an individual residing in Tyler, Smith County, Texas.

Defendant, KNIGHT OIL TOOLS, INC., now KNIGHT OIL TOOLS LLC, (Knight Oil Tools) is a Louisiana corporation and now a limited liability company authorized by the Texas Secretary of State to do business in Texas and doing business in Texas. Knight Oil Tools' principal place of business in Texas is Houston, Harris County, Texas. Knight Oil Tools can be served with process by serving its registered agent Timothy R. Brown at 333 Clay Street, Suite 3300, Houston, Texas 77002. Defendant Knight Oil Tools, Inc has made an appearance and is being served with this First Amended Petition by serving its attorney of record.

Defendant, PIONEER DRILLING COMPANY, (Pioneer Drilling) is a Texas corporation with its principal place of business in Texas and can be served with process by serving its registered agent CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Dallas County, Texas 75201. Defendant Pioneer Drilling Company has made an appearance and is being served with this First Amended Petition by serving its attorney of record.

III.

## JURISDICTION AND VENUE

This Court has jurisdiction over the subject matter of this lawsuit because the amount in controversy is in excess of the minimal jurisdictional limits of the Court. The Court has personal jurisdiction over Defendants, because they have purposely availed themselves of the privileges and benefits of conducting business in Texas pursuant to §17.042 of the Texas Civil Practice & Remedies Code, have engaged in business in Texas by providing services to Texas residents, which services were to be performed in whole or in part in Texas, and the cause of action made the basis of this suit arises out of Defendants' contacts with and in the state of Texas.

Venue is proper in Leon County, Texas pursuant to the provisions of §§ 15.001, 15.002(a)(1) of the Texas Civil Practice & Remedies Code because Leon County is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred.

IV.

## FACTUAL SUMMARY

At all times mentioned below, Plaintiff Rippy Oil Company was, and is now, engaged in the oil and gas business, including the exploration, drilling, and production of hydrocarbons.

At all times mentioned below, Defendant Knight Oil Tools was, and is now, engaged in the business of providing drilling services including supplying drill pipe and inspection services through its wholly owned, supervised, and captured in-house inspection division Robinson Tubular Services Inc., a Knight Oil Tools company, which merged effective April 4, 2011 into Knight Oil Tools LLC the successor in interest to Knight Oil Tools Inc. which was also merged into Knight Oil Tools LLC in April 2011. Knight Oil Tools LLC assumed all liabilities and obligations of Robinson Tubular

3

Services Inc. and Knight Oil Tools Inc. in April 2011 including liabilities for the drill pipe failure made the basis of this lawsuit.

At all times mentioned below, Defendant Pioneer Drilling was, and is now, engaged in the business of providing drilling services including the use of drill pipe.

Heretofore, Defendants provided Plaintiff certain drilling services, sales, and rentals including the supplying and rental of drill pipe by Defendant Knight Oil Tools for which Defendants have invoiced Plaintiffs in excess of the minimum jurisdictional limits of this Court. Plaintiffs sought the drilling services and drill pipe for use in their well known as the Easterling No. 1-H well located in Leon County, Texas. The Easterling No. 1-H well was one of the first of a multi-well program planned for the Aguila Vado (Eagleford Shale) Field discovered by Rippy Oil Company which comprised approximately 14,000 acres in Leon County. Plaintiffs acquired its mineral acreage at an average cost well below the mineral acreage costs subsequent to Plaintiffs successful discover of the Aguila Vado Field.

The drill pipe supplied and delivered by Defendant Knight Oil Tools to Plaintiffs for utilization by drilling contractor, Defendant Pioneer Drilling, was represented to be API inspected, API Premium Class, 3 ½" O.D. 13.30-PPF Grade S-135 drill pipe with API Premium Class IF or NC38 tool joints designated by center punch mark on pin upset and two white bands around pin end pipe body and accompanying inspection report (hereinafter "drill pipe" or "drill pipe in question"), that was safe, suitable, and fit for use in the horizontal drilling of Plaintiffs' well. Indeed, after allegedly performing the appropriate API inspection pursuant to API Recommended Practice 7G and/or 7G - 2, Defendant Knight Oil Tools marked the drill pipe in question as API Premium with one center punch and two painted double white bands only and no other color paint band or bands

4

on the drill pipe tool joint. Defendant Knight Oil Tools also represented that drill pipe including tool joints had been inspected. Drill pipe marked with one center punch and painted with two double white bands conveys a well established industry representation to users of drill pipe in the oil and gas business that the drill pipe including tool joints, has been inspected and found to be API Premium Class. Defendant Knight Oil Tools knew or in the exercise of ordinary care should have known that one center punch and two painted double white bands conveyed and represented to the user that the drill pipe in question was API inspected and API Premium Class and met certain qualities, characteristics, and capacities that made the drill pipe suitable for use in drilling horizontal wells. Defendant Knight Oil Tools knew that Plaintiffs' drilling consultant and Defendant Pioneer Drilling would be relying on the one center punch and/or double white bands and accompanying inspection papers as a representation that the drill pipe in question was API inspected and API premium class drill pipe, that was safe, suitable, and fit for use in the horizontal drilling of Plaintiffs' well.

At the time the drill pipe was distributed and supplied, Defendants knew or had reason to know the purpose for which Plaintiffs sought the drill pipe and drilling services and that Plaintiffs were relying on Defendants to furnish drill pipe and drilling services suitable and fit for that purpose.

On or about May 11, 2010, Defendant Pioneer Drilling was utilizing the drill pipe supplied and represented to have been API inspected and API Premium Class by Defendant Knight Oil Tools during normal drilling operations and well within the capacity of API Premium Class drill pipe. The drill pipe was being utilized well within the capacity, capabilities, and operating parameters of API Premium Class drill pipe, when the drill pipe supplied by Defendant Knight Oil Tools catastrophically failed, destroying a valuable portion of the Easterling No. 1-H well which prevented

its completion and subsequent production of oil reserves from the target intervals Plaintiffs had successfully penetrated with the Easterling No. 1-H well bore. Plaintiffs made every effort to mitigate their damages by attempting to fish the failed drill pipe, separated drill pipe string, bottom-hole assembly, and drill bit damaged and lost in the hole after notifying Defendant Knight Oil Tools of the drill pipe failure. Despite efforts to salvage same, Plaintiffs could not reproduce the Easterling No. 1-H well with resulting loss of well bore and hydrocarbon reserves, and drilling equipment damaged and lost down hole and charged to Plaintiffs, all of which caused Plaintiffs to suffer damages set forth below in excess of the minimum jurisdictional limits of this Court.

## V.

## NEGLIGENCE AND NEGLIGENT MISREPRESENTATION

Plaintiffs would incorporate the factual allegations set forth in Paragraph IV under "Factual Summary." Defendants were negligent in the selection, inspection, labeling, marking, distribution, representation, and use of the drill pipe in question. Defendants' negligence was a proximate cause of Plaintiffs' damages. Discovery is continuing, and Plaintiffs cannot more specifically allege the specific acts of negligent inspection, distribution, representation, and utilization of the drill pipe in question on the part of Defendants at this time because facts in that regard are particularly within the knowledge of Defendant Knight Oil Tools before delivery of the drill pipe (and after its return) and Defendant Pioneer Drilling after delivery of the drill pipe to the Easterling No. 1-H well-site. In the alternative, in the event Plaintiffs are unable to prove specific acts of negligent inspection, distribution, representation, and utilization of the drill pipe in question, Plaintiffs rely on the doctrine of *res ipsa loquitur*. In this connection, Plaintiffs would show that the character of the occurrence giving rise to this litigation is such that it would not have happened in the absence of negligence, and

the inspection, supply, distribution, representation, and use of the drill pipe in question was within the exclusive control of Defendants at the time the negligence probably occurred.

Additionally, Defendant Knight Oil Tools initially represented that it would supply API inspected, API Premium Class drill pipe to Plaintiffs. Defendant Knight Oil Tools undertook to obtain and provide API inspected and API Premium Class drill pipe. Defendant Knight Oil Tools failed to exercise reasonable care to secure API inspected and API Premium Class drill pipe, that was safe, suitable, and fit for use in the horizontal drilling of Plaintiffs' well. Indeed, the drill pipe supplied by Defendant Knight Oil Tools was not properly API inspected or labeled, was not API Premium Class, had undersized O.D. and I.D. tool joints that also exceeded maximum I.D. for API Premium Class drill pipe, and was excessively worn, corroded, pitted, and cracked before it arrived at the Easterling No. 1-H well-site which rendered the drill pipe unsafe, unsuitable, and unfit for the use of the horizontal drilling of Plaintiffs' well. Defendant Knight Oil Tools knowingly supplied Plaintiffs with false and/or misleading information, including but not limited to, the fact that the drill pipe was API inspected and API Premium Class as signified by the false inspection papers, one center punch mark, and painted double white bands on each joint of drill pipe delivered to the well-site including the drill pipe that failed. Plaintiffs relied on the representation and undertaking by Defendant Knight Oil Tools in using the drill pipe. Defendant Knight Oil Tools did not exercise reasonable care or competence in selecting, inspecting, marking, labeling, representing, or communicating information about the drill pipe. If the drill pipe had been as represented by Defendant Knight Oil Tools, Plaintiffs would not have suffered the damages Plaintiffs suffered. The negligence and negligent misrepresentation of Knight Oil Tools in this regard and to be proved at trial was a proximate cause of Plaintiffs' damages.

Moreover, Defendant Pioneer Drilling undertook to visually inspect the drill pipe in question before using same and to notify Plaintiffs of any apparent defects therein. Defendant Pioneer Drilling failed to notify Plaintiffs of any visual defects in the drill pipe in question until after the drill pipe had failed in the well. After the drill pipe failure, it was determined that the drill pipe supplied by Defendant Knight Oil Tools was not properly API inspected or labeled, was not API Premium Class, had undersized O.D. and I.D. tool joints that also exceeded the maximum I.D. for API Premium Class drill pipe and was excessively worn, corroded, pitted, and cracked which rendered the drill pipe unsafe, unsuitable, and unfit for use in the horizontal drilling of Plaintiffs' well. Defendant Pioneer Drilling represented that it would perform a visual inspection of the drill pipe in question. Plaintiffs relied on the representation and undertaking by Defendant Pioneer Drilling. If Defendant Pioneer had discharged its representation and undertaking, Plaintiffs would not have suffered the damages Plaintiffs suffered. Defendant Pioneer Drilling's negligence and negligent misrepresentation in this regard was a proximate cause of Plaintiffs' damages including amounts Defendant Knight Oil Tools seeks to recover from Plaintiffs.

Defendants' negligence and negligent misrepresentation as set out above was a proximate cause of injury to Plaintiffs, which resulted in the following damages: cash market value damages for destruction of that portion of the Easterling No. 1-H well which is the market value of the well less any salvage value, because reproducing that portion of the well is impossible and the cost would exceed its value due to the irreparable damage occasioned to that portion of the well. In the alternative, should the trier of fact find that the Easterling No. 1-H well could be reproduced, Plaintiffs are entitled to recover the reasonable and necessary cost to reproduce the Easterling No. 1-H well. Additionally, Defendants' negligence and negligent misrepresentation proximately caused

direct and/or consequential damages including the loss of the Easterling No. 1-H lateral well bore and hydrocarbon reserves, the additional drilling costs incurred following the drill pipe separation, and the total loss of the drill bit, bottom-hole assembly, and other rental equipment lost down hole all of which damages were legally caused by the drill pipe failure and Defendants' breach of legal duties owed Plaintiffs.

VI.

STRICT LIABILITY/ PRODUCT LIABILITY

Plaintiffs would incorporate the factual allegations set forth in Paragraph IV under "Factual Summary," and the causes of action asserted in Paragraph V under "Negligence and Negligent Misrepresentation."

Defendant Knight Oil Tools engaged in the business of designing, manufacturing, constructing, rebuilding, fabricating, processing, assembling, and marketing drill pipe for use (by drilling contractors, mineral interest owners, and operators) in drilling oil and gas wells including lateral on horizontal wells.

The drill pipe in question that was placed in the stream of commerce and distributed by Defendant Knight Oil Tools was defective and unsafe for its intended purpose at the time it left the control of Defendant Knight Oil Tools and at the time it was delivered to Plaintiffs' well-site. The drill pipe in question was defective in that it failed to conform to its design, specifications, and represented qualities and characteristics, was not properly API inspected or labeled, was not API Premium Class, had undersized O.D. and I.D. tool joints that also exceeded the maximum I.D. for API Premium Class drill pipe and was excessively worn, corroded, pitted, and cracked which rendered the drill pipe unsafe, unsuitable, unfit, and unreasonably dangerous for use in drilling of

9

Plaintiffs' well. The drill pipe in question was in the same or substantially same condition at the time it failed as it was when it was originally distributed by Defendant Knight Oil Tools to the Easterling No. 1-H well-site.  Defendant Knight Oil Tools' defective drill pipe was the producing cause of Plaintiffs' damages: cash market value damages for destruction of that portion of the Easterling No. 1-H well which is the market value of the well less any salvage value, because reproducing that portion of the well is impossible and the cost would exceed its value due to the irreparable damage occasioned to that portion of the well. In the alternative, should the trier of fact find that the Easterling No. 1-H well could be reproduced, Plaintiffs are entitled to recover the reasonable and necessary cost to reproduce the Easterling No. 1-H well. Additionally, Defendants' negligence and negligent misrepresentation proximately caused direct and/or consequential damages including the loss of the Easterling No. 1-H lateral well bore and hydrocarbon reserves, the additional drilling costs incurred following the drill pipe separation, and the total loss of the drill bit, bottom-hole assembly, and other rental equipment lost down hole all of which damages were legally caused by the drill pipe failure and Defendants' breach of legal duties owed Plaintiffs.

Moreover, although Defendant Knight Oil Tools was not the manufacturer of the drilling pipe in question, Defendant Knight Oil Tools is a "manufacturer" as defined by § 82.001(4) and is nevertheless liable for product liability under Chapter 82 of the Texas Civil Practice & Remedy Codes as a "seller" pursuant to § 82.001(3). Specifically, Defendant Knight Oil Tools as seller is liable to Plaintiffs pursuant to § 82.003(a)(2), (4), (5), (6) and (7).

10

## VI.

## BREACH OF EXPRESS WARRANTY OF GOODS

Plaintiffs would incorporate the factual allegations set forth in Paragraph IV under "Factual Summary." Defendant Knight Oil Tools distributed, sold, rented, and/or otherwise placed in the stream of commerce for commercial purposes and use by Plaintiffs the above-described drill pipe. Defendant Knight Oil Tools made a representation to Plaintiffs about the quality of the drill pipe. Specifically, Defendant Knight Oil Tools represented that the drill pipe supplied and utilized in drilling the Easterling No. 1-H well was API inspected, API Premium Class drill pipe that was safe, suitable, and fit for use in the horizontal drilling of Plaintiffs' well. Among other representations, Defendant Knight Oil Tools marked the drill pipe and distributed same with one center punch mark and double white painted bands only. Defendant Knight Oil Tools also presented a false inspection report with delivery of the drill pipe.

Defendant Knight Oil Tools made the representation as an affirmation of fact. Moreover, Defendant Knight Oil Tools possessed superior knowledge and it is an actionable statement of fact when made, as it was here, by Defendant Knight Oil Tools who knew, or should have known, Plaintiffs were justifiably relying on its superior knowledge. The drill pipe did not comply with Defendant Knight Oil Tools' representations in that the drill pipe was not properly API inspected or labeled and was not API Premium Class, but instead had undersized O.D. and I.D. tool joints that also exceed the maximum I.D. and was excessively worn, corroded, pitted, and cracked, which was a breach of Defendant Knight Oil Tools' express warranty. Plaintiffs notified Defendant Knight Oil Tools of the breach of the express warranty.

11

Defendants' breach of warranty directly and proximately caused injury to Plaintiffs, which resulted in the following damages: cash market value damages for destruction of that portion of the Easterling No. 1-H well which is the market value of the well less any salvage value, because reproducing that portion of the well is impossible and the cost would exceed its value due to the irreparable damage occasioned to that portion of the well. In the alternative, should the trier of fact find that the Easterling No. 1-H well could be reproduced, Plaintiffs are entitled to recover the reasonable and necessary cost to reproduce the Easterling No. 1-H well. Additionally, Defendants' breach of warranty proximately caused direct and/or consequential damages including the loss of the Easterling No. 1-H lateral well bore, hydrocarbon reserves, the additional drilling costs incurred following the drill pipe separation, and the total loss of the drill bit, bottom-hole assembly, and other rental equipment lost down hole all of which damages were legally caused by the drill pipe failure and Defendant Knight Oil Tools' breach of express warranty.

VII.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE

Plaintiffs would incorporate the factual allegations set forth in Paragraph IV under "Factual Summary". In the alternative, Plaintiffs would show that Defendant Knight Oil Tools was a seller and distributor of the drill pipe rented and distributed to Plaintiffs.

The drill pipe was unmerchantable when Defendants tendered it to Plaintiffs because it was not properly API inspected or labeled and was not API Premium Class, but instead had undersized O.D. and I.D. tool joints, that also exceeded the maximum I.D. for API Premium

12

Class drill pipe and was excessively worn, corroded, pitted, and cracked, to the extent that it would not withstand customary drilling activity, with the operational capacity of API Premium Class drill pipe, which is a breach of implied warranty of merchantability.

Plaintiffs notified Defendants of the breach of the warranty of merchantability.

Defendants' breach of implied warranty of merchantability directly and proximately caused injury to Plaintiffs, which resulted in the following damages: cash market value damages for destruction of that portion of the Easterling No. 1-H well, which is the market value of the well less any salvage value, because reproducing that portion of the well is impossible and the cost would exceed its value due to the irreparable damage occasioned to that portion of the well. In the alternative, should the trier of fact find that the Easterling No. 1-H well could be reproduced, Plaintiffs are entitled to recover the reasonable and necessary cost to reproduce the Easterling No. 1-H well. Additionally, Defendants' breach of warranty proximately caused direct and/or consequential damages to include the loss of the Easterling No. 1-H lateral well bore, hydrocarbon reserves, the additional drilling costs incurred following the drill pipe separation, and the total loss of the drill bit, bottom-hole assembly, and other rental equipment lost down hole all of which damages were legally caused by the drill pipe failure and Defendant Knight Oil Tools' breach of warranty.

Further, Defendant Knight Oil Tools distributed the drill pipe in question knowing that Plaintiffs sought the drill pipe for use in drilling its well. Defendant Knight Oil Tools knew that Plaintiffs were relying on Defendant Knight Oil Tools' skill or judgment to select, inspect, and classify drill pipe fit for API Premium Class designation, identified by one center punch and double white bands, for the intended purpose. Defendants delivered and utilized drill pipe that

13

was not properly API inspected and labeled; was not API Premium Class as noted above; was not acceptable or worthy to receive one center punch and be painted with double white bands only; and was so defective and flawed because of excessive wear, corrosion, pitting, and cracking that the drill pipe was unfit for use in any drilling including horizontal drilling.

Plaintiffs notified Defendants of the breach of the warranty of fitness for a particular purpose.

Defendants' breach of implied warranty of fitness for a particular purpose directly and proximately caused injury to Plaintiffs, which resulted in the following damages:

Cash market value damages for destruction of that portion of the Easterling No. 1-H well, which is the market value of the well less any salvage value, because reproducing that portion of the well is impossible and the cost would exceed its value due to the irreparable damage occasioned to that portion of the well. In the alternative, should the trier of fact find that the Easterling No. 1-H well could be reproduced, Plaintiffs are entitled to recover the reasonable and necessary cost to reproduce the Easterling No. 1-H well. Additionally, Defendant Knight Oil Tools' breach caused direct and/or consequential damages to include the loss of the Easterling No. 1-H lateral well bore and hydrocarbon reserves, the additional drilling costs incurred following the drill pipe separation, and the total loss of the drill bit, bottom-hole assembly, and other rental equipment lost down hole all of which damages were legally caused by the drill pipe failure and Defendant Knight Oil Tools' breach of warranty of merchantability and fitness for a particular purpose.

# VIII.

## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

Plaintiffs incorporate herein by reference the factual allegations contained in the preceding Paragraphs V, VI, VII, as well as those allegations set forth in Paragraph IV under "Factual Summary".

Defendant Knight Oil Tools engaged in certain false, misleading and deceptive acts, practices and/or omissions actionable under the Texas Deceptive Trade Practices - Consumer Protection Act (Tex. Bus. & Comm. Code § 17.41 et. seq.) as alleged herein.

Defendants violated § 17.46(b) of the Texas Business & Commerce Code in that Defendants:

a.   represented that goods (drill pipe) were of a particular standard, quality or grade, or that goods are  of a particular style or model , when they are of another;

b.   represented that goods (drill pipe) had approval, characteristics or uses that they did have not have;

c.   failed to disclose information about goods (drill pipe) that was known at the time of the transaction with the intention to induce Plaintiff into a transaction it otherwise would not have entered into if the information had been disclosed for the benefit of others, including the Plaintiffs;

d.   caused confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services. (drill pipe and inspection of same).

As described above in Paragraphs V, VI, and VII, these acts, practices and/or omissions by Defendant Knight Oil Tools were false, misleading and deceptive.  As previously described, Plaintiffs relied upon all of these acts, practices, and/or omissions to their detriment, and they were a producing cause of damages to Plaintiffs.

15

Moreover, Defendant Knight Oil Tools have violated Texas Business & Commerce Code § 17.50 by breaching the express and implied warranties described above in Paragraphs VI and VII.

The acts, practices, and/or omissions made by Defendant Knight Oil Tools and the warranties breached by Defendant Knight Oil Tools were a producing cause of Plaintiffs' damages in an amount in excess of the minimum jurisdictional limits of this Court.

The acts, practices and/or omissions made by Defendant Knight Oil Tools as described above were committed knowingly. Defendant Knight Oil Tools was actually aware, at the time of their conduct, of the falsity and deception about which Plaintiffs are complaining. Moreover, Defendant Knight Oil Tools were aware of the conditions, defects or failures which constitute the breaches of warranties described above.

Plaintiffs would further assert the applicability of Section 17.42 of the Texas Business and Commerce Code and that any attempt by Defendant Knight Oil Tools to assert waiver release, limitation of liability, indemnity, or other alleged exculpatory defenses are contrary to public policy, unenforceable, and void.

Defendant Knight Oil Tools' violation of the Texas Deceptive Trade Practices Act was a proximate and/or producing cause of injury to Plaintiffs which resulted in the following damages: cash market value damages for destruction of that portion of the Easterling No. 1-H well which is the market value of the well less any salvage value, because reproducing that portion of the well is impossible and the cost would exceed its value due to the irreparable damage occasioned to that portion of the well. In the alternative, should the trier of fact find that the Easterling No. 1-H well could be reproduced, Plaintiffs are entitled to recover the reasonable and necessary cost to

16

reproduce the Easterling No. 1-H well. Additionally, Defendants' violation of the Texas

Deceptive Trade Practices Act was a producing and/or proximate cause of direct and/or

consequential damages including the loss of the Easterling No. 1-H lateral well bore and

hydrocarbon reserves, the additional drilling costs incurred following the drill pipe separation,

and the total loss of the drill bit, bottom-hole assembly, and other rental equipment lost down

hole all of which damages were legally caused by the drill pipe failure and Defendant Knight Oil

Tools' violations of the Texas Deceptive Trade Practices Act.

IX.

<u>GROSS NEGLIGENCE</u>

Plaintiffs would incorporate the factual allegations set forth in Paragraph IV under

"Factual Summary" and Paragraph V under "Negligence and Negligent Misrepresentation."

Plaintiffs would further show that the conduct of Defendants when viewed objectively

from Defendants' stand point at the time of the conduct, involved an extreme degree of risk,

considering the probability and magnitude of the potential harm to others, and Defendants were

actually, subjectively aware of the risk involved, but nevertheless proceeding with conscious

indifference to the rights, safety, or welfare of others.  As a result of Defendants' gross

negligence, Plaintiffs are entitled to punitive and/or exemplary damages pursuant to Chapter 41

of the Texas Civil Practice & Remedies Code. Moreover, exemplary damages are not capped in

this case as Defendant Knight Oil Tools violated § 41.008(c)(11) of the Texas Civil Practice &

Remedies Code and § 32.46 of the Texas Penal Code by securing execution of a document by

deception.

17

X.

BREACH OF CONTRACT

Plaintiffs would incorporate the factual allegations set forth in Paragraph IV under

"Factual Summary." In the alternative, and without waiving the causes of action plead above in

Paragraphs V, VI, VII, VIII, and IX, Plaintiffs would assert that Defendant Knight Oil Tools and

Defendant Pioneer Drilling agreed to provide certain drilling goods and/or services, including the

supplying of drill pipe represented to be API inspected and API Premium Class drill pipe. The

drill pipe in question failed under normal and customary drilling activity within the represented

capacity of API Premium Class drill pipe. Defendants knew that Plaintiffs were relying on

Defendants' skill or judgment to properly select, inspect, label, represent, and deliver drill pipe

fit for the intended purpose. Defendants selected, inspected, labeled, delivered, represented, and

utilized drill pipe that was not API inspected; was not API Premium Class; was misrepresented

as double white band with one center punch mark when in fact it had undersized O.D. and I.D.

tool joints, that also exceeded the maximum I.D. for API Premium Class pipe and was so

excessively worn, corroded, pitted, and cracked that the drill pipe was unfit for use in horizontal

drilling and should never have been marked with one center punch mark and painted as double

white band API Premium Class drill pipe and delivered to the Easterling well-site. Defendants

breached its agreement with Plaintiffs. As a proximate cause of said breach, Plaintiffs have been

damaged in excess of the minimum jurisdictional limits of this Court including: cash market

value damages for destruction of that portion of the Easterling No. 1-H well which is the market

value of the well less any salvage value, because reproducing that portion of the well is

impossible and the cost would exceed its value due to the irreparable damage occasioned to that

18

portion of the well. In the alternative, should the trier of fact find that the Easterling No. 1-H well

could be reproduced, Plaintiffs are entitled to recover the reasonable and necessary cost to

reproduce the Easterling No. 1-H well. Additionally, Defendants' breach of contract proximately

caused direct and/or consequential damages including the loss of the Easterling No. 1-H lateral

well bore and hydrocarbon reserves, the additional drilling costs incurred following the drill pipe

separation, and the total loss of the drill bit, bottom-hole assembly, and other rental equipment

lost down hole all of which damages were legally caused by the drill pipe failure and Defendant

Knight Oil Tools' breach of contract.

XI.

FRAUD

Plaintiffs would incorporate the factual allegations set forth in Paragraph IV under

"Factual Summary" and Paragraphs VII, VIII, and IX. Defendant Knight Oil Tools made false

representations by representing that the drill pipe was API inspected and by classifying the drill

pipe in question as API Premium Class. Moreover, Defendant Knight Oil Tools fraudulently

represented the drill pipe was API Premium Class by use of one center punch mark and double

white bands only on each joint drill pipe delivered to the Easterling No. 1-H well site

accompanied by a false inspection report when in fact the drill pipe in question was not API

Premium Class and could not be classified as API Premium Class. These representations were

material and false in that had the drill pipe been properly inspected and marked it would not have

been classified API premium and marked with one center punch mark and painted with a double

white band only.  When Defendant, Knight Oil Tools, made this representation, they knew the

representation was false or made the representation recklessly, as a positive assertion, without

19

knowledge of its truth.  Likewise, Defendant Knight Oil Tools made the representation with the intent that Plaintiffs act on it.  Plaintiffs relied on the representations to their detriment in that had the drill pipe in question been properly inspected and classified it would not have been marked with one center punch mark and double white bands only or otherwise accompanied by a false inspection report and would not have been used in the drilling of Plaintiffs' well.  As a proximate cause of Defendants' fraud, Plaintiffs have been damaged in excess of the minimal jurisdictional limits of this Court including:  cash market value damages for destruction of that portion of the Easterling No. 1-H well which is the market value of the well less any salvage value, because reproducing that portion of the well is impossible and the cost would exceed its value due to the irreparable damage occasioned to that portion of the well. In the alternative, should the trier of fact find that the Easterling No. 1-H well could be reproduced, Plaintiffs are entitled to recover the reasonable and necessary cost to reproduce the Easterling No. 1-H well. Additionally, Defendants' fraud proximately caused direct and/or consequential damages including the loss of the Easterling No. 1-H lateral well bore and hydrocarbon reserves, the additional drilling costs incurred following the drill pipe separation, and the total loss of the drill bit, bottom-hole assembly, and other rental equipment lost down hole all of which damages were legally caused by the drill pipe failure and Defendant Knight Oil Tools' fraud.

XII.

AIDING AND ABETTING, CIVIL CONSPIRACY,

CONCERT OF ACTION, SPOLIATION, AND SUCCESSOR LIABILITY

Defendant Knight Oil Tools, and its employees, agents, and representatives had a duty to exercise reasonable care and judgment in its inspection of the drill pipe in question to ensure it

20

complied with API specifications including API Recommended Practice 7G or 7G-2 or other applicable industry guidelines for certifying API Premium Class drill pipe that would be safe, suitable or fit for the use as intended. Defendant Knight Oil Tools failed to exercise reasonable care and judgment in the selection, assessment, evaluation, inspection, and representations of the condition of the drill pipe in question. As a result, Defendant Knight Oil Tools delivered excessively worn, corroded, pitted, and cracked drill pipe that was negligently, falsely, fraudulently, and/or deceptively marked as API Premium Class drill pipe when it was not API Premium Class and should have never been delivered to the Easterling No. 1-H drill site. Moreover, Defendant Knight Oil Tools measured and recorded minimum O.D .numbers on numerous joints of drill pipe including the joint of drill pipe that failed which did not meet O.D. minimums or I.D. maximums for tool joints required by API Premium Class certification and industry standards. Further, had Defendant Knight Oil Tools properly performed a standard API Recommended Practice 7G or 7G-2 inspection, the drill pipe that failed would not have been classified as API Premium Class, would have been accompanied by proper inspection papers instead of the false inspection report that was delivered, and would not have been used in the Easterling No. 1-H well. Despite failing to perform the API recommended practice 7G or 7G-2 inspection, Robinson Tubular Services, Defendant Knight Oil Tools' wholly owned, controlled, and supervised in-house inspection service, which was not an independent third party inspection service, with Defendant Knight Oil Tools knowledge, approval, and ratification, nevertheless, placed one center punch mark on pin upset and painted double white bands on the drill pipe in question representing to all foreseeable users that the drill pipe was API Premium Class when it was not. Plaintiffs believe that Defendant Knight Oil Tools and its wholly owned, controlled, and

21

supervised in-house inspection service Robinson Tubular Services, a Knight Oil Tools company, which was merged into Knight Oil Tools LLC in April 2011, entered into an agreement to misrepresent a mixed string of different weight, worn out, corroded, pitted, and cracked drill pipe, as API inspected, API Premium Class, utilizing one center punch mark and double white bands only, when in fact the drill pipe in question was not fit to be classified as API Premium Class, double white banded drill pipe. Following its failure, Defendant Knight Oil Tools has conspired to cover up the evidence that the drill pipe in question was not API inspected, API Premium Class, double white banded drill pipe. Accordingly, Defendant Knight Oil Tools is responsible for the acts of the others including Knight Oil Tools wholly owned, controlled, and supervised in-house inspection service Robinson Tubular Services, a Knight company, that were done in the furtherance of the common purpose to cover up the misrepresentation of the drill pipe in question.

Moreover, such conduct constitutes spoliation and Plaintiffs would request an appropriate spoliation instruction at the time this case is submitted to the jury.

Subsequent to the drill pipe failure and filing of this suit, Knight Oil Tools Inc. and Robinson Tubular Services Inc. were merged into Knight Oil Tools LLC which assumed the liabilities and obligations of Knight Oil Tools Inc. and Robinson Tubular Services Inc. Knight Oil Tools Inc., now Knight Oil Tools LLC, is the named insured on the policies of liability insurance produced by Defendant Knight Oil Tools in this case in response to Request for Disclosures.

22

XIII.

DAMAGES

Plaintiffs would incorporate the factual allegations set forth in Paragraph IV under "Factual Summary," and the causes of action asserted in Paragraphs V, VI, VII, VIII, IX, X, XI, and XII.

As a result of Defendants' strict liability/ product liability, breach of warranty, negligence, negligent misrepresentation, violations of the Texas Deceptive Practices Act, gross negligence, breach of contract, and fraud as set out in Paragraphs V through XII, Plaintiffs have suffered damages in excess of the minimal jurisdictional limits of this Court to include:

a. General damages;

b. Special damages;

c. Actual damages;

d. Incidental and consequential damages;

e. Cash-market value of the Easterling No. 1-H well and hydrocarbon reserves;

f. Out-of-pocket damages including the loss of the Easterling No. 1-H lateral well bore and the cost of the drill bit, bottom-hole assembly, and other rental equipment damaged, lost, and/or destroyed down hole;

g. Loss of use damages;

h. Mitigation damages including the cost to attempt to fish the drill pipe that separated along with the drill pipe string, bottom-hole assembly, and drill bit;

i. Loss profits;

j. Repair and/or replacement damages;

23

k.     Damages to the Easterling No. 1-H well lease and/or loss of reservoir and/or reservoir damage and lost hydrocarbon reserves; or in the alternative, the cost to reproduce the Easterling No. 1-H well;

l.     Additional or treble damages permitted under the Texas Deceptive Treble Practices Act;

m.     Punitive and/or exemplary damages as allowed by law;

n.     Reasonable and necessary attorneys' fees and costs through trial and on appeal;

o.     Pre-judgment interest and post-judgment interest as permitted by law; and

p.     Taxable court costs.

## XIV.

## ATTORNEYS' FEES

This is the type of action against Defendant Knight Oil Tools that gives rise to attorneys' fees and, therefore, Plaintiffs would further show that it was necessary to employ the services of The Krist Law Firm, P.C. and the firm of Tekell, Book, Allen & Morris, L.L.P. and specifically, Ronald D. Krist and Mike Morris, in order to assert their claim again Defendants. Accordingly, Plaintiffs seek to recover attorneys' fees, expenses, and costs pursuant to Tex. Civ. Prac. & Rem. Code. §38.001 and Section 17.50(d) of the Texas Deceptive Trade Practices Act to prosecute this matter to conclusion through trial and on appeal.

## XV.

## CONDITIONS PRECEDENT

Pursuant to Texas Rule of Civil Procedure 54, Plaintiffs aver generally that all conditions precedent have been performed or have occurred.

## XVI.

## SELF-AUTHENTICATION

Pursuant to Texas Rule of Civil Procedure 193.7, Plaintiffs hereby give actual written notice that all documents produced in this litigation shall be used by the Plaintiffs at pre-trial proceedings and trial. Hence, all documents produced in this litigation are deemed self-authenticating for use in any pre-trial proceeding or at trial; and any objections thereto by the Defendants shall be in writing or placed on the record, giving Plaintiffs a reasonable opportunity to establish the challenged documents authenticity.

## XVII.

## RESERVATION OF RIGHTS

Plaintiffs fully reserve the right to amend or supplement this petition to add additional causes of action, parties and/or claims as discovery continues.

## XVIII.

## MONETARY RELIEF REQUESTED

Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs seek monetary relief over $1,000,000. Plaintiffs would state that the actual, exemplary, and/or additional damages awarded Plaintiffs are within the sound discretion of the trier of fact. Pursuant to Defendants special exceptions and request under Texas Rule of Civil Procedure 47(d), Plaintiffs seek a maximum amount of direct and consequential economic and actual damages, excluding pre-judgment and post-judgment interest, attorneys' fees and costs, not to exceed $11,239,642; additional damages not to exceed three times the amount of economic damages found; and/or

25

exemplary damages to be awarded as a penalty or by way of punishment, in the discretion of the jury not to exceed $30,000,000.

## XIX.

## JURY REQUEST

Plaintiffs request a jury trial of this matter and have accordingly paid the proper fee with the filing of Plaintiffs' Original Petition and continue to demand a jury trial pursuant to Texas Rule of Civil Procedure 216.

## XX.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that Defendants be cited to appear and answer, and that on final trial, Plaintiffs have:

(1)    judgment against Defendants for all direct and consequential economic and actual damages, exemplary damages, and/or additional damages in a sum in excess of the minium the jurisdictional limits of this Court;

(2)    pre-judgment and post-judgment interest at the maximum rate permitted by law;

(3)    costs of court;

(4)    attorneys' fees and expenses litigation through trial and on appeal; and

(5)    such other and further relief to which Plaintiffs may be justly entitled.

Respectfully Submitted,

THE KRIST LAW FIRM, P.C.

BY: _Ronald D Krist_

RONALD D. KRIST
State Bar No. 11727000

26

Marina View Building
2600 South Shore Blvd., Suite 120
League City, Texas 77573
(281) 283-8500
(281) 488-3489 - Fax

TEKELL, BOOK, ALLEN & MORRIS, L.L.P.

BY: _Mike Morris_

MIKE MORRIS
State Bar No. 14495800
1221 McKinney, Suite 4300
Houston, Texas 77010-2010
(713) 222-9542
(713) 655-7727  - Fax

ATTORNEYS FOR PLAINTIFFS, RIPPY OIL
COMPANY, RIPPY INTEREST LLC, THE
GENECOV GROUP, INC., and JOHN PROCTER



**SO ORDERED.**

**SIGNED October 24, 2017.**

**ROBERT SUMMERHAYS**
**UNITED STATES BANKRUPTCY JUDGE**

---

### UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 17-51014 |
| | § | |
| KNIGHT ENERGY HOLDINGS, LLC, | § | CHAPTER 11 |
| *et al.*,[1] | § | |
| | § | |
| DEBTORS. | § | |
| | § | |

### <u>AGREED ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY</u>

Upon consideration the Motion for an Order Granting Relief From the Automatic Stay

(Doc. 357) (the "<u>Motion</u>"), filed herein by Rippy Oil Company, Rippy Interests LLC, The Genecov

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Knight Energy Holdings, LLC (1930) (Case No. 17-51014); Knight Oil Tools, LLC (2667) (Case No. 17-51015); Knight Manufacturing, LLC (0600) (Case No. 17-51016); KDCC, LLC, f/k/a Knight Well Services, LLA (4156) (Case No. 17-51017); Tri-Drill, LLC (4957) (Case No. 17-51018); Advanced Safety & Training Management, LLC (0510) (Case No. 17-51019); Knight Security, LLC (0923) (Case No. 17-51020); Knight Information Systems, LLC (0000) (Case No. 17-51021); El Caballero Ranch, Inc. (7345) (Case No. 17-51022); Rayne Properties, LLC (0000) (Case No. 17-51023); Knight Aviation, LLC (3329) (Case No. 17-51024); Knight Research & Development, LLC (3760) (Case No. 17-51025); Knight Family Enterprises, LLC (7190) (Case No. 17-51026); HMC Leasing, LLC (0814) (Case No. 17-51027); and HMC Investments, LLC (0000) (Case No. 17-51029. The Debtors' service address is 2272 SE Evangeline Thruway, Lafayette, Louisiana 70508, except for Knight Manufacturing, LLC, which can be served at 2710-A Melancon Road, Broussard, Louisiana 70518, and Advanced Safety and Training Management, LLC, which can be served at 1042 Forum Drive, Broussard, Louisiana 70518

**EXHIBIT C**

Group, Inc., and John D. Proctor (together, "Rippy Oil"), the agreement of the Debtors to the relief requested therein, and the Court finding that: (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. § 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) proper and adequate notice of the Motion has been given and no other or further notice is necessary; and (iv) upon the record herein after due deliberation thereon, good and sufficient cause exists for the granting of the relief as set forth herein; therefore:

IT IS ORDERED that the Motion is GRANTED.

IT IS FURTHER ORDERED that the automatic stay be and is hereby modified as to Knight Oil Tools, LLC (the "Subject Debtor") for the limited purpose of allowing the prosecution of the case captioned as *Rippy Oil Company, et al. v. Knight Oil Tools, Inc., et al.,* No. 0-10-498, pending in the 369th Judicial District Court in Leon County, Texas (the "Proceeding").

IT IS FURTHER ORDERED that Rippy Oil shall seek recovery on the claims asserted in the Proceeding solely from applicable insurance policies of the Subject Debtor and the other non–Debtor defendants; it is further

IT IS FURTHER ORDERED that the Subject Debtor's liability in the Proceeding, and for any claims or causes of action that were or could have been raised in the Proceeding, shall be limited to the extent of any coverage provided by the Subject Debtor's applicable insurance policies.

IT IS FURTHER ORDERED that except as expressly provided herein, no collection action shall be commenced against the Subject Debtor without prior order of this Court.

IT IS FURTHER ORDERED that Rippy Oil may seek and conduct such discovery involving the Subject Debtor as allowed by the applicable rules of civil procedure, local rules and scheduling orders in the Proceeding.

IT IS FURTHER ORDERED that nothing herein (i) alters or amends the terms and conditions of any insurance policies issued to the Debtor by ACE American Insurance Company or any of its affiliates or successors (collectively, "Chubb") or any related agreements; (ii) relieves the Debtors of any obligations to Chubb to pay any retentions or to pay (or reimburse Chubb for) any deductibles; (iii) relieves the Debtors of any of their other obligations to Chubb under the insurance policies and related agreements; (iv) creates or permits a direct right of action by Rippy Oil against Chubb that would not otherwise exist under applicable law; or (v) precludes or limits, in any way, any rights of Chubb to contest and/or litigate the existence, primacy and/or scope of available coverage.

###

This Agreed Order was prepared and is being submitted by:

 _/s/ Benjamin W. Kadden_
Benjamin W. Kadden (La. Bar. No. 29927)
LUGENBUHL, WHEATON, PECK,
     RANKIN & HUBBARD
601 Poydras St., Suite 2775
New Orleans, Louisiana 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195

_Attorneys for Rippy Oil Company, Rippy Interests LLC,
The Genecov Group, Inc., and John D. Proctor_

 _/s/ Tristan Manthey_
**Heller, Draper, Patrick, Horn & Dabney, L.L.C.**
William H. Patrick, III (La. Bar. No. 10359)
Tristan Manthey (La. Bar. No. 24539)
Cherie Dessauer Nobles (La. Bar. No. 30476)
650 Poydras St., Suite 2500
New Orleans, Louisiana 70130-6175
Telephone: (504) 299-3300
Facsimile: (504) 299-3399

_Attorneys for the Debtors_

{00360226-2}3

DM3\4872250.1

## CAUSE NO. O-10-498

| | | |
|---|---|---|
| RIPPY OIL COMPANY, RIPPY INTEREST LLC, THE GENECOV GROUP, INC., AND JOHN D. PROCTOR, | § § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § | |
| | § | LEON COUNTY, T E X A S |
| VS. | § § | |
| KNIGHT OIL TOOLS, INC. AND PIONEER DRILLING COMPANY, | § § | |
| *Defendants.* | § | 278th JUDICIAL DISTRICT |

FILED
BEVERLY WILSON, DISTRICT CLERK
LEON COUNTY, TEXAS
MAY 10 2010
BY

## CHARGE OF COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.



EXHIBIT
D

1.     Do not let bias, prejudice, or sympathy play any part in your decision.

2.     Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3.     You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.     If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.     All the questions and answers are important. No one should say that any question or answer is not important.

6.     Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

7.     Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.     Do not answer questions by drawing straws or by any method of chance.

9.     Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.     Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.     Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

# DEFINITIONS

"Occurrence": in the questions, below "occurrence" means the drill pipe separation that occurred on the Easterling No. 1-H well on May 11, 2010.

"Knight Oil Tools" includes its employees and, Robinson Tubular Services and its employees.

"Rippy Oil Company" includes Rippy Oil Company, and its agents, employees, or consultants, including Leo Wiggins and Larry Elkins.

"Gyrodata" means Gyrodata, and its agents and employees.

# QUESTION 1

Did Knight Oil Tools breach the implied warranty of fitness for a particular purpose, and, if so, was such breach a proximate cause of the occurrence in question?

A warranty that the goods are fit for a particular purpose is implied at the time of contracting if -

1. Knight Oil Tools had reason to know the particular purpose for which the drill pipe was required; and

2. Knight Oil Tools had reason to know that Rippy Oil Company was justifiably relying on Knight Oil Tools' skill and judgment to furnish suitable drill pipe.

There is a breach of an implied warranty of fitness for a particular purpose if at the time of lease, the drill pipe supplied by Knight Oil Tools was unfit for the particular purpose for which the drill pipe was leased.

"Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

Answer "Yes" or "No."

Answer: _Yes_

## QUESTION 2

Did Knight Oil Tools make a negligent misrepresentation with respect to the condition of the drill pipe at issue, on which Rippy Oil Company justifiably relied and was the proximate cause of the occurrence in question?

Negligent misrepresentation occurs when—

　　1.　　a party makes a representation in the course of his business; and

　　2.　　the representation supplies false information for the guidance of others in their business; and

　　3.　　the party making the representation did not exercise reasonable care or competence in obtaining or communicating the information.

"Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

A person may not justifiably rely on a representation if there is information indicating such reliance is unwarranted.

Answer "Yes" or "No."

　　Answer: ___yes___

## **QUESTION 3**

Did the negligence, if any, of those named below proximately cause the occurrence in question?

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Proximate cause" means a cause, unbroken by any new and independent cause, that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

"New and independent cause" means the act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence.

You are instructed that the occurrence of an accident is not of itself evidence of negligence.

Answer "Yes" or "No" for each of the following:

1.   Rippy Oil Company                          NO

2.   Gyrodata                                           NO

If you answered "Yes" to Question 1 or 2 and "Yes" to one or more entities in Question 3, then answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found caused or contributed to cause the occurrence in question. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

## **QUESTION 4**

For each person you found caused or contributed to cause the occurrence, find the percentage of responsibility attributable to each:

| | | | |
|---|---|---|---|
| 1. | Knight Oil Tools | _____ | % |
| 2. | Rippy Oil Company | _____ | % |
| 3. | Gyrodata | _____ | % |
| | *Total* | _____100_____ | % |

## QUESTION 5

Was the Easterling No. 1-H well capable of being reproduced by drilling another well as it existed at the time of the occurrence in question?

Answer "Yes" or "No."

Answer: __ND_____

## QUESTION 6

What would have been the reasonable and necessary costs of drilling and equipping the Easterling 2-H well in the condition the Easterling 1-H well was equipped before the occurrence in question less the salvage value?

Do not include in your answer any amount that you find Rippy Oil Company could have avoided by the exercise of reasonable care. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any:

a. The reasonable and necessary drilling and equipping costs for the Easterling No. 2-H well.

Answer: __1.5 Million__

If you answered "Yes" to Question 1 or 2 as to Knight Oil ~~Company~~ Tools HER, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 7

What is the reasonable fair market value of the Rippy Oil Company's Easterling 1-H well immediately before the occurrence in question and immediately after the occurrence in question and proximately caused by the occurrence in question?

"Fair market value" means the price a willing seller not obligated to sell can obtain from a willing buyer not obligated to buy.  Do not include interest on any amount of damages you find.

Answer each question in dollars and cents, if any.

**a. Before the occurrence in question.**

Consider only evidence of fair market value immediately prior to the time of the occurrence, not at any time after the occurrence. Do not consider evidence from wells not in the same field and formation as the Easterling No. 1-H well.

Answer:  _5.9 Million_

**b. After the occurrence in question.**

Consider only evidence of fair market value immediate after the time of the occurrence.  Do not consider evidence from wells not in the same field and formation as the Easterling No. 1-H well.

Answer:  _0_

## QUESTION 8

Did Rippy fail to comply with the parties' Agreement by failing to pay the Invoices?

For the purpose of answering this question, "Invoices" means Knight Oil Tools Invoice Nos. 232983, 233524, 233853, 234340, and 234461.

Answer "Yes" or "No":

Answer: _yes_

## QUESTION 9

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Knight Oil Tools for its damages, if any, that resulted from such failure to comply?

Consider this measure of damages, and none other, the total amount of the invoices.

Please answer in dollars and cents.

Answer: $ _361,356.87_

## Presiding Juror:

1.      When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.      The presiding juror has these duties:

     a.  have the complete charge read aloud if it will be helpful to your deliberations;

     b.  preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

     c.  give written questions or comments to the bailiff who will give them to the judge;

     d.  write down the answers you agree on;

     e.  get the signatures for the verdict certificate; and

     f.  notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

## Instructions for Signing the Verdict Certificate:

1.      You may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2.      If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If 11 jurors agree on every answer, those 11 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.      All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

Do you understand these instructions? If you do not, please tell me now.

_____

**CHARGE OF THE COURT**
14

Page

_Clay R. Ridley_

Judge Presiding

### VERDICT CERTIFICATE

Check one:

_____  Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_____        _____
**Signature of Presiding Juror**                    **Printed Name of Presiding Juror**

_____  Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_JD_  Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

|  | Signature | Name Printed |
|---|---|---|
| 1. | *Jean Davis* | Jean Davis |
| 2. | *Powell Ward* | Powell Ward |
| 3. | *Paul Bosse* | Paul Bosse |
| 4. | *Tomas Clark* | Tomas Clark |
| 5. | *Margaret Gray* | Margaret Gray |
| 6. | *Tony H Gonzalez* | Tony H Gonzalez |
| 7. | *Louisa Hargrave* | Louisa Hargrave |
| 8. | *Lawrence J Cornett* | Lawrence J. Cornett |
| 9. | *George Pawley* | George Pawley |
| 10. | *Jacob Holcomb* | Jacob Holcomb |
| 11. | | |

FILED
BEVERLY WILSON, DISTRICT CLERK
LEON COUNTY, TEXAS          5-10-18
MAY 10 2018                 5:50pm
BY _____
1388

Case 6:23-cv-04190-RRS-CBW Document 1-61 Filed 10/22/22 Page 1 of 27 PageID #: 984

FILED
BEVERLY WILSON, DISTRICT CLERK
LEON COUNTY, TEXAS
06-04-18
JUN 04 2018
BY [signature] Ballard

**CAUSE NO. O-10-498**

| | | |
|---|---|---|
| RIPPY OIL COMPANY, RIPPY | § | IN THE DISTRICT COURT OF |
| INTEREST LLC, THE GENECOV | § | |
| GROUP, INC., AND JOHN D. | § | |
| PROCTOR, | § | |
| *Plaintiffs,* | § | |
| | § | LEON COUNTY, TEXAS |
| VS. | § | |
| | § | |
| KNIGHT OIL TOOLS, INC. AND | § | |
| PIONEER DRILLING COMPANY, | § | |
| *Defendants.* | § | 278TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

BE IT REMEMBERED that on the 1st day of May 2018, came on to be heard the above-entitled and numbered cause for trial, with due and proper notice to all parties, and came Plaintiff Rippy Oil Company ("Plaintiff"), by and through its attorneys of record, and announced ready for trial, and came Defendants Knight Oil Tool, Inc. and Pioneer Drilling Co., by and through their attorneys of record, and announced ready for trial.

A jury of twelve (12) good and lawful citizens of Leon County was duly qualified, selected, impaneled, and sworn. The case proceeded to trial and the parties presented their evidence.

At the conclusion of the evidence, the Court submitted the questions of fact to the jury. The jury returned and announced its verdict in open Court in the presence of the parties and their counsel. The verdict was by ten jurors who together concurred in and agreed to the answers to all required questions and who signed their names to the verdict. There being no objection, the Court thereafter accepted the verdict and ordered same duly filed. The charge of the Court and the verdict of the jury are incorporated herein for all purposes by reference.



EXHIBIT
E

Based on the pleadings, the evidence, the jury verdict, and the stipulations of the parties, the Court finds that Plaintiff is entitled to recover from Defendant Knight Oil Tools, Inc. as follows.

It is ORDERED, ADJUDGED and DECREED that Plaintiff Rippy Oil Company have and recover $5,900,000.00 in past damages from Defendant Knight Oil Tools, Inc., less the amount of Defendant Knight Oil Tools' counterclaim of $361,356.87, for a net recovery of $5,538,643.13. Additionally, the Court awards prejudgment interest on these past damages in the amount of $2,056,885.14 through June 1, 2017 and an additional $758.72 per day until the day before this final judgment is signed.

IT IS FURTHER ORDERED that this judgment will bear interest at the rate of 5.00%, compounded annually, from the date of this judgment until paid.

All costs of court spent or incurred in this cause are adjudged against Defendant.

All writs and processes for the enforcement and collection of this judgment or court costs may issue as necessary. All relief requested in this case and not expressly granted is denied. This judgment finally disposes of all parties and claims and is appealable.

SIGNED this ___4___ day of June 2018.

THE HONORABLE HAL R. RIDLEY
JUDGE PRESIDING

**APPROVED AS TO SUBSTANCE AND FORM:**

LAW OFFICE OF KENNETH TEKELL, SR. PLLC          HERRICK & ASSOCIATES, P.C.


By: _____                By: _____
Kenneth Tekell                                 David P. Herrick
State Bar No.                                   State Bar No. 00785957
ktekell@balagiatekell.com                       dherrick@herrickassociates.com
1221 McKinney, Suite 3200                       18111 Preston Road, Suite 480
Houston, TX  77010                              Dallas, TX  75252
(713) 654-5191                                  (214) 303-1258
                                                (214) 303-1257 (Fax)


THE KRIST LAW FIRM, P.C.                         DAVID HAMMIT LLC


By: _____                By: _____
Ronald D. Krist                                 David Hammit
State Bar No. 11727000                           State Bar No. 08857660
psteele@kristlaw.com                             david@hammitlaw.com
The Krist Building                               109 South Madison Street
17100 El Camino Real                             Madisonville, TX  77864
Houston, TX  77058                               (936) 349-1600
(281) 283-8500                                   (936) 349-0505 (Fax)
(281) 488-3489 (Fax)


BECK REDDEN LLP


By: _____
David M. Gunn
State Bar No. 08621600
dgunn@beckredden.com
John S. Adcock
State Bar No. 00790206
jadcock@beckredden.com
1221 McKinney, Suite 4500
Houston, TX  77010
(713) 951-3700
(713) 951-3720 (Fax)

3

**ATTORNEYS FOR PLAINTIFFS**

**APPROVED AS TO FORM ONLY:**

DONATO, MINX, BROWN & POOL, P.C.


By: _____
    Randy Donato
    State Bar No. 05973300
    rdonato@donatominxbrown.com
    James T. Sunosky
    State Bar No. 24033372
    jsunosky@donatominxbrown.com
    3200 Southwest Freeway, Suite 2300
    Houston, TX 77027
    (713) 877-1112
    (713) 877-1138 (Fax)


WRIGHT CLOSE & BARGER, LLP


By: _____
    Jessica Z. Barger
    State Bar No. 24032706
    barger@wrightclosebarger.com
    One Riverway, Suite 2200
    Houston, TX 77056
    (713) 572-4321
    (713) 572-4320 (Fax)

**ATTORNEYS FOR DEFENDANTS**

CAUSE NO. O-10-498

| | | |
|---|---|---|
| RIPPY OIL COMPANY, RIPPY | § | IN THE DISTRICT COURT OF |
| INTEREST LLC, THE GENECOV | § | |
| GROUP, INC., AND JOHN D. | § | |
| PROCTOR, | § | |
| *Plaintiffs,* | § | LEON COUNTY, T E X A S |
| | § | |
| VS. | § | |
| | § | |
| KNIGHT OIL TOOLS, INC. AND | § | |
| PIONEER DRILLING COMPANY, | § | 278th JUDICIAL DISTRICT |
| *Defendants.* | | |

## KNIGHT OIL TOOLS, INC.'S MOTION TO DISREGARD CERTAIN JURY FINDINGS, AND FOR ENTRY OF JUDGMENT

Defendant Knight Oil Tools, Inc. files this this Motion to Disregard Jury Findings, and for Entry of Judgment, requesting that this Court disregard certain of the jury's findings and render judgment that Plaintiffs, Rippy Oil Company, Rippy Interest, LLC, The Genecov Group, Inc., and John D. Proctor (collectively, "Rippy"), take nothing on their claims against Knight Oil, and that Knight Oil recover on its counterclaim. Knight Oil expressly reserves its right to file additional motions or assert further challenges to the jury's findings as permitted under the Texas Rules of Civil Procedure.

### INTRODUCTION

This case was called to a jury trial before this Court on May 1, 2018. At trial, Rippy presented its claims for recovery against Knight Oil based on allegations of negligent misrepresentation and breach of the implied warranty for fitness for particular purpose. Rippy claimed that these acts damaged its well, and that the well could not be reproduced "as it existed at the time of the occurrence in question." Based on these claims, Rippy



EXHIBIT
**F**

sought to recover as damages the fair market value of the well immediately before the occurrence in question.

The jury found that Knight Oil breached the implied warranty for fitness for particular purpose and made a negligent misrepresentation. The jury also found that the well could not be reproduced "as it existed at the time of the occurrence in question." However, in answer to a separate question, the jury found that the cost to reproduce the well was $1.5 million, necessarily implying that the well could be reproduced. The jury further found that the fair market value of the well was $5.9 million immediately before the occurrence in question, and $0 immediately after the occurrence in question. Finally, the jury found that Rippy failed to comply with the parties' agreement and awarded $361,356.87 in damages to Knight Oil.

Under Texas law, if a well can be reproduced by drilling another one, the proper measure of damages is the *lesser* of (i) the cost of drilling and equipping another such well, less the value of any salvage, and (ii) the reasonable cash market value of the well immediately before the occurrence in question. *Basic Energy Serv., Inc. v. D-S-B Properties, Inc.*, 367 S.W.3d 254, 262 (Tex. App.—Tyler 2011, no pet.); *Atex Pipe & Supply, Inc. v. Sesco Prod. Co.*, 736 S.W.2d 914, 917 (Tex. App.—Tyler 1987, writ denied). Because the jury found that the well could be reproduced for $1.5 million, which was less than the fair market value of the well, the proper measure of damages, if any, is the cost to reproduce the well. Nevertheless, the Court signed a Final Judgment on June 4, 2018, awarding Rippy $5.9 million, minus the amount of Knight Oil's counterclaim, totaling $5,538,643.13, plus $2,056,885.14 in prejudgment interest.

2

For the reasons herein, Knight Oil requests the Court to disregard certain of the jury's findings and render judgment that Rippy take nothing. By filing this motion, Knight Oil does not waive any of the points previously made in other motions or withdraw any of those points.

**ARGUMENT**

## I.      Question No. 1.

The Court should disregard the jury's answer to Question No. 1 for any one or more of the following reasons:

1.      The jury's answer to Question No. 1 is not supported by legally sufficient evidence.

2.      The evidence is factually insufficient to support a finding of each of the elements, and subparts of Question No. 1  that—

      a.      Knight Oil breached the implied warranty of fitness for a particular purpose;

      b.      Any such breach was a proximate cause of the occurrence in question;

      c.      Knight Oil had reason to know the particular purpose for which the drill pipe was required; and

      d.      Knight Oil had reason to know that Rippy was justifiably relying on Knight Oil's skill and judgment to furnish suitable drill pipe.

      e.      Rippy did, in fact, justifiably rely on Knight Oil's skill and judgment to furnish suitable drill pipe.

      f.      The drill pipe failed the particular purpose for which was it was allegedly required.

3.    Rippy's evidence was intended to prove that there was a defect in the pipe that caused the occurrence, which would have been a different legal theory than the one submitted to the jury in Question 1. Rippy offered legally insufficient evidence that the occurrence in question was caused by a product free from defects and suitable for some purposes, but not for the specific purpose in question. Rippy's proof at trial was designed to demonstrate that there was a defect in the pipe that caused the failure, which is not a theory of breach of an  implied warranty for fitness for particular use. Rippy offered legally insufficient evidence under the theory it submitted—i.e., that the occurrence in question was caused by a product free from defects and suitable for some purposes, but not for the specific purpose in question. Thus, Rippy has no viable cause of action for breach of the implied warranty of fitness for particular purpose.  And, because Rippy has submitted the wrong theory and there is no evidence to support the theory of negligent misrepresentation (discussed below), judgment should be rendered in favor in Knight on all liability findings.

4.    This question as submitted is immaterial, and should not have been submitted.

## II.    Question No. 2.

The Court should disregard the jury's answer to Question No. 2 for any one or more of the following reasons:

1.    The jury's answer to Question No. 2 is not supported by legally sufficient evidence.

2.    The evidence is factually insufficient to support a finding of each of the elements, and subparts of Question No. 2 that—

      a.     Knight Oil made a misrepresentation with respect to the condition of the drill pipe at issue;

      b.     Such representation supplied false information for the guidance of others in their business;

      c.     Knight Oil did not exercise reasonable care or competence in obtaining or communicating the information;

      d.     Rippy justifiably relied on such representation; and

      e.     Any such representation was the proximate cause of the occurrence in question.

3.    This question as submitted is immaterial, and should not have been submitted.

## III. Question No. 3, subpart 1.

The Court should disregard the jury's answer to Question No. 3, subpart 1 for any one or more of the following reasons:

1.    The conclusive evidence established that the negligence of Rippy was a proximate cause of the occurrence in question.

2.    There is no evidence, or the evidence is legally insufficient, to support a finding that a new and independent cause destroyed the casual connection between Rippy's negligence and the occurrence in question.

## IV. Question No. 3, subpart 2.

The Court should disregard the jury's answer to Question No. 3, subpart 2 for any one or more of the following reasons:

1.    The conclusive evidence established that the negligence of Gyrodata was a proximate cause of the occurrence in question.

2.      There is no evidence, or the evidence is legally insufficient, to support a finding that a new and independent cause destroyed the casual connection between Gyrodata's negligence and the occurrence in question.

## V.      Question No. 5.

The Court should disregard the jury's answer to Question No. 5 for any one or more of the following reasons:

1.      The jury's answer to Question No. 5 is not supported by legally sufficient evidence.

2.      There is no evidence, or the evidence is legally insufficient, to support a finding that the Easterling No. 1–H well was not capable of being reproduced by drilling another well as it existed at the time of the occurrence in question.

3.      The conclusive evidence established that the Easterling No. 1–H well was capable of being reproduced by drilling another well as it existed at the time of the occurrence in question.

4.      This question as submitted contained an improper statement of law and should not have been submitted, by including the language "as it existed at the time of the occurrence in question."  *See Am. Glycerin Co. v. Kenridge Oil Co.*, 295 S.W. 633, 636–37 (Tex. Civ. App.—Eastland 1927, no writ) ("We suggest that upon another trial of this case evidence should be admitted and the jury called upon to determine in answer to a proper special issue *whether or not the well could have been reproduced by drilling another one*."(emphasis added)).

5.      This question as submitted is immaterial, and should not have been submitted.

## VI.  Question No. 6.

The Court should disregard the jury's answer to Question No. 6 for any one or more of the following reasons:

1.      The jury's answer to Question No. 6 is not supported by legally sufficient evidence.

2.      There is no evidence, or the evidence is legally insufficient, to support a finding that the reasonable and necessary drilling and equipping costs for the Easterling No. 2-H well was $1.5 million.

## VII.  Question No. 7, subpart a.

The Court should disregard the jury's answer to Question No. 7, subpart a for any one or more of the following reasons:

1.      The jury's answer to Question No. 7, subpart a is not supported by legally sufficient evidence.

2.      There is no evidence, or the evidence is legally insufficient, to support a finding that the reasonable fair market value of the Rippy Easterling 1–H well immediately before the occurrence in question was $5.9 million.

3.      The conclusive evidence established that the reasonable fair market value of the well immediately before the occurrence in question was less than $5.9 million.

4.      There is no evidence, or the evidence is legally insufficient, to support a finding that the reasonable fair market value of the Easterling 1–H well immediately before the occurrence in question was proximately caused by the occurrence in question.

5.      This question as submitted is immaterial, and should not have been submitted.

## VIII.  Question No. 7, subpart b.

The Court should disregard the jury's answer to Question No. 7, subpart b for any one or more of the following reasons:

1.      The jury's answer to Question No. 7, subpart b is not supported by legally sufficient evidence.

2.      There is no evidence, or the evidence is legally insufficient, to support a finding that the reasonable fair market value of the Rippy Easterling 1–H well immediately after the occurrence in question was $0 million.

3.      The conclusive evidence established that the reasonable fair market value of the well immediately after the occurrence in question was greater than $0.

4.      There is no evidence, or the evidence is legally insufficient, to support a finding that the reasonable fair market value of the Easterling 1–H well immediately after the occurrence in question was proximately caused by the occurrence in question.

5.      This question as submitted is immaterial, and should not have been submitted.

## CONCLUSION

Knight Oil Tools, Inc. requests that the Court vacate the Final Judgment in this matter, disregard the jury's findings, and render judgment that Plaintiffs, Rippy Oil Company, Rippy Interest, LLC, The Genecov Group, Inc., and John D. Proctor, take nothing, and that Knight Oil recover on its counterclaim as found by the jury.

Respectfully submitted,

*/s/ Jessica Z. Barger*
Thomas C. Wright
State Bar No.22059400
Jessica Z. Barger
State Bar No. 24032706
Bradley W. Snead
State Bar No. 24049835
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321
(713) 572-4320 (fax)
wright@wrightclosebarger.com
barger@wrightclosebarger.com
snead@wrightclosebarger.com

/s/ *Randy Donato*
Randy Donato
SBN: 05973300
James T. Sunosky
SBN: 2403372
DONATO, MINX, BROWN & POOL, P.C.
3200 Southwest Freeway, Suite 2300
Houston, Texas 77027
(713) 877-1112 (Main)
(713) 877-1138 (Fax)
rdonato@donatominxbrown.com

**ATTORNEYS FOR DEFENDANT**
**KNIGHT OIL TOOL**

9

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 3rd day of July, 2018, a true and correct copy of the above and foregoing has been served by electronic transmission on all counsel of record.

*/s/ Jessica Z. Barger*
Jessica Z. Barger

CAUSE NO. O-10-498

| | | |
|---|---|---|
| RIPPY OIL COMPANY, RIPPY | § | IN THE DISTRICT COURT OF |
| INTEREST LLC, THE GENECOV | § | |
| GROUP, INC., AND JOHN D. | § | |
| PROCTOR, | § | |
| *Plaintiffs,* | § | LEON COUNTY, T E X A S |
| | § | |
| VS. | § | |
| | § | |
| KNIGHT OIL TOOLS, INC. AND | § | |
| PIONEER DRILLING COMPANY, | § | 278th JUDICIAL DISTRICT |
| *Defendants.* | | |

### KNIGHT OIL TOOL, INC.'S MOTION FOR NEW TRIAL AND ALTERNATIVE MOTION FOR REMITTITUR

Defendant Knight Oil Tools, Inc. files this Motion for New Trial, pursuant to Texas Rules of Civil Procedure 324 and 329b, and alternative Motion for Remittitur, pursuant to Texas Rule of Civil Procedure 315. The fee required for filing this Motion for New Trial is being tendered along with the motion.

### INTRODUCTION

This case was called to a jury trial before this Court on May 1, 2018. At trial, Plaintiffs, Rippy Oil Company, Rippy Interest, LLC, The Genecov Group, Inc., and John D. Proctor (collectively, "Rippy") presented their claims for recovery against Knight Oil based on allegations of negligent misrepresentation and breach of the implied warranty for fitness for particular purpose. Rippy claimed that these acts damaged its well, and that the well could not be reproduced "as it existed at the time of the occurrence in question." Based on these claims, Rippy sought to recover as damages the fair market value of the well immediately before the occurrence in question.



**EXHIBIT**
**G**

The jury found that Knight Oil breached the implied warranty for fitness for particular purpose and made a negligent misrepresentation. The jury also found that the well could not be reproduced "as it existed at the time of the occurrence in question." However, in answer to a separate question, the jury found that the cost to reproduce the well was $1.5 million, necessarily implying that the well could be reproduced. The jury further found that fair market value of the well was $5.9 million immediately before the occurrence in question, and $0 immediately after the occurrence in question. Finally, the jury found that Rippy failed to comply with the parties' agreement and awarded $361,356.87 in damages to Knight Oil.

Under Texas law, if a well can be reproduced by drilling another one, the proper measure of damages is the *lesser* of (i) the cost of drilling and equipping another such well, less the value of any salvage, and (ii) the reasonable cash market value of the well immediately before the occurrence in question. *Basic Energy Serv., Inc. v. D-S-B Properties, Inc.*, 367 S.W.3d 254, 262 (Tex. App.—Tyler 2011, no pet.); *Atex Pipe & Supply, Inc. v. Sesco Prod. Co.*, 736 S.W.2d 914, 917 (Tex. App.—Tyler 1987, writ denied). Because the jury found that the well could be reproduced for $1.5 million, which was less than the fair market value of the well, the proper measure of damages, if any, is the cost to reproduce the well. Nevertheless, the Court signed a Final Judgment on June 4, 2018, awarding Rippy $5.9 million, minus the amount of Knight Oil's counterclaim, totaling $5,538,643.13, plus $2,056,885.14 in prejudgment interest.

For the reasons stated herein, Knight Oil requests the Court to vacate its Final Judgment and order a new trial of this case. By filing this Motion for New Trial, Knight

2

Oil does not waive any of the points previously made in other motions or withdraw any of those points.

## ARGUMENT

## I. Question No. 1.

The jury's answer to Question No. 1 should be set aside, and a new trial granted, for any one or more of the following reasons:

1. The jury's answer to Question No. 1 is not supported by factually sufficient evidence and is against the great weight and preponderance of the evidence.

2. The evidence is factually insufficient to support a finding of each of the following parts of Question 1, that—

    a. Knight Oil breached the implied warranty of fitness for a particular purpose;

    b. Any such breach was a proximate cause of the occurrence in question;

    c. Knight Oil had reason to know the particular purpose for which the drill pipe was required; and

    d. Knight Oil had reason to know that Rippy was justifiably relying on Knight Oil's skill and judgment to furnish suitable drill pipe.

    e. Rippy did, in fact, justifiably rely on Knight Oil's skill and judgment to furnish suitable drill pipe.

    f. The drill pipe failed the particular purpose for which was it was allegedly required.

3. Rippy's evidence was intended to prove that there was a defect in the pipe that caused the occurrence, which would have been a different legal theory than the one submitted to the jury in Question 1. Rippy offered factually insufficient evidence that the

occurrence in question was caused by a product free from defects and suitable for some purposes, but not for the specific purpose in question. Thus, Rippy has no viable cause of action for breach of the implied warranty of fitness for particular purpose.

4.      This question as submitted is immaterial, and should not have been submitted.

## II.    Question No. 2.

The jury's answer to Question No. 2 should be set aside, and a new trial granted, for any one or more of the following reasons:

1.      The jury's answer to Question No. 2 is not supported by factually sufficient evidence and is against the great weight and preponderance of the evidence.

2.      The evidence is factually insufficient to support a finding of each of the elements of Question No. 2 that—

      a.      Knight Oil made a misrepresentation with respect to the condition of the drill pipe at issue;

      b.      Such representation supplied false information for the guidance of others in their business;

      c.      Knight Oil did not exercise reasonable care or competence in obtaining or communicating the information;

      d.      Rippy justifiably relied on such representation; and

      e.      Any such representation was the proximate cause of the occurrence in question.

3.      This question as submitted is immaterial, and should not have been submitted.

## III. Question No. 3, subpart 1.

The jury's answer to Question No. 3, subpart 1 should be set aside, and a new trial granted, for any one or more of the following reasons:

1.     The jury's answer to Question No. 3, subpart 1 is against the overwhelming t weight and preponderance of the evidence.

2.     The great weight and preponderance of the evidence established that the negligence of Rippy was a proximate cause of the occurrence in question.

3.     The evidence is factually insufficient to support a finding that a new and independent cause destroyed the casual connection between Rippy's negligence and the occurrence in question.

## IV. Question No. 3, subpart 2.

The jury's answer to Question No. 3, subpart 2 should be set aside, and a new trial granted, for any one or more of the following reasons:

1.     The jury's answer to Question No. 3, subpart 2 is against the great weight and preponderance of the evidence.

2.     The great weight and preponderance of the evidence established that the negligence of Gyrodata was a proximate cause of the occurrence in question.

3.     The evidence is factually insufficient to support a finding that a new and independent cause destroyed the casual connection between Gyrodata's negligence and the occurrence in question.

## V.      Question No. 5.

The jury's answer to Question No. 5 should be set aside, and a new trial granted, for any one or more of the following reasons:

1.      The jury's answer to Question No. 5 is not supported by factually sufficient evidence and is against the great weight and preponderance of the evidence.

2.      The evidence is factually insufficient to support a finding that the Easterling No. 1–H well was not capable of being reproduced by drilling another well as it existed at the time of the occurrence in question.

3.      The great weight and preponderance of the evidence established that the Easterling No. 1–H well was capable of being reproduced by drilling another well as it existed at the time of the occurrence in question.

4.      This question as submitted contained an improper statement of law and should not have been submitted, by including the language "as it existed at the time of the occurrence in question."  *See Am. Glycerin Co. v. Kenridge Oil Co.*, 295 S.W. 633, 636–37 (Tex. Civ. App.—Eastland 1927, no writ) ("We suggest that upon another trial of this case evidence should be admitted and the jury called upon to determine in answer to a proper special issue *whether or not the well could have been reproduced by drilling another one*." (emphasis added)).

5.      This question as submitted is immaterial, and should not have been submitted.

## VI. Question No. 6.

The jury's answer to Question No. 6 should be set aside, and a new trial granted, for any one or more of the following reasons:

1.     The jury's answer to Question No. 6 is not supported by factually sufficient evidence and is against the great weight and preponderance of the evidence.

2.     The evidence is factually insufficient to support a finding that the reasonable and necessary drilling and equipping costs for the Easterling No. 2-H well was $1.5 million.

## VII. Question No. 7, subpart a.

The jury's answer to Question No. 7, subpart a should be set aside, and a new trial granted, for any one or more of the following reasons:

1.     The jury's answer to Question No. 7, subpart a is not supported by factually sufficient evidence and is against the great weight and preponderance of the evidence.

2.     The evidence is factually insufficient to support a finding that the reasonable fair market value of the Rippy Easterling 1–H well immediately before the occurrence in question was $5.9 million.

3.     The great weight and preponderance of the evidence established that the reasonable fair market value of the well immediately before the occurrence in question was less than $5.9 million.

4.     The evidence is factually insufficient to support a finding that the reasonable fair market value of the Easterling 1–H well immediately before the occurrence in question was proximately caused by the occurrence in question.

7

5.     This question as submitted is immaterial, and should not have been submitted.

6.     Alternatively, the award is excessive and the Court should suggest a substantial remittitur.

## VIII.  Question No. 7, subpart b.

The jury's answer to Question No. 7, subpart b should be set aside, and a new trial granted, for any one or more of the following reasons:

1.     The jury's answer to Question No. 7, subpart b is not supported by factually sufficient evidence and is against the great weight and preponderance of the evidence.

2.     The evidence is factually insufficient to support a finding that the reasonable fair market value of the Rippy Easterling 1–H well immediately after the occurrence in question was $0 million.

3.     The great weight and preponderance of the evidence established that the reasonable fair market value of the well immediately after the occurrence in question was greater than $0.

4.     The evidence is factually insufficient to support a finding that the reasonable fair market value of the Easterling 1–H well immediately after the occurrence in question was proximately caused by the occurrence in question.

5.     This question as submitted is immaterial, and should not have been submitted.

# CONCLUSION

Knight Oil Tools, Inc. requests that the Court grant its Motion for New Trial, vacate its Final Judgment in this matter, and order a new trial on one or more of the challenges raised in this motion. Alternatively, Knight Oil requests a substantial remittitur, and, in the event the remittitur is not accepted, a new trial.

Respectfully submitted,

*/s/ Jessica Z. Barger*
Thomas C. Wright
State Bar No.22059400
Jessica Z. Barger
State Bar No. 24032706
Bradley W. Snead
State Bar No. 24049835
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321
(713) 572-4320 (fax)
wright@wrightclosebarger.com
barger@wrightclosebarger.com
snead@wrightclosebarger.com

*/s/ Randy Donato*
Randy Donato
SBN:  05973300
James T. Sunosky
SBN: 2403372
DONATO, MINX, BROWN & POOL, P.C.
3200 Southwest Freeway, Suite 2300
Houston, Texas 77027
(713) 877-1112 (Main)
(713) 877-1138 (Fax)
rdonato@donatominxbrown.com

**ATTORNEYS FOR DEFENDANT KNIGHT OIL TOOL**

## CERTIFICATE OF SERVICE

      I hereby certify that, on the 3rd day of July, 2018, a true and correct copy of the aboveand foregoing has been served by electronic transmission on all counsel of record.

*/s/ Jessica Z. Barger*
Jessica Z. Barger

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-18-00284-CV

**KNIGHT OIL TOOLS, INC.,**

Appellant

**v.**

**RIPPY OIL COMPANY, RIPPY INTEREST LLC,
THE GENECOV GROUP, INC., AND JOHN D. PROCTOR,**

Appellees

_____

### From the 278th District Court
### Leon County, Texas
### Trial Court No. O-10-498

## MEMORANDUM OPINION

Rippy Oil Company brought suit against Knight Oil Tools, Inc. for damages that occurred when a drill pipe broke while drilling a well. Knight filed a counterclaim against Rippy for unpaid invoices. The jury found Knight liable for damages and also found Rippy failed to pay certain invoices. The trial court entered judgment in favor of Rippy for $5,538,643.13. We affirm.



### BACKGROUND FACTS

Knight Oil Tools rents drill pipe to oil companies and oil well operators for drilling oil and gas wells. Rippy Oil Company made plans to drill a well in the Eagle Ford Shale and contacted Knight to supply pipe for drilling the horizontal portion of the Easterling 1-H well. Rippy hired Leo Wiggins as a well consultant, and Larry Elkins to assist Wiggins. Wiggins and Elkins had authority to order equipment as needed for drilling and to accept delivery.

Knight delivered pipe and other equipment to the Easterling 1-H well site with a delivery ticket and sent the invoice to the main office. The delivery ticket contained language that the pipe measurements complied with the dimensions for American Petroleum Institute (A.P.I.) premium class and/or Knight Oil Tools value. The testimony at trial established that pipe marked with two white bands meets the standards for A.P.I. premium pipe. The pipe delivered by Knight was marked with two white bands, but the record shows that some of the pipe delivered did not comply with the dimensions for A.P.I. premium class pipe.

On May 11, 2010, one of the drill pipes supplied by Knight broke while it was in the well. The parties agree that the pipe failure was caused by fatigue. Rippy was not able to recover the broken pipe and the drill string beyond it and eventually had to abandon the Easterling 1-H. Rippy attempted to drill an offset well, Easterling 2-H, but that effort was unsuccessful.

Rippy filed suit against Knight to recover damages for the lost well, and Knight filed a counterclaim to recover for unpaid invoices. The jury found in favor of Rippy on submitted questions of negligent representation and breach of implied warranty of fitness for a particular purpose. The jury further found in favor of Knight on unpaid invoices. The trial court entered judgment in favor of Rippy.

## SUFFICIENCY OF THE EVIDENCE

The case was submitted to the jury on two theories of liability: (1) negligent misrepresentation, and (2) breach of warranty of fitness for a particular purpose. In its first issue, Knight argues that the evidence is legally and factually insufficient to support the jury's findings regarding negligent misrepresentation or causation of the well failure under any theory. Specifically, Knight argues that the evidence was insufficient to prove Knight's conduct was the proximate cause of the loss of the well under either theory submitted to the jury. In the second issue, Knight argues that the evidence is legally and factually insufficient to support the jury's finding on breach of warranty of fitness for a particular purpose.

In reviewing the jury's verdict for the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex.2005). We must not substitute our opinion on witness credibility for that of the jury. *Id*. at 816-17.

Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary.

Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it.

...

Nor is it necessary to have testimony from both parties before jurors may disbelieve either. Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses. Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.

Of course, "[t]he jury's decisions regarding credibility must be reasonable." Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted. And as noted above, they are not free to believe testimony that is conclusively negated by undisputed facts. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review.

*Id*. at 819-20 (footnotes and citations omitted).

In a factual-sufficiency challenge, an appellate court must consider and weigh all of the evidence. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id*. We may not pass upon the witnesses' credibility or substitute our judgment for that of the factfinder, even if the evidence would support a different result. *2900 Smith, Ltd. v. Constellation New Energy, Inc.*, 301 S.W.3d 741, 746 (Tex. App. —Houston [14th Dist.] 2009, no pet.). If we determine the evidence is factually

insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence supporting the trial court's judgment; we need not do so when affirming the judgment. *Id*.

## NEGLIGENT MISREPRESENTATION

The jury was asked in Question 2 whether Knight Tool made a negligent representation with respect to the condition of the drill pipe on which Rippy justifiably relied and was the proximate cause of the drill pipe separation. The jury answered "yes," and Knight challenges the jury finding.

The elements of negligent misrepresentation are: (1) a defendant provided information in the course of his business; (2) the information supplied was false; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff justifiably relied on the information; and (5) the plaintiff suffered damages proximately caused by the reliance. *Retherford v. Castron*, 378 S.W.3d 29, 37 (Tex. App. — Waco 2012, pet. den'd); *Larsen v. Carlene Langford & Associates*, 41 S.W.3d 245, 249-50 (Tex. App. —Waco 2001, pet. den'd).

Charles Rippy, the President of Rippy Oil, testified that Rippy requested A.P.I. premium pipe for the Easterling 1-H well. The evidence shows that A.P.I. premium pipe is marked with two white bands to signify that it is premium. Daniel Rogers, a corporate representative for Knight, testified by deposition that if the drill pipe supplied by Knight had two white bands, the customer could rely on the pipe being A.P.I. premium pipe and

that "the whole world" could rely on it being premium pipe. Rogers further stated that Knight intended to represent the pipe as being inspected to A.P.I. premium standards.

The record shows that the pipe that failed did not meet A.P.I. premium standards. The pipe broke in the well, and the well was lost. Viewing the evidence in the light most favorable to the jury's verdict, we find that a rational factfinder could conclude that Knight made a false representation about the quality of the drill pipe, that Knight did not use reasonable care in obtaining or communicating the information, and that Rippy justifiably relied on the representation.

We now address whether the evidence supports the jury's finding on proximate cause. The components of proximate cause are cause-in-fact and foreseeability. *See Western Investments, Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). The cause-in-fact element is satisfied by proof that (1) the act was a substantial factor in bringing about the harm at issue, and (2) absent the act ("but for" the act), the harm would not have occurred. *HMC Hotel Props. II Ltd. Partnership v. Keystone-Texas Prop. Holding Corporation*, 439 S.W.3d 910, 913 (Tex. 2014). These elements cannot be established by mere conjecture, guess, or speculation. *Id*.

Charles Rippy testified that after the lawsuit was filed, Knight provided serial numbers for some of the drill pipe. Based on those serial numbers, evidence showed that Knight Oil purchased the drill pipe in 1993, and delivered the pipe to the well site in April 2010. Charles Rippy further testified that some of the drill pipe had not been inspected

by Knight in over a year. The jury heard evidence that the fatigue cracks in the pipe were present before the pipe was used by Rippy. Hilton Prejean, an A.P.I. member who helped write the A.P.I. standards, testified by deposition that the pipe that broke was "scrap tool joint" with excessive wear. Prajean found that the tool joint on the pipe had pre-existing cracks before being used at the Rippy well and that it "should not have been on location at all."

Knight argues that Rippy was required to produce evidence that the pipe would not have failed assuming it met A.P.I. premium standards citing *BIC Pen Corporation v. Carter*, 346 S.W.3d 533 (Tex. 2011) as authority. In *BIC*, a six year-old girl was severely burned when her five year-old brother started a fire with a BIC lighter. The plaintiff alleged that the manufacturing defects in the lighter were the cause of the fire and the girl's injuries. The Court stated that there must have been some evidence that the fire that burned the little girl started because of the specific manufacturing defects and that absent those defects her injuries would not have occurred. *Id*. at 542. The Court concluded that the evidence was insufficient to support the finding that manufacturing defects in BIC's Subject Lighter were a cause-in-fact of the injuries. *Id*. at 545.

We do not agree with Knight's premise that under *BIC*, Rippy must show that the pipe would not have failed assuming it met A.P.I. premium standards. Rather, pursuant to *BIC*, Rippy must show that the condition of the pipe supplied by Knight was a

substantial factor in the loss of the well and that absent the condition of the pipe, the harm would not have occurred.

The parties agree that the pipe broke as a result of fatigue failure. Rippy presented evidence that the tool joint was worn excessively, did not meet A.P.I. premium standards, and had pre-existing cracks before being used in the Rippy well. Although Knight presented evidence that other factors could have caused the fatigue failure, we must not substitute our opinion on witness credibility for that of the jury. *City of Keller v. Wilson*, 168 S.W.3d at 816-17.

We find that the evidence is legally sufficient to support the jury's finding on negligent representation. Additionally, we cannot say that the jury's verdict as to this claim is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

We overrule Knight's first issue as to the sufficiency of the evidence on proximate cause and negligent misrepresentation. When the judgment rests on multiple theories of recovery, we need not address all causes of action if any one theory is valid. *EMC Mortgage Corp. v. Jones*, 252 S.W.3d 857, 870 (Tex. App. —Dallas 2008, no pet.); *Checker Bag Co. v. Washington*, 27 S.W.3d 625, 634 (Tex. App. — Waco 2000, pet. den'd). Therefore, we need not address Knight's second issue on appeal as to the sufficiency of the evidence to support the jury's answer on breach of breach of implied warranty of fitness for a particular purpose.

NEGLIGENCE

In the fourth issue, Knight argues that the evidence is factually insufficient to support the jury's failure to find that Rippy and Gyrodata were negligent. In Question 3, the jury was asked if the negligence of the Rippy Oil Company and/or Gyrodata proximately caused the occurrence in question. The jury answered "No" for both Rippy Oil Company and Gyrodata.

Knight contends that there were problems in the well prior to the drill pipe breaking. Charles Rippy testified that they encountered a trouble spot while drilling the Easterling 1-H, but that it was not a "catastrophe" and was fairly common. Rippy also testified that a Gyrodata motor broke off in the well, and they had to make adjustments for that. In Question 3 the jury was asked if the negligence of Rippy or Gyrodata proximately caused the "occurrence" in question. Occurrence was defined for the jury as "the drill pipe separation that occurred on the Easterling No. 1-H well on May 11, 2010." We cannot say that the jury's answer to Question 3 is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule the fourth issue.

SUMMARY JUDGMENT

In the third issue, Knight argues that the trial court erred in granting summary judgment. Rippy filed a traditional and no evidence motion for summary judgment as to Knight's affirmative defense of release and indemnity.

We review the trial court's granting of a motion for summary judgment de novo. The movant in a traditional summary judgment motion must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). The granting of a no-evidence motion will be sustained when the evidence offered by the non-movant to prove a vital fact is no more than a mere scintilla. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

The pipe was delivered to the well site with a delivery ticket that had a provision on the front indicating that the customer agrees to the terms and conditions on the reverse side of the document. The reverse side of the delivery ticket contained terms and conditions including a paragraph on release and indemnity:

> Customer assumes full responsibility for and agrees to defend, indemnify and hold Knight harmless from every demand, claim, suit or cause of action, including, but not limited to, personal injury, illness, death, loss of well, well damage, reservoir damage, blowout pollution, contamination or any damage to property which arise out of, in connection with, incident to or results directly or indirectly from the rental or use of the equipment or services provided.
> Customer's release, defense, indemnity, and hold harmless obligations apply even if the liability demand, claims, suits and causes of action are caused by the sole, concurrent, active or passive negligence, fault or strict liability of Knight, the unseaworthiness of any vessel, a pre-existing condition or any defect in the services or equipment or services provided..

There was also a paragraph on waiver of warranty:

> Knight makes no representation or warranty of any kind, express or implied, with respect to drill pipe, tools or other equipment or services provided; customer understands and agrees that no warranty is to be

implied with respect to the condition of the equipment, or its merchantability or the fitness of the equipment for a particular purpose. Knight shall not in any event be liable for any special, direct, indirect, incidental or consequential damages. Knight makes no warranty as to whether the equipment leased or sold meets the specifications, stipulated size, or the description for which customer contracted. Customer understands and acknowledges that the equipment rented or sold may be used equipment.

Because of the uncertainty of well conditions and the necessity of relying on information and services provided by others, Knight cannot guarantee the effectiveness of the equipment or services provided by Knight. Knight shall not be liable for any special, direct, indirect, incidental or consequential damages. Customer agrees that Knight shall not be liable for and customer shall indemnify Knight against any damages arising from the use of such services and equipment, even if such is contributed to by Knight's sole or concurrent negligence, fault or strict liability or the defect of any equipment sold or leased by Knight.

The trial court initially granted the motion without stating the basis for its ruling. During trial, Knight moved for reconsideration of the trial court's ruling. The trial court denied the motion for reconsideration and found that the Release Discharging Indemnity Agreement on back of the invoice was not negotiated between the parties. The trial court further found that "neither Elkins or Wiggins had apparent, implied, or actual authority on behalf of Rippy to bind them to the indemnity, discharge and release provisions...."

"Contracts indemnifying one against his distribution of defective products should be viewed as exceptions to the usual business practice, in the same manner as those indemnifying one against his own negligence." *Rourke v. Garza*, 530 S.W.2d 794, 804 (Tex. 1975). Leo Wiggins and Larry Elkins were well consultants on the Easterling 1-H well, but they were not employees of Rippy. The summary judgment evidence establishes that

Wiggins and Elkins had authority to order equipment and accept delivery of equipment and to supervise operations at the well, but that they did not have authority to negotiate any agreement on behalf of Rippy on release and indemnity. Such negotiations may have great financial impact on the parties, and are therefore not of the kind ordinarily executed by a superintendent of job sites. *See Rourke v. Garza*, 530 S.W.2d at 804. The trial court did not err in granting Rippy's motion for summary judgment. We overrule the third issue.

**DAMAGES**

In issues five, six, and seven, Knight argues that the evidence is insufficient to support the jury's finding on damages, that the trial court erred in admitting evidence and refusing jury charge instructions, and that the trial court erred in wording jury questions.

In Question 5, the jury was asked if the Easterling No. 1-H well was capable of being reproduced by drilling another well as it existed at the time of the occurrence in question. The jury answered "No." In Question 6, the jury was asked what would have been the reasonable and necessary costs of drilling and equipping the Easterling 2-H well in the condition the Easterling 1-H well was equipped before the occurrence in question less the salvage value. The jury answered that the reasonable and necessary drilling and equipping costs for the Easterling No. 2-H well were $1.5 million. In Question 7, the jury was asked the reasonable fair market value of the Easterling 1-H well immediately before

the occurrence in question and immediately after the occurrence in question. The jury was instructed that fair market value means the price a willing seller not obligated to sell can obtain from a willing buyer not obligated to buy. The jury answered that the value of the Easterling 1-H before the occurrence was 5.9 million dollars and after the time of the occurrence was 0.

We will not disregard a jury's determination of damages merely because its reasoning in reaching its figures is unclear. *Enright v. Goodman Distribution, Inc.*, 330 S.W.3d 392, 403 (Tex. App. —Houston [14th Dist.] 2010, no pet.). A jury generally has discretion to award damages within the range of evidence presented at trial. *Gulf States Utilities. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). It may not, however, "arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial." *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App. Austin —1993, writ denied).

Charles Rippy testified that the fair market value of the Easterling 1-H well just prior to the drill pipe breaking was nine million dollars. Charles Rippy explained that they drilled the Sims 3-H as a concept well to gather information before drilling the Easterling 1-H. Charles Rippy explained that he used the production data from the Sims 3-H to help determine the fair market value of the Easterling 1-H.

Knight produced evidence that the fair market value of the Easterling 1-H before the drill pipe break was between $1,053,315 and $2,231,600. Knight's fair market value

made reductions for potential mechanical problems. Knight's expert explained in detail how he arrived at those values.

The jury's answer of 5.9 million dollars is in the range of evidence presented at trial. The jury heard differing methods for arriving at the value of the well and for discounting the value for risk. Although no one testified to the 5.9 million figure determined by the jury, the amount is supported by the evidence at trial. We find that the evidence is legally sufficient to support the jury's determination of damages. Additionally, we cannot say that the jury's verdict as to this claim is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Knight argues that the trial court admitted "numerous" exhibits relating to lost profits over objection. Knight contends that such evidence was confusing, prejudicial, and irrelevant.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Interstate Northborough Partnership v. State*, 66 S.W.3d 213, 220 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). Knight does not specifically identify which exhibits were erroneously admitted. However, we find that the trial court did not abuse its discretion in admitting exhibits relating to lost profits.

Knight also argues that the trial court erred in refusing its requested instructions in Question 7. Knight requested the trial court include two instructions: (1) lost profits should not be considered in fair market value, and (2) lost profits should be shown with reasonable certainty.

We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). The trial court has considerable discretion to determine proper jury instructions, and "[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *Id*. An appellate court will not reverse a judgment for a charge error unless that error was harmful because it "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts." TEX. R. APP. P. 61.1; *Thota v. Young*, 366 S.W.3d at 687.

Knight has not shown that the trial court abused its discretion in denying the requested instructions. Moreover, because we found that the jury's answer of 5.9 million dollars was supported by the evidence, Knight has not shown that failure to include the instruction probably caused the rendition of an improper judgment.

Knight further argues that the proper measure of damages when the damaged property is an oil or gas well is the lesser of the cost of drilling and equipping a replacement well, less the value of salvage and the reasonable cash market value of the

well immediately before the occurrence in question citing *Basic Energy Services, Inc. v. D-S-B Props., Inc.*, 367 S.W.3d 254, 262 (Tex. App. —Tyler 2011, no pet.). Knight states that the trial court should have entered judgment on the jury's answer in Question 6 rather than the jury's finding in Question 7.

If the well can be reproduced by drilling another one, the proper measure of damages is the cost of drilling and equipping another such well, less the value of any salvage; provided that this cost does not exceed the reasonable cash market value of the well immediately before the tubing collapse. *Atex Pipe & Supply, Inc. v. Sesco Production Co.*, 736 S.W.2d 914, 917 (Tex. App. —Tyler 1987, writ den'd). If the well cannot be reproduced or if the cost of reproduction exceeds the value of the well, the proper measure of damages is the difference in the reasonable cash market value of the well, as equipped, immediately before and immediately after the tubing collapse. *Id*.

In Question 5, the jury found that the Easterling No. 1-H well was not capable of being reproduced by drilling another well as it existed at the time of the occurrence in question. The trial court did not abuse its discretion in submitting Question 5 to the jury. Because the jury found the well could not be reproduced, the proper measure of damages is the difference in the reasonable cash market value of the well, as equipped, immediately before and immediately after the drill pipe failure as found by the jury in Question 7. *See Atex Pipe & Supply, Inc. v. Sesco Production Co.*, 736 S.W.2d at 917.

We overrule the fifth, sixth, and seventh issues on appeal.

Knight Oil Tools v. Rippy Oil Company     Page 16

## CONCLUSION

We affirm the trial court's judgment.


JOHN E. NEILL
Justice


Before Chief Justice Gray,
Justice Davis, and
Justice Neill
(Chief Justice Gray dissents with a note)*
Affirmed
Opinion delivered and filed December 30, 2020
[CV06]
*(Chief Justice Gray dissents. A separate opinion will not issue. Chief Justice Gray notes, however, that prior to the jury trial the trial court granted a motion for summary judgment on the affirmative defenses of indemnity and release. The basis of the motion was that the person who had the authority to order and accept delivery of the pipe for Rippy did not have the authority to accept the terms and conditions on the delivery ticket. The question thus framed was the scope of the agency; was he a "company man" or was he merely a "job superintendent" with no real authority to contract on behalf of the company. Chief Justice Gray believes that Rippy did not conclusively prove through summary judgment evidence that the well consultants did not have that limitation on their authority. The evidence established that they had the authority to agree to the terms necessary to order equipment and accept delivery on behalf of the company. At the very least the scope of the agency was disputed. Moreover, because the evidence regarding these defenses also impacts the reasonableness of the reliance on the representation of Knight, the evidence of the defenses has evidentiary implications on the reasonableness of Rippy's reliance upon the representations of Knight as to the quality/condition of the pipe that was delivered, thus potentially impacting the jury findings on the elements of Rippy's claims. Therefore, in fairness, a new trial is warranted which is not limited to the affirmative defenses. Because the Court affirms the trial court's judgment, Chief Justice Gray respectfully dissents.)



# COURT OF APPEALS
### TENTH DISTRICT OF TEXAS

November 10, 2021

No. 10-18-00284-CV

## KNIGHT OIL TOOLS, INC.

v.

## RIPPY OIL COMPANY, RIPPY INTEREST LLC, THE GENECOV GROUP, INC., AND JOHN D. PROCTOR

From the 278th District Court
Leon County, Texas
Trial Court No. O-10-498

# JUDGMENT

This Court has reviewed the briefs of the parties and the record in this proceeding as relevant to the issues raised and finds no reversible error is presented. Accordingly, the trial court's judgment signed on June 4, 2018, is affirmed.

It is further ordered that Rippy Oil Company, is awarded judgment against Knight Oil Tools, Inc. for Rippy Oil Company's appellate costs that were paid, if any, by Rippy Oil Company; and all unpaid appellate court costs, if any, are taxed against Knight Oil Tools, Inc.

A copy of this judgment will be certified by the Clerk of this Court and delivered to the trial court clerk for enforcement.

PER CURIAM

**Nita Whitener**, Clerk

By: Kim Wernet, Deputy Clerk



EXHIBIT

I

# General Liability Policy – Declarations

**ACE USA** 

☐ Bankers Standard Insurance Company
436 Walnut Street, PO Box 1000
Philadelphia, Pennsylvania 19106-3703

☐ ACE Property and Casualty Insurance Company
436 Walnut Street, PO Box 1000
Philadelphia, Pennsylvania 19106-3703

☐ Century Indemnity Company
436 Walnut Street, PO Box 1000
Philadelphia, Pennsylvania 19106-3703

☐ Indemnity Insurance Company of North America
436 Walnut Street, PO Box 1000
Philadelphia, Pennsylvania 19106-3703

☐ ACE Fire Underwriters Insurance Company
436 Walnut Street, PO Box 1000
Philadelphia, Pennsylvania 19106-3703

☐ Insurance Company of North America
436 Walnut Street, PO Box 1000
Philadelphia, Pennsylvania 19106-3703

☒ ACE American Insurance Company
436 Walnut Street, PO Box 1000
Philadelphia, Pennsylvania 19106-3703

☐ Pacific Employers Insurance Company
436 Walnut Street, PO Box 1000
Philadelphia, Pennsylvania 19106-3703

## POLICY IDENTIFICATION

| HDO | G24940214 |

**NAMED INSURED AND ADDRESS**

Knight Oil Tools, Inc.
2030 Hwy 90 E
Lafayette, LA 70508

PRIOR POLICY NO. OR NEW: HDO G23749257

PRODUCER CODE: 273873    COMM: Nil

Knox Insurance Group, LLC
301 E. Kaliste Saloom Rd., Suite 300A
Layfayette, LA 70508

MARKETING OFFICE: 5EM/HOU
MARKET HAZARD CODE:
PIIC CODE: 5084    INDUSTRY CODE:

| POLICY IS | : | Renewal OF HDO G23749257 |
| NAMED INSURED IS | : | Corporation |
| BUSINESS OF INSURED | : | Wholesale |
| POLICY PERIOD | : | FROM 03/31/2010    TO 03/31/2011 |
| | | 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE. |

## PREMIUM PAYMENT CONDITIONS

| AUDIT PERIOD | : | ** |
| PAYMENT FREQUENCY | : | ** |
| PAYMENT SCHEDULE | : | ** |

TOTAL ADVANCE PREMIUM: $ 90,842

PREMIUMS RESULTING FROM AUDIT ARE NOT INCLUDED IN THE ABOVE.

LD-8E00b (8/96) Printed in the U.S.A.

**EXHIBIT J**

| DECLARATIONS – GENERAL LIABILITY POLICY | Page 2 | | POLICY IDENTIFICATION |
|---|---|---|---|
| | | HDO | G24940214 |

## COVERAGES AND LIMITS OF INSURANCE

In return for the payment of premium indicated above, we agree with you to provide the following coverage(s) at the limits shown, subject to all of the terms and conditions of this policy.

**Coverage Form:**

Limits of Insurance

COMMERCIAL GENERAL LIABILITY

| | | |
|---|---|---|
| Each Occurrence Limit | $ | 1,000,000 |
| Damage to Premises Rented to You Limit | $ | 100,000 |
| Medical Expense Limit (any one person or organization) | $ | 5,000 |
| Personal & Advertising Injury Limit | $ | 1,000,000 |
| General Aggregate Limit (other than Products/ | $ | 10,000,000 |
| Completed Operations) | | |
| Products/Completed Operations Aggregate Limit | $ | 2,000,000 |

## SCHEDULE OF LOCATIONS

**LOCATION NUMBER AND ADDRESS**

LD –2F52b (Ed. 10/01) Printed in U.S.A.

AA067274a

## DECLARATIONS – GENERAL LIABILITY POLICY  Page 3

POLICY IDENTIFICATION
HDO   G24940214

# SCHEDULE OF COVERAGES

**COVERAGE PART:**

| Location Number | Coverage | Class Code/ Classification Description 50050 | Premium Basis | Exposure | Rate | Premium |
|---|---|---|---|---|---|---|
| All | All | Wholesale | ** | ** | $ ** | $ 90,842 |
| | | **Refer to the Notice of Election | | | | |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |
| | | | | | $ | $ |

TOTAL PREMIUM FOR THIS COVERAGE PART                    $ 90,842

When used as a premium basis the following code definitions apply:

A - Area – Per 1,000 square feet of area
C - Total Cost – per $1,000 of total cost
D - If Any
E - Admissions – per 1,000 admissions
F - Flat Charge
J - Total Operating Expenditures – per $1,000 of Expenditures

O - Other
P - Payroll – per $1,000 of payroll
S - Gross Sales – per $1,000 of Gross Sales
U - Units
X - Each

LD-2F51a (Ed. 3/87) Printed in U.S.A.

AA067271a

Case 6:21-cv-00474-RS-CJW Document 8-1 Filed 02/02/22 Page 136 of 289 PageID #:
Case 4:24-cv-00474-SBJ Document 1-1 Filed 12/10/24 Page 137 of 289 Page ID #:
1031

**DECLARATIONS – GENERAL LIABILITY POLICY**   **Page 4**

---

## FORMS AND ENDORSEMENTS (Page 1 of 2)

### FORMS AND ENDORSEMENTS ATTACHED TO THIS POLICY AT INCEPTION

#### SCHEDULE OF COVERAGE FORMS

| | |
|---|---|
| ALL20887 | ACE Producer Compensation Practices & Policies |
| ILP0010104 | U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders |
| IL00171198 | Common Policy Conditions |
| CG00011207 | Commercial General Liability Coverage Form |
| ALL2Y31b | Arkansas Notice to Policyholders |
| ALL22368 | Colorado Fraud Statement |
| ALL2U78b | Notice To All Oklahoma Policyholders |
| ALL4Y30d | Information and Complaints (TX) |
| ALL11559d | Risk Control Services for Texas Policyholders |

#### SCHEDULE OF FORMS AND ENDORSEMENTS

| Endt. No. | Form No. | Description |
|---|---|---|
| 1. | LD2X58 | Broad Form Named Insured |
| 2. | LD19643e | Reimbursement of Deductible Endorsement |
| 3. | CC1E15 | Gulf Of Mexico Extension |
| 4. | CC1E15 | Watercraft Work Platform Coverage Endorsement |
| 5. | LD21730 | Additional Insured Where Required By Written Contract |
| 6. | LD9863A | Employee Benefits Liability Endorsement |
| 7. | LD3R16 | Exclusion - Asbestos |
| 8. | LD8R38 | Exclusion Extremely Low Frequency Electromagnetic Fields (ELF-EMF) |
| 9. | LD4S35 | Exclusion - Lead |
| 10. | LD20284 | In Rem |
| 11. | LD15284 | MTBE Exclusion |
| 12. | LD20287 | Non-Contributory Endorsement For Additional Insureds |
| 13. | LD5T98 | Nonowned Watercraft Exception |
| 14. | LD6Z60a | Personal Injury and Advertising Injury Liability |
| 15. | LD0846 | Professional Liability Exclusion Endorsement |
| 16. | LD12991a | Pollution Exclusion - Time Element Exception (Broad Form) |
| 17. | LD21733 | Radioactive Matter Exclusion |
| 18. | LD15270 | Silica, Dust and Particulate Matter Exclusion |
| 19. | ALL18057-0305 | Notification of Premium Adjustment |
| 20. | CG20260704 | Additional Insured - Designated Person or Organization |

---

This declaration and the coverage form(s) and endorsements, if any, listed above and attached, completes this policy.

COUNTERSIGNED AT: _____   AUTHORIZED AGENT: _____

DATE: _____

## SCHEDULE OF FORMS AND ENDORSEMENTS

| Named Insured | **Knight Oil Tools, Inc.** | | Endorsement Number **(Page 2 of 2)** |
|---|---|---|---|
| Policy Symbol **HDO** | Policy Number **G24940214** | Policy Period **03/31/2010**   to   **03/31/2011** | Effective Date of Endorsement **03/31/2010** |
| Issued By (Name of Insurance Company) **ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

| Endt. No. | Form No. | Description |
|---|---|---|
| 21. | CG02241093 | Earlier Notice Of Cancellation Provided By Us |
| 22. | CG21471207 | Employment-Related Practices Exclusion |
| 23. | CG22430798 | Exclusion - Engineers, Architects or Surveyors Professional Liability |
| 24. | CG21411185 | Exclusion - Intercompany Products Suits |
| 25. | CG22330798 | Exclusion - Testing or Consulting Errors and Omissions |
| 26. | CG21671204 | Fungi or Bacteria Exclusion |
| 27. | CG21700108 | Cap on Losses From Certified Acts of Terrorism |
| 28. | CG21800108 | Certified Acts of Terrorism Aggregate Limit; Cap on Losses From Certified Acts of Terrorism |
| 29. | CG24040509 | Waiver of Transfer of Rights of Recovery Against Others To Us |
| 30. | IL09850108 | Disclosure Pursuant to Terrorism Risk Insurance Act |
| 31. | ALL21101 | Trade or Economic Sanctions Endorsement |
| 32. | IL00210702 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| 33. | CG26080490 | Arkansas Changes - Multi-Year Policies |
| 34. | IL02310908 | Arkansas Changes - Cancellation and Nonrenewal |
| 35. | IL02280907 | Colorado Changes - Cancellation and Nonrenewal |
| 36. | CG01181204 | Louisiana Changes - Legal Action Against Us |
| 37. | CG01250303 | Louisiana Changes - Insuring Agreement |
| 38. | CG26841204 | Louisiana Changes - Transfer of Rights of Recovery Against Others To Us Condition |
| 39. | IL02770908 | Louisiana Changes - Cancellation and Nonrenewal |
| 40. | IL01650908 | North Dakota Changes - Examination of Your Books and Records |
| 41. | IL02340908 | North Dakota Changes and Cancellation and Nonrenewal |
| 42. | IL02980908 | New Mexico Changes - Cancellation and Nonrenewal |
| 43. | CG01091185 | Kansas And Oklahoma Changes - Transfer of Rights |
| 44. | IL02360907 | Oklahoma Changes - Cancellation and Nonrenewal |
| 45. | CG01030606 | Texas Changes |
| 46. | CG01861204 | Utah Changes |
| 47. | IL02660908 | Utah Changes - Cancellation and Nonrenewal |
| 48. | CG01600798 | Wyoming Changes |
| 49. | IL01140908 | Wyoming Changes - Defense Costs |
| 50. | IL02520907 | Wyoming Changes - Cancellation and Nonrenewal |
| 51. | CC1K11e | Signatures |

Authorized Agent

CC-1E15 Ptd. In U.S.A.

POLICY NUMBER: HDO G24940214



## ACE Producer Compensation
## Practices & Policies

ACE believes that policyholders should have access to information about ACE's practices and policies related to the payment of compensation to brokers and independent agents. You can obtain that information by accessing our website at http://www.aceproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

ALL-20887 (10/06)

POLICY NUMBER:  HDO G24940214

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

IL P 001 01 04

© ISO Properties, Inc., 2004

Page 1 of 1

**POLICY NUMBER:** HDO G24940214

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. **10** days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. **30** days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

Case 6:23-cv-02419-PGB-RMN Document 81-1 Filed 02/10/22 Page 148 of 289 PageID #: 1042

**POLICY NUMBER: HDO G24940214**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

© ISO Properties, Inc., 2006

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© ISO Properties, Inc., 2006

□

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

 © ISO Properties, Inc., 2006

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(b)** the operation of any of the machinery or equipment listed in Paragraph f.**(2)** or f.**(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

© ISO Properties, Inc., 2006

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

© ISO Properties, Inc., 2006

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

## 2. Exclusions

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

© ISO Properties, Inc., 2006

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

© ISO Properties, Inc., 2006

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. Damages under Coverage A; and

b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

© ISO Properties, Inc., 2006

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph **a.** above;

      (2) The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph **f.** does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

© ISO Properties, Inc., 2006

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it Is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Moblie equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        (1) Power cranes, shovels, loaders, diggers or drills; or

        (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

    e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        (2) Cherry pickers and similar devices used to raise or lower workers;

    f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    (1) Equipment designed primarily for:

        (a) Snow removal;

        (b) Road maintenance, but not construction or resurfacing; or

        (c) Street cleaning;

    (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

    f. The use of another's advertising idea in your "advertisement"; or

    g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

© ISO Properties, Inc., 2006

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those insurers.

© ISO Properties, Inc., 2006

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

  **(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

  **(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

  **a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

  **b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

  **c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

  **a.** The statements in the Declarations are accurate and complete;

  **b.** Those statements are based upon representations you made to us; and

  **c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

  **a.** As if each Named Insured were the only Named Insured; and

  **b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

  **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

  **b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

  **a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

  **b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

© ISO Properties, Inc., 2006

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

© ISO Properties, Inc., 2006

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    **(2)** The providing of or failure to provide warnings or instructions.

© ISO Properties, Inc., 2006

**CG 00 01 12 07** □

## POLLUTION EXCLUSION – TIME ELEMENT EXCEPTION
### (Broad Form)

| Named Insured | |
|---|---|
| Knight Oil Tools, Inc. | |

| Policy Symbol | Policy Number | Policy Period | Endorsement Number |
|---|---|---|---|
| HDO | G24940214 | 03/31/2010 to 03/31/2011 | 16 |
| | | | Effective Date of Endorsement |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement replaces any pollution exclusion and amends all insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This insurance does not apply to any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to "pollution", however caused.

This exclusion does not apply to "bodily injury" or "property damage" caused by "pollution" if the "pollution":

1. Is both unexpected and unintended from the standpoint of the Insured;
2. is at or from any:

a. premises, site or location which is owned by or occupied by, or rented or loaned to, any insured; or
b. premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor;

3. commenced abruptly and instantaneously and can be clearly identified as having commenced entirely at a specific time on a specific date during the policy period.

4. is known by any insured within 72 hours of the commencement of the discharge, dispersal, seepage, migration, release or escape of "pollutants"; and

5. is reported to us within 30 days of the commencement of the discharge, dispersal, seepage, migration, release or escape of "pollutants"; and

Notwithstanding anything to the contrary in the foregoing paragraphs and regardless of the cause of the "pollution", this policy shall not apply to:

1. loss of, damage to or loss of use of property directly or indirectly resulting from subsurface operations of the insured, and/or removal of, loss or damage to subsurface oil, gas or other substance;
2. any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to actual or alleged "pollution" or contamination at or from a waste site, meaning the part of any premises, site or location which is or was at the time used by any insured or by others for the storage, disposal, processing or treatment of waste of any kind. Waste site includes but is not limited to any landfill, pit or dumping ground, treatment, storage and disposal facility, lagoon or pond, drum storage or disposal area, disposal pipe outfall, injection well or any other repository of waste of any kind, whether permitted or not.

LD-12991a (08/04)          Reprinted with permission of Insurance Services Office          Page 1 of 2

The following definitions are added to the policy:

"Pollution" means the actual, alleged, or potential presence in or introduction into the environment of any "pollutants", if such "pollutants" have, or are alleged to have, the effect of making the environment impure, harmful, or dangerous. Environment includes any air, land, structure or the air therein, watercourse or water, including underground water, and biota.

"Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, bacteria, virus and "waste".

"Waste" means any substance that:
a. is left over, or no longer in use, or discarded;
b. is to be reclaimed, reconditioned or recycled; or
c. has been removed, treated, stored or disposed of as part of any environmental remediation effort.

Notwithstanding the foregoing, we shall have no duty to defend the insured against any claim or "suit" or proceeding arising out of or in any way related to "pollution".

_____
                                    Authorized Agent



# Arkansas
# Notice To Policyholders

# QUESTIONS ABOUT YOUR INSURANCE?

If you have questions about your insurance, need coverage information, or require assistance in resolving complaints, do not hesitate to contact either your insurance agent, or ACE USA, Customer Service Department, 436 Walnut Street, Philadelphia, PA 19106-3703, telephone 1-800-352-4462.

If we fail to provide you with reasonable and adequate service, you should feel free to contact:

Arkansas Insurance Department
1200 West Third Street
Little Rock, AR 72201
(501) 371-2640 or 800-852-5494

ALL-2Y31b (11/09)

# COLORADO FRAUD STATEMENT

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

ALL-22368 (06/07)

© ISO Properties, Inc., 2004

# NOTICE TO ALL OKLAHOMA POLICYHOLDERS

**WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

You are insured by the Company listed on the Signature page which is named on the first page of the Declarations of this policy.  It is an ACE USA company and has its principal office at 436 Walnut Street, PO Box 1000, Philadelphia, PA  19106-3703.

ALL-2U78b (2/06) Ptd. in **U.S.A.**

**POLICY NUMBER:** HDO G24940214



**ace group**

# Information and Complaints

This information is being provided to you pursuant to the requirements of Title 28, Part 1, Chapter 1, Subchapter E. 1.601 of the Texas Administrative Code relating to our Toll Free information and complaint number.

## IMPORTANT NOTICE

To obtain information or make a complaint:

You may call the Company's toll-free telephone number for information or to make a complaint at:

### 1-(800) 352-4462

You may also write to the Company at:

_ACE USA
Customer Services
PO Box 1000
Philadelphia, PA 19106-3703

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

### 1-(800) 252 3439

You may write the Texas Department of Insurance

P. O. Box 149104
AUSTIN, TX 78714-9104
FAX # (512) 475-1771
Web: http://www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

PREMIUM OR CLAIM DISPUTES: Should you have a dispute concerning your premium or about a claim you should contact your agent or the company first. If the dispute is not resolved you may contact the Texas Department of Insurance.

ATTACH THIS NOTICE TO YOUR POLICY: This notice is for information only and does not become a part or condition of the attached document.

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de la Compania para informacion o para someter una queja at:

### 1 (800) 352-4462

Usted tambien puede escribir a la Compania:

_ACE USA
Customer Services
PO Box 1000
Philadelphia, PA 19106-3703

Puede communicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

### 1 (800) 252-3439

Puede escribir al Departamento de Seguros de Texas

P. O. Box 149104
AUSTIN, TX 78714-9104
FAX # (512) 475-1771
Web: http://www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

DISPUTAS SOBRE PRIMAS O RECLAMOS: Si tiene una disputa concemiente a su prima o un reclamo, debe comunicarse con el agente o la compania primero. Si no se resuelve la disputa puede entonces communicarse con el departamento de Seguros en Texas

UNA ESTE AVISO A SU POLIZA: Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

ALL- 4Y30d (10/2009)

**POLICY NUMBER:  HDO G24940214**



**ACE USA**

ACE USA
Risk Control Services
436 Walnut Street
Philadelphia, PA 19106-3703

Phone: 1.866.357.3797
Fax: 215.640.5084
www.ace-ina.com

National Manager, Jurisdictional Services

RE: **RISK CONTROL SERVICES FOR TEXAS POLICYHOLDERS**
Commercial Automobile Liability, General Liability, Professional Liability, and Medical Professional Liability (other than Hospitals)

The ACE Companies are required by Texas law and regulations to maintain or provide accident prevention services for its commercial automobile, general liability and professional liability policyholders. The Ace Companies offer an array of accident prevention services in Texas at no additional charge. These services are intended to help prevent and/or minimize loss.

These services include but are not limited to:  individual risk surveys; improvement recommendations; loss investigation; specific loss problem identification and recommended improvement actions.

ACE may recommend one or more of these services based upon hazard, experience, and size of your Texas operations.  You have the choice of receiving or declining any of the services offered.  If you wish to decline all of the services or wish to receive only selected risk control service, please indicate that by signing and dating this letter in the space provided below.  Please mail or fax to the captioned address or fax number.  If you decline all of ACE's risk control services or choose only a support service, such as ergonomics survey, driving training, or other services and not a complete risk survey, we still have a responsibility under Texas law and regulation to monitor your losses.  In the event you start to have a loss problem and a trend is established, and/or adverse loss ratio is developed, we will contact you and offer to assist you in addressing the situation.

Sincerely,

National Manager, Jurisdictional & Regulatory Services
ACE USA Risk Control Services
436 Walnut Street, Philadelphia, PA 19106-3703
or call toll free at:  1-866-357-3797

☐  I am aware of the loss control services offered and decline them.  I have made other arrangements for these services.

☐  I wish to obtain the following offered accident prevention services:

_____

☐  I have no risk control services needs now.  I reserve the right to request loss control services within the period.

_____   _____   _____
(Signature)                        (Phone #)                          (Date)

Print Name: _____   Policy # _____

Company Name: _____

Address: _____

City, State, Zip: _____

*One of the ACE Group of Insurance & Reinsurance Companies*
This Company has undertaken a survey of your premises, equipment, or operations (whichever is pertinent to the type of insurance applied for or provided) for the purpose of supporting the functions of risk underwriting.  Any recommendations or information provided is not intended as a substitute for advice from a safety expert or legal counsel you may retain for your own purposes.  It is not intended to supplant any legal duty you may have to provide a safe premises, workplace, product or operation.

ALL- 11559d (10/07)

POLICY NUMBER: HDO G24940214

ENDT. #1

## BROAD FORM NAMED INSURED

| Named Insured | | | |
|---|---|---|---|
| Knight Oil Tools, Inc. | | | Endorsement Number 1 |
| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

It is agreed that:

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations and any business entity incorporated or organized under the laws of the United States of America (including any State thereof), its territories or possessions or Canada (including any Province thereof) in which the Named Insured shown in the Declarations owns, during the policy period, an interest of more than 50 percent. If other valid and collectible insurance is available to any business entity covered by this policy solely by reason of ownership by the Named Insured shown in the Declarations in excess of 50 percent, this insurance is excess over the other insurance, whether primary, excess, contingent, or any other basis.

_____
Authorized Agent

LD-2X58 Ptd. in U.S.A.

ENDT. #2

# REIMBURSEMENT OF DEDUCTIBLE ENDORSEMENT
## ALLOCATED LOSS ADJUSTMENT EXPENSE ("ALAE")
## INCLUDED IN THE DEDUCTIBLE AMOUNT

| Named Insured Knight Oil Tools, Inc. | Endorsement Number 2 |
|---|---|
| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) ACE American Insurance Company | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies all insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

I) **DEDUCTIBLE AMOUNT**

   1) Deductible Amount:  $ 350,000

   2) The Deductible Amount applies separately to:

      (a) The sum of:

         (i) damages per "occurrence" under Coverage A; and

         (ii) medical expenses per accident under Coverage C; and

         (iii) "ALAE" incurred with respect to an "occurrence" under Coverage A.

      (b) The sum of:

         (i) damages sustained by any one person or organization under Coverage B; and

         (ii) "ALAE" incurred with respect to an offense under Coverage B.

II) **ADDITIONAL PROVISIONS**

   1) "We" will pay all sums that "we" become legally obligated to pay up to the Limits of Insurance under this policy.

   2) "You" must reimburse us up to the Deductible Amount for any amounts we have paid under this policy.

   3) The Deductible Amount will apply as shown in Section I of this endorsement regardless of the number of claimants, Insureds, claims made or "suits" brought, or persons or organizations making claims or bringing "suits".

   4) If "you" fail to reimburse "us" for any amount due under this endorsement, or fail to provide "us" any collateral that "we" require, "you" will be in default of "your" obligations to "us", and "we" may take any

LD-19643e (09/09)

Includes copyrighted material of Insurance Services Office, Inc. with its permission

steps "we" deem necessary to enforce our rights against "you", including but not limited to drawing on any amount of collateral "we" hold or canceling this policy, if permitted by law.

5) Each Named Insured is jointly and severally liable for all reimbursable amounts under this endorsement.

6) If "we" recover any payment "we" make under this policy from anyone liable for damages or "ALAE", the amount "we" recover will first be applied to any payments "we" made in excess of the Deductible Amount and to "our" expenses in obtaining the recovery. The remainder of the recovery, if any, will reduce the amount that is reimbursable by "you".

III) **ALLOCATED LOSS ADJUSTMENT EXPENSE DEFINITION**

"**Allocated Loss Adjustment Expense(s)" or "ALAE**" means such claim expenses, costs and any interest provided for under Section I – Coverages, Supplementary Payments – Coverages A and B of this policy, that are incurred in connection with the investigation, administration, adjustment, subrogation, settlement or defense of any claim or lawsuit that we, under our accounting practices, directly allocate to a particular claim, whether or not a payment indemnifying the claimant(s) is made. Such expenses include, but are not limited to all court costs, fees and expenses; fees for service of process; fees and expenses to attorneys for legal services; the cost of services of undercover operations and detectives; fees to obtain medical cost containment services; the cost of employing experts for the purpose of preparing maps, photographs, diagrams, and chemical or physical analysis, or for expert advice or opinion; the cost of obtaining copies of any public records; and the cost of depositions and court reporters or recorded statements, provided, however, that Allocated Loss Adjustment Expense shall not include the salaries and traveling expenses of our employees or our overhead and adjusters' fees.

IV) **NO OTHER CHANGES**

All other terms of this policy, including those with respect to:

(a) Our right and duty to defend any "insured" against a "suit" asking for damages to which this insurance applies, and

(b) Limits of Insurance, and

(c) Your Duties In The Event Of Occurrence, Offense, Claim Or Suit

remain unchanged.

_____
Authorized Agent

LD-19643e (09/09)

Includes copyrighted material of Insurance Services Office, Inc. with its permission

## GULF OF MEXICO EXTENSION

| Named Insured | Knight Oil Tools, Inc. | | Endorsement Number<br>3 |
|---|---|---|---|
| Policy Symbol<br>HDO | Policy Number<br>G24940214 | Policy Period<br>03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

The Definition of "Coverage territory" is replaced by the following:

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

c. All other parts of the world if the injury or damage arises out of:

   (1) Goods or products made or sold by you in the territory described in a. above;
   (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business;
   (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication; or

d. Notwithstanding the foregoing, "coverage territory" also means the Gulf of Mexico, but only for the operations of the Named Insured.

provided the insured's responsibility to pay damages under c. and d. above is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

CC-1E15 Ptd. In U.S.A.

Authorized Agent

# WATERCRAFT WORK PLATFORM COVERAGE ENDORSEMENT

| Named Insured | Knight Oil Tools, Inc. | | |
|---|---|---|---|

| Policy Symbol HDO | Policy Number G23749257 | Policy Period 03/31/2009 to 03/31/2010 | Endorsement Number 4 |
|---|---|---|---|

| | | | Effective Date of Endorsement |

Issued By (Name of Insurance Company)
ACE American Insurance Company

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

1. It is agreed that Section I Coverage A, exclusion g. will not apply to any liability arising out of the deck space of any owned or chartered tug, barge, work boat, crew boat, drilling or workover barge, when such watercraft is not operating under navigation and when such deck space is used only as a work platform in connection with oil, gas, seismic or geothermal exploration production operations of the Named Insured.

2. Regardless of the limited watercraft coverage provided by this policy, this policy excludes any losses recoverable under any of the following or similar types policies: Environmental Liability, Hull, Protection & Indemnity including Contractual Liability or Marine Operators/Charter's Liability Coverage on operated, chartered or brokered watercraft; regardless of whether such insurance is actually in force at the time of the loss and regardless of the limit of liability available under such insurance.

3. Solely for purposes of coverage provided under this endorsement, the following supersedes any Pollution Exclusion contained in or endorsed to this policy:

This insurance does not apply to any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to pollution, however caused.
Pollution includes the actual, alleged or potential presence in or introduction into the environment of any substance if such substance has, or is alleged to have, the effect of making the environment impure, harmful, or dangerous. Environment includes any air, land, structure or the air therein, watercourse or water, including underground water.

We shall have no duty to defend any suit arising out of or in any way related to pollution.

*Ewa approved*

CC-1E15 Ptd. In U.S.A. | Authorized Agent

# ADDITIONAL INSURED WHERE REQUIRED BY WRITTEN CONTRACT

| Named Insured<br>Knight Oil Tools, Inc. | | Endorsement Number<br>5 |
|---|---|---|
| Policy Symbol<br>HDO | Policy Number<br>G24940214 | Policy Period<br>03/31/2010   to   03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)<br>ACE American Insurance Company | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies all insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following is added to Section II.2 – Who Is An Insured:

    e.    Any person or organization that you are required to include as an additional insured under this policy because of a written contract that:

        1)    Is in effect during this policy period; and
        2)    Was executed prior to the "occurrence" of the "bodily injury" or "property damage"; and
        3)    Qualifies as an "insured contract" as defined in this policy.

Such person or organization is an additional insured only for:

        4)    Coverage under Section I – Coverages, Coverage A. Bodily Injury and Property Damage Liability; and
        5)    Liability arising out of "your work" or "your product" for that additional insured; and
        6)    For the period of time required by the written contract and in no event beyond the expiration of this policy.

In the event that the Limits of Insurance provided by this policy exceed the Limits of Insurance required by the written contract:

        7)    The insurance provided by this endorsement shall be limited to the Limits of Insurance required by the written contract; and
        8)    This endorsement shall not increase the Limit of Insurance stated in the Declarations under Item 3. Limits of Insurance pertaining to the coverage provided herein.

Any coverage provided by this endorsement to an additional insured shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis unless the written contract specifically requires that this insurance apply on a primary or non-contributory basis.

In accordance with the terms and conditions of the policy and as more fully explained in the policy, as soon as practicable, each additional insured must give us prompt notice of any "occurrence" which may result in a claim, forward all legal papers to us, cooperate in the defense of any actions, and otherwise comply with all of the policy's terms and conditions.

_____

Authorized Agent

LD-21730 (01/07) Printed in U.S.A.

Includes copyrighted material of Insurance Services Office, Inc. with its permission

**POLICY NUMBER: HDO G24940214**
Case 6:23-cv-24191-DRS-CDM Document 1-1 Filed 02/02/22 XBX Page 184 of 230 PageID #: 1080

**ENDT. #6**

# EMPLOYEE BENEFITS LIABILITY ENDORSEMENT

| Named Insured    Knight Oil Tools, Inc. | | | Endorsement Number  6 |
|---|---|---|---|
| Policy Symbol  HDO | Policy Number  G24940214 | Policy Period  03/31/2010   to   03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company)  ACE American Insurance Company | | | |

Insert the policy number.  The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE.

Limits of Insurance

| | | |
|---|---|---|
| Each Claim Limit | $ | 1,000,000 |
| Aggregate Limit | $ | 1,000,000 |
| Retroactive Date | | N/A |
| Deductible Amount | $ | 350,000 |

(If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

### INSURING AGREEMENT

We will pay under this endorsement those sums that the insured becomes legally obligated to pay as damages because of a claim or "suit" brought by any employee, former employee, or their beneficiaries or legal representatives in connection with any negligent error, omission, or breach of duty in the "administration" of your "employee benefits" programs.

We will have the right and the duty to defend any "suit" seeking those damages.  But:

The amount we will pay for damages is limited as described in the Schedule as Limits of Insurance;

We may investigate and settle any claim or "suit" at our discretion; and

Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under this endorsement.

This insurance applies to negligent errors, omissions, breaches of duty, or misstatements only if a claim for damages is first made against any insured during the policy period or any Extended Reporting Period we provide under the paragraph titled Extended Reporting Period.

This insurance does not apply to negligent errors, omissions, breaches of duty, or misstatements which occurred before the Retroactive Date shown above, or which occur after the end of the policy period.

### WHO IS AN INSURED

With respect to this endorsement, Section II – Who Is An Insured is modified to include employees only while authorized to act in the "administration" or your "employee benefits" programs.

### EXCLUSIONS

Insurance under this endorsement does not apply to any claim or "suit" arising out of:

any dishonest, fraudulent, criminal or malicious act;

any "Bodily Injury," "Personal Injury," "Advertising Injury," or "Property Damage";

any claim for failure of performance of contract by any Insurer;

any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law;

any termination of employment;

any failure of stock to perform as represented by you;

any advice given by you to your "employees" to participate or not to participate in stock subscription plans; or

any actual or alleged error or omission or breach of duty, committed or alleged to have been committed by a trustee, in the discharge of fiduciary duties, obligations or responsibilities Imposed by the Federal Employee Retirement Income Security Act of 1974 or Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Public Law 99-272) or Section 9319 of the Omnibus Budget Reconciliation Act of 1986 (Public Law 99-509) or any amendments to these Acts.

## LIMITS OF INSURANCE

The Limits of Insurance shown in the Schedule of this endorsement and the rules below, fix the most we will pay regardless of the number of:

Insureds;

Claims made or "suits" brought; or

Persons or organizations making claims or bringing "suits".

The Aggregate Limit is the most we will pay for the sum of all damages under this endorsement.

The Each Claim Limit is the most we will pay for damages arising out of any one claim or "suit".

The Limits of Insurance apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## DEDUCTIBLE

A Deductible in the amount in the Schedule of this endorsement applies to each claim covered by this endorsement. We will subtract this amount from the amount of damages payable for each claim.

## ADDITIONAL DEFINITIONS

The following additional definitions are added to Section V – Definitions:

"Employee benefits" means group life insurance, group accident or health insurance, profit sharing plans, pension plans, "employee" stock subscription plans, "employee" travel, vacation, or savings plans, workers compensation, unemployment insurance, social security and disability benefits insurance, and any other similar benefit program.

"Administration" means any of the following acts that you do or authorize a person to do:

Counseling "employees", other than giving legal advice, on "employee benefits" programs;

Interpreting your "employee benefits" programs;

Handling records for your "employee benefits" programs; and

Effecting enrollment, termination or cancellation of "employees" under your "employee benefits" programs.

"Administration" does not include:

The failure of performance of any contract by any insurer;

The failure of any investment plan to perform as represented by an insured;

The inability of "employee benefit" programs to meet their obligation due to insolvency.

LD-9863a

**EXTENDED REPORTING PERIOD**

1. We will automatically provide an Extended Reporting Period as described in paragraph 2. and 3. below if:

   a. This endorsement is cancelled or not renewed; or

   b. We renew or replace this endorsement with insurance that:

      (1) Has a Retroactive Date later than the date shown on this endorsement; or

      (2) Does not apply to errors, omissions, breaches of duty, or misstatements on a claims-made basis.

2. The Extended Reporting Period does not extend the policy period or change the scope of coverage provided. It applies only to claims for errors, omissions, breaches of duty, or misstatements that occur before the end of the policy period but not before the Retroactive Date shown on this endorsement.

   Once in effect, the Extended Reporting Period may not be cancelled.

3. The Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for Five years.

   The Extended Reporting Period does not apply to claims that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such claims.

4. The Extended Reporting Period does not reinstate or increase the Limits of Insurance.

_____

**Authorized Agent**

LD-9863a

Case 6:21-cv-00173-CBW Document 1 Filed 02/10/22 Page 188 of 230 PageID #: 1084

## EXCLUSION – ASBESTOS

| Named Insured | Knight Oil Tools, Inc. | | Endorsement Number 7 |
|---|---|---|---|
| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Eff. Date of Endorsement |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**FARM COVERAGE FORM**
**LIQUOR LIABILITY COVERAGE FORM**
**OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM**
**POLLUTION LIABILITY COVERAGE FORM**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM**
**RAILROAD PROTECTIVE LIABILITY COVERAGE FORM**
**SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY - NEW YORK**

This insurance does not apply to any loss, demand, claim or "suit" arising out of or related in any way to asbestos or asbestos-containing materials.

Authorized Agent

LD-3R16 (Ed. 3/87) Printed in U.S.A. Reprinted in part with permission of Insurance Service Office, Inc., 1985

Case 6:23-cv-00191-JCB Document 1 Filed 02/10/22 Page 190 of 289 PageID #: 1086

# EXCLUSION
## EXTREMELY LOW FREQUENCY ELECTROMAGNETIC FIELDS (ELF-EMF)

| Named Insured    Knight Oil Tools, Inc. | | | Endorsement Number 8 |
|---|---|---|---|
| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM
FARM COVERAGE
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK**

This insurance does not apply to, and we shall have no duty of any kind with respect to, any injury, damage, expense, cost, loss, liability or legal obligation arising out of or allegedly arising out of, or in any way related to, any exposure, other than an instantaneous or abrupt exposure that results in electrocution, electric shock or skin burning, to "extremely low frequency electromagnetic fields," or "ELF-EMF."

"Extremely low frequency electromagnetic fields," or "ELF-EMF," means the 60-Hertz power frequency electric and magnetic fields or invisible lines of force that occur wherever electricity is present.

This exclusion applies, but is not limited, to any injury, damage, expense, cost, loss, liability or legal obligation to trest for, monitor, abate, weaken, control or take any other remedial action with respect to "ELF-EMF"

The addition of this endorsement does not imply that other policy provisions, including but not limited to any pollution exclusion, do not otherwise preclude or exclude coverage for "ELF-EMF" related injury, damage, expense, cost, loss, liability or legal obligation.

_____
Authorized Agent

LD-8R38 (1/94) Printed in U.S.A.

**POLICY NUMBER: HDO G2494021**

**ENDT. #9**

## EXCLUSION - LEAD

| Named Insured | Knight Oil Tools, Inc. | | Endorsement Number 9 |
|---|---|---|---|
| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY FORM
FARM COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK**

**THE COMBINE POLICY – SECTION II
COMMERCIAL FARM POLICY – SECTION II
FARMERS PACKAGE POLICY – SECTION II**

This insurance does not apply to, and we shall have no duty of any kind with respect to, any injury, damage, expense, cost, loss, liability or legal obligation arising out of or allegedly arising out of or in any way related to the toxic properties of lead or lead-containing products, materials or substances.

This exclusion applies to all forms of lead, including but not limited to solid, liquid, vapor and fumes.

This exclusion applies, but is not limited, to any injury, damage, expense, cost, loss, liability or legal obligation to test for, monitor, abate, remove, or take any other remedial action with respect to lead or lead-containing products, materials or substances.

The addition of this endorsement does not imply that other policy provisions, including but not limited to any pollution exclusion, do not also exclude coverage for lead-related injury, damage, expense, cost, loss, liability or legal obligation.

Authorized Agent

LD-4S35 (Ed. 6/92) Ptd. In U.S.A.

**IN REM**

| Named Insured | Endorsement Number |
|---|---|
| Knight Oil Tools, Inc. | 10 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| HDO | G24940214 | 03/31/2010  to  03/31/2011 | |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This Endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
**EXCESS COMMERCIAL GENERAL LIABILITY POLICY**

The following is added to the Insuring Agreement of Coverage A. Bodily Injury and Property Damage (Section I – Coverages):

An action "in rem" against a vessel owned by, leased to, operated by, or chartered by or for you, shall be treated as if it were an action "in personam" against you.

Authorized Agent

LD-20284 (06/06)                                                                          Page 1 of 1

## MTBE EXCLUSION

| Named Insured | |
|---|---|
| Knight Oil Tools, Inc. | Endorsement Number 11 |

| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
|---|---|---|---|

Issued By (Name of Insurance Company)
ACE American Insurance Company

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to any injury, damage, expense, cost, loss, demand, claim, liability or legal obligation arising out of, resulting from or in any way related to actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape, spill, leak, handling, sale, distribution, manufacture, remediation, disposal, monitoring, testing, investigation, treatment, neutralization or detoxification of Methyl-Tertiary-Butyl Ether or Methyl-Tert-Butyl Ether ("MTBE"); or any product, substance, or wastes containing MTBE; or any daughter or degradation products of MTBE.

The addition of this endorsement does not imply that other policy provisions, including but not limited to any pollution exclusion, do not also exclude coverage for MTBE related injury, damage, expense, cost, loss, liability, or legal obligation.

All other terms and conditions of this policy remain unchanged.

_____
Authorized Representative

LD-15284 (03/04)                    Reprinted in part, with permission of ISO Properties, Inc., 2001



# NON-CONTRIBUTORY ENDORSEMENT FOR ADDITIONAL INSUREDS

| Named Insured Knight Oil Tools, Inc. | | Endorsement Number 12 |
|---|---|---|
| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010   to   03/31/2011 |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | Effective Date of Endorsement |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## COMMERCIAL GENERAL LIABILITY COVERAGE

### Schedule

**Organization**

**Additional Insured Endorsement**

BP America Production Company, ITS Co-Venturers, ITS and Their Respective Affiliates and ITS and Their Respective Directors, Officers and Employees. Dynmcdermott Petroleum Operations Company & The United States of America, 850 S. Clearview Parkway, New Orleans, LA  70123.

All persons or entities added as additional insureds through an endorsement with the term "Additional Insured" in the title.

*(If no information is filled in, the schedule shall read: "All persons or entities added as additional insureds through an endorsement with the term "Additional Insured" in the title)*

For organizations that are listed in the Schedule above that are also an Additional Insured under an endorsement attached to this policy, the following is added to Section IV.4.a:

If other insurance is available to an insured we cover under any of the endorsements listed or described above (the "Additional Insured") for a loss we cover under this policy, this insurance will apply to such loss on a primary basis and we will not seek contribution from the other insurance available to the Additional Insured.

_____
Authorized Agent

LD-20287 (06/06)

Case 6:21-cv-02419-CBW Document 61-1 Filed 02/10/22 Page 202 of 289 PageID #: 1096

## NONOWNED WATERCRAFT EXCEPTION

| Named Insured  Knight Oil Tools, Inc. | | Endorsement Number 13 |
|---|---|---|
| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

### Commercial General Liability Coverage Form

Subparagraph (2) of Exclusion 2.g of Coverage I.A., Bodily Injury and Property Damage Liability is deleted in its entirety and replaced by the following:

(2)    A watercraft you do not own that is:

(a)    Less than    90    feet long; and

(b)    Not being used to carry persons or property for a charge;

_____    Authorized Agent

LD-5T98 Ptd. In U.S.A.

Case 6:21-cv-02419-DTS-CBW Document 1-1 Filed 02/10/22 Page 204 of 289 PageID #: 1098

## PERSONAL INJURY AND ADVERTISING INJURY LIABILITY

| Named Insured Knight Oil Tools, Inc. | | | Endorsement Number 14 |
|---|---|---|---|
| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### This endorsement modifies insurance provided under the following:

#### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

It is agreed that the General Liability Coverage – Section I, Coverage B., Exclusion 2(e) is deleted.

All other terms and conditions remain unchanged.

_____
Authorized Agent

LD-6Z60a (10/02) Ptd. in U.S.A.

# PROFESSIONAL LIABILITY EXCLUSION ENDORSEMENT

| Named Insured   Knight Oil Tools, Inc. | Endorsement Number 15 |
|---|---|

| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010   to   03/31/2011 | Effective Date of Endorsement |
|---|---|---|---|

Issued By (Name of Insurance Company)
ACE American Insurance Company

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This insurance does not apply to any damages arising out of any professional services, including, but not limited to,

- A. The rendering or failure to render:

  1. Medical, surgical, dental, x-ray, nursing, or any other health service or treatment, or the related furnishing of food or beverages;

  2. Any cosmetic, ear piercing, tonsorial, massage, physiotherapy, chiropody, hearing aid, optical or optometrical service or treatment;

  3. Any legal advice or legal service;

  4. Any service or advice relating to physical fitness, including services or advice in connection with diet, cardio-vascular fitness, body building or physical training program; or

  5. Any accounting, architectural, or engineering service.

- B. The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances; or

- C. The handling or treatment of dead bodies and remains, including autopsies, organ donation or other procedures.

Authorized Agent

LO-0846  (Ed. 1/89) Ptd. In U.S.A.

## RADIOACTIVE MATTER EXCLUSION

| Named Insured | Endorsement Number |
|---|---|
| Knight Oil Tools, Inc. | 17 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| HDO | G24940214 | 03/31/2010   to   03/31/2011 | |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies all insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

SECTION I. – Coverages, Coverage A. – Bodily injury and Property Damage Liability, 2. – Exclusions, is amended to add:

Any liability for "bodily injury" or "property damage" arising out of the actual, alleged or threatened exposure of person(s) or property to any radioactive matter or any form of radiation.

SECTION I. – Coverages, Coverage B. – Personal and Advertising Liability, 2. – Exclusions, is amended to add:

Arising out of the actual, alleged or threatened exposure of person(s) or property to any radioactive matter or any form of radiation.

Authorized Agent

LD-21733 (01/07) Printed in U.S.A.                                                                    Page 1 of 1

Includes copyrighted material of Insurance Services Office, Inc. with its permission

Case 6:21-cv-01091-CBW Document 1 Filed 02/10/21 Page 210 of 289 PageID #: 1104

## SILICA, DUST AND PARTICULATE MATTER EXCLUSION

| Named Insured | Endorsement Number |
|---|---|
| Knight Oil Tools, Inc. | 18 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| HDO | G24940214 | 03/31/2010  to  03/31/2011 | |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to any injury, damage, expense, cost, loss, liability or legal obligation arising out of, resulting from, or in any way related to, in whole or in part, the respiration, inspiration, inhalation or breathing in of dust or particulate matter. Dust or particulate matter may include, but is not limited to: dust, particulate matter, inspirable dust, respirable dust, smoke, mist, dirt, fibers, grit, soot, salt, acids, bases, metals, aerosols, crystals, minerals, sand, silicates, or silica.

The addition of this endorsement does not imply that other policy provisions, including but not limited to any pollution exclusion or asbestos exclusion, do not also exclude coverage for dust or particulate matter related injury, damage, expense, cost, loss, liability, or legal obligation.

_____

Authorized Representative

## NOTIFICATION OF PREMIUM ADJUSTMENT

| Named Insured | Endorsement Number |
|---|---|
| Knight Oil Tools, Inc. | 19 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| HDO | G24940214 | 03/31/2010 to 03/31/2011 | |

| Issued By (Name of Insurance Company) |
|---|
| ACE American Insurance Company |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### This endorsement modifies insurance provided under the following:

**CONTRACTUAL INDEMNITY COVERAGE PART OCCURRENCE CORRIDOR
CONTRACTUAL INDEMNITY COVERAGE PART SLIDING ATTACHMENT
CONTRACTUAL INDEMNITY COVERAGE PART DEDUCTIBLE REIMBURSEMENT
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE FORM
BUSINESS AUTO COVERAGE PART
EXCESS COMMERCIAL AUTOMOBILE COVERAGE PART
TRUCKERS COVERAGE PART
EXCESS TRUCKERS COVERAGE PART
MOTOR CARRIER COVERAGE PART
GARAGE COVERAGE PART**

For the states and lines of business in which regulatory approval has been granted for the NCCI Large Risk Alternative Rating Option, the ISO Large Risk Alternative Rating Option, or the independently filed ACE Large Risk Rating Plan, the premiums for this policy will be adjusted in accordance with the Notice of Election, signed by you.

_____
Authorized Agent

POLICY NUMBER: HDO G24940214

ENDT. #20

COMMERCIAL GENERAL LIABILITY
CG 20 26 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) |
|---|
| BP America Production Company, ITS Co-Venturers, ITS and Their Respective Affiliates and ITS and Their Respective Directors, Officers and Employees. Dynmcdermott Petroleum Operations Company & The United States of America, 850 S. Clearview Parkway, New Orleans, LA 70123.<br><br>Any person or organization whom you have agreed to name as an additional insured in a written contract, provided such contract was executed prior to the date of loss. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

Section II – Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

A. In the performance of your ongoing operations; or

B. In connection with your premises owned by or rented to you.

CG 20 26 07 04 &copy; ISO Properties, Inc. , 2004 Page 1 of 1

Case 6:23-cv-24191-RS-CPW Document 1 Filed on 02/10/22 in XBD Page 216 of 289 PageID #: 1110

POLICY NUMBER: HDO G24940214

ENDT. #21
COMMERCIAL GENERAL LIABILITY
CG 02 24 10 93

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EARLIER NOTICE OF CANCELLATION PROVIDED BY US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

Number of Days' Notice   90

(If no entry appears above, information required to complete this Schedule will be shown in the Declarations as applicable to this endorsement.)

For any statutorily permitted reason other than nonpayment of premium, the number of days required for notice of cancellation, as provided in paragraph **2.** of either the CANCELLATION Common Policy Condition or as amended by an applicable state cancellation endorsement, is increased to the number of days shown in the Schedule above.

CG 02 24 10 93          Copyright, Insurance Services Office, Inc., 1992          Page 1 of 1     □

**POLICY NUMBER: HDO G24940214**

**ENDT. #22**

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

© ISO Properties, Inc., 2006

POLICY NUMBER:  HDO G24940214

ENDT.  #23

**COMMERCIAL GENERAL LIABILITY**
CG 22 43 07 98

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability**::

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2. Supervisory, inspection, architectural or engineering activities.

Copyright, Insurance Services Office, Inc.,  1997

POLICY NUMBER: HDO G24940214

ENDT. #24

COMMERCIAL GENERAL LIABILITY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – INTERCOMPANY PRODUCTS SUITS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This insurance does not apply to any claim or damages by any Named Insured against another Named Insured because of "bodily injury" or "property damage" arising out of "your products" and included within the "products/completed operations hazard."

CG 21 41 11 85

Copyright, Insurance Services Office, Inc., 1984

Case 6:21-cv-04909-RMG Document 8-1 Filed 02/10/22 XBD Page 222 of 230 Page ID #: 1118

**POLICY NUMBER: HDO G24940214**

ENDT. #25

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – TESTING OR CONSULTING ERRORS AND OMISSIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

**1.** An error, omission, defect or deficiency in:

  **a.** Any test performed; or

  **b.** An evaluation, a consultation or advice given, by or on behalf of any insured;

**2.** The reporting of or reliance upon any such test, evaluation, consultation or advice; or

**3.** An error, omission, defect or deficiency in experimental data or the insured's interpretation of that data.

Copyright, Insurance Services Office, Inc., 1997

**POLICY NUMBER: HDO G24940214**

ENDT. #26

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

  **2. Exclusions**

    This insurance does not apply to:

    **Fungi Or Bacteria**

    **a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

    **b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

  This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

  **2. Exclusions**

    This insurance does not apply to:

    **Fungi Or Bacteria**

    **a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

    **b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

  "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

---

CG 21 67 12 04        © ISO Properties, Inc., 2003        Page 1 of 1    ☐

POLICY NUMBER: HDO G24940214

ENDT. #27

COMMERCIAL GENERAL LIABILITY
CG 21 70 01 08

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**POLICY NUMBER: HDO G24940214**

ENDT. #28

COMMERCIAL GENERAL LIABILITY
CG 21 80 01 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CERTIFIED ACTS OF TERRORISM AGGREGATE LIMIT; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| | |
|---|---|
| Certified Acts Of Terrorism Aggregate Limit: | $ 1,000,000 |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** Coverage provided by this insurance for "bodily injury", "property damage" or "personal and advertising injury", arising out of a "certified act of terrorism", is subject to the Certified Acts Of Terrorism Aggregate Limit as described in Paragraph **B.** of this endorsement.

**B.** The following are added to **Section III – Limits Of Insurance:**

Subject to Paragraphs **2.** and **3.** of Section III – Limits Of Insurance, as applicable, the Certified Acts Of Terrorism Aggregate Limit shown in the Schedule of this endorsement is the most we will pay for all:

**1.** "Bodily injury" or "property damage" under Coverage **A;**

**2.** "Personal and advertising injury" under Coverage **B;** and

**3.** Medical payments under Coverage **C;**

arising out of all "certified acts of terrorism".

Paragraph **4.**, the Personal and Advertising Injury Limit, Paragraph **5.**, the Each Occurrence Limit, Paragraph **6.**, the Damage To Premises Rented To You Limit, and Paragraph **7.**, the Medical Expense Limit, of Section III – Limits Of Insurance continue to apply to damages arising out of a "certified act of terrorism". Those limits will only be available if, and to the extent that, limits are available under the Certified Acts Of Terrorism Aggregate Limit.

**C.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

© ISO Properties, Inc., 2007

**D.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© ISO Properties, Inc., 2007

**CG 21 80 01 08**

POLICY NUMBER: HDO G24940214

ENDT. #29
COMMERCIAL GENERAL LIABILITY
CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

SCHEDULE

| Name Of Person Or Organization: |
| Any person or organization against whom you have agreed to waive your right of recovery in a written contract, provided such contract was executed prior to the date of loss. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph 8. Transfer Of Rights Of Recovery Against Others To Us of Section IV – Conditions:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

© Insurance Services Office, Inc., 2008

POLICY NUMBER: HDO G24 14     ENDT. #30

IL 09 85 01 08

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## SCHEDULE

Terrorism Premium (Certified Acts) $   1,886

This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):

Additional Information, if any, concerning the terrorism premium:

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

IL 09 85 01 08     © ISO Properties, Inc., 2007     Page 1 of 1

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured Knight Oil Tools, Inc. | | Endorsement Number 31 |
|---|---|---|
| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) ACE American Insurance Company | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of policy remain unchanged.

Authorized Agent

**POLICY NUMBER: HDO G24940214**

ENDT. #32

IL 00 21 07 02

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

IL 00 21 07 02

© ISO Properties, Inc., 2001

Page 1 of 2   □

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   **(a)** Any "nuclear reactor";

   **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2001

IL 00 21 07 02       □

**POLICY NUMBER:** HDO G249●●●4

ENDT. #33
COMMERCIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# ARKANSAS CHANGES – MULTI-YEAR POLICIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The following is added to the Common Policy Conditions:

### G. MULTI-YEAR POLICIES

We may issue this policy for a term in excess of twelve months with the premium adjusted on an annual basis in accordance with our rates and rules.

CG 26 08 04 90      Copyright, Insurance Services Office, Inc., 1990      Page 1 of 1

POLICY NUMBER: HDO G24940214

ENDT. #34

IL 02 31 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ARKANSAS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraph **5.** of the Cancellation Common Policy Condition is replaced by the following:

**5.a.** If this policy is cancelled, we will send the first Named Insured any premium refund due.

**b.** We will refund the pro rata unearned premium if the policy is:

(1) Cancelled by us or at our request;

(2) Cancelled but rewritten with us or in our company group;

(3) Cancelled because you no longer have an insurable interest in the property or business operation that is the subject of this insurance; or

(4) Cancelled after the first year of a prepaid policy that was written for a term of more than one year.

**c.** If the policy is cancelled at the request of the first Named Insured, other than a cancellation described in b.(2), (3) or (4) above, we will refund 90% of the pro rata unearned premium. However, the refund will be less than 90% of the pro rata unearned premium if the refund of such amount would reduce the premium retained by us to an amount less than the minimum premium for this policy.

**d.** The cancellation will be effective even if we have not made or offered a refund.

**e.** If the first Named Insured cancels the policy, we will retain no less than $100 of the premium, subject to the following:

(1) We will retain no less than $250 of the premium for the Equipment Breakdown Coverage Part.

(2) We will retain the premium developed for any annual policy period for the General Liability Classifications, if any, shown in the Declarations.

(3) If the Commercial Auto Coverage Part covers only snowmobiles or golfmobiles, we will retain $100 or the premium shown in the Declarations, whichever is greater.

(4) If the Commercial Auto Coverage Part covers an "auto" with a mounted amusement device, we will retain the premium shown in the Declarations for the amusement device and not less than $100 for the auto to which it is attached.

© ISO Properties, Inc., 2007

**B.** The following is added to the **Cancellation** Common Policy Condition:

7. **Cancellation Of Policies In Effect More Than 60 Days**

   a. If this policy has been in effect more than 60 days or is a renewal policy, we may cancel only for one or more of the following reasons:

      (1) Nonpayment of premium;

      (2) Fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy or in presenting a claim under the policy;

      (3) The occurrence of a material change in the risk which substantially increases any hazard insured against after policy issuance;

      (4) Violation of any local fire, health, safety, building or construction regulation or ordinance with respect to any insured property or its occupancy which substantially increases any hazard insured against under the policy;

      (5) Nonpayment of membership dues in those cases where our by-laws, agreements or other legal instruments require payment as a condition of the issuance and maintenance of the policy; or

      (6) A material violation of a material provision of the policy.

   b. Subject to Paragraph **7.c.**, if we cancel for:

      (1) Nonpayment of premium, we will mail or deliver written notice of cancellation, stating the reason for cancellation, to the first Named Insured and any lienholder or loss payee named in the policy at least 10 days before the effective date of cancellation.

      (2) Any other reason, we will mail or deliver notice of cancellation to the first Named Insured and any lienholder or loss payee named in the policy at least 20 days before the effective date of cancellation.

   c. The following applies to the Farm Umbrella Liability Policy, Commercial Liability Umbrella Coverage Part and the Commercial Automobile Coverage Part:

      (1) If we cancel for nonpayment of premium, we will mail or deliver written notice of cancellation, stating the reason for cancellation, to the first Named Insured and any lienholder or loss payee named in the policy, and any lessee of whom we have received notification prior to the loss, at least 10 days before the effective date of cancellation;

      (2) If we cancel for any other reason, we will mail or deliver notice of cancellation to the first Named Insured and any lienholder or loss payee named in the policy, and any lessee of whom we have received notification prior to the loss, at least 20 days before the effective date of cancellation.

**C.** Paragraph **g.** of the Mortgageholders Condition, if any, is replaced by the following:

   g. If we elect not to renew this policy, we will give written notice to the mortgageholder:

      (1) As soon as practicable if nonrenewal is due to the first Named Insured's failure to pay any premium required for renewal; or

      (2) At least 60 days before the expiration date of this policy if we nonrenew for any other reason.

**D.** The following Condition is added and supersedes any other provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy, we will mail to the first Named Insured shown in the Declarations, and to any lienholder or loss payee named in the policy, written notice of nonrenewal at least 60 days before:

   a. Its expiration date; or

   b. Its anniversary date, if it is a policy written for a term of more than one year and with no fixed expiration date.

   However, we are not required to send this notice if nonrenewal is due to the first Named Insured's failure to pay any premium required for renewal.

   The provisions of this Paragraph **1.** do not apply to any mortgageholder.

2. We will mail our notice to the first Named Insured's mailing address last known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

   © ISO Properties, Inc., 2007   IL 02 31 09 08

**POLICY NUMBER: HDO G24940214**

ENDT. #35

IL 02 28 09 07

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# COLORADO CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2.** If this policy has been in effect for less than 60 days, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7. Cancellation Of Policies In Effect For 60 Days Or More**

**a.** If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel this policy by mailing through first-class mail to the first Named Insured written notice of cancellation:

**(1)** Including the actual reason, at least 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

**(2)** At least 45 days before the effective date of cancellation if we cancel for any other reason.

We may only cancel this policy based on one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** A false statement knowingly made by the insured on the application for insurance; or

**(3)** A substantial change in the exposure or risk other than that indicated in the application and underwritten as of the effective date of the policy unless the first Named Insured has notified us of the change and we accept such change.

**C.** The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

If we decide not to renew this policy, we will mail through first-class mail to the first Named Insured shown in the Declarations written notice of the nonrenewal at least 45 days before the expiration date, or its anniversary date if it is a policy written for a term of more than one year or with no fixed expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

IL 02 28 09 07

© ISO Properties, Inc., 2006

Page 1 of 2

**D.** The following condition is added:

**INCREASE IN PREMIUM OR DECREASE IN COVERAGE**

We will not increase the premium unilaterally or decrease the coverage benefits on renewal of this policy unless we mail through first-class mail written notice of our intention, including the actual reason, to the first Named Insured's last mailing address known to us, at least 45 days before the effective date.

Any decrease in coverage during the policy term must be based on one or more of the following reasons:

**1.** Nonpayment of premium;

**2.** A false statement knowingly made by the insured on the application for insurance; or

**3.** A substantial change in the exposure or risk other than that indicated in the application and underwritten as of the effective date of the policy unless the first Named Insured has notified us of the change and we accept such change.

If notice is mailed, proof of mailing will be sufficient proof of notice.

© ISO Properties, Inc., 2006

IL 02 28 09 07   □

**POLICY NUMBER: HDO G24940214**

ENDT. #36

COMMERCIAL GENERAL LIABILITY
CG 01 18 12 04

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LOUISIANA CHANGES – LEGAL ACTION AGAINST US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The **Legal Action Against Us** Condition (Section **IV** – Conditions) is replaced by the following.

**Legal Action Against Us**

A person or organization may bring a "suit" against us including, but not limited to, a "suit" to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**POLICY NUMBER: HDO G24940214**

ENDT. #37

COMMERCIAL GENERAL LIABILITY
CG 01 25 03 03

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LOUISIANA CHANGES – INSURING AGREEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Paragraph **1.a.** of **Section I – Coverages, Coverage A – Bodily Injury And Property Damage Liability** is replaced with the following:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage **A** or **B** or medical expenses under Coverage **C**. However, using up the Medical Expense Limit does not end our right and duty to defend.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**B.** Paragraph **1.a.** of **Section I – Coverages, Coverage B – Personal And Advertising Injury Liability** is replaced with the following:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**. However, using up the Medical Expense Limit does not end our right and duty to defend.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

© ISO Properties, Inc., 2002

**POLICY NUMBER: HDO G24940214**

ENDT. #38

COMMERCIAL GENERAL LIABILITY
CG 26 84 12 04

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LOUISIANA CHANGES – TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US CONDITION

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    ELECTRONIC DATA LIABILITY COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCT WITHDRAWAL COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK POLICY

The **Transfer Of Rights Of Recovery Against Others To Us Condition Section IV – Conditions** is replaced by the following:

**TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

In the event of any payment under this Coverage Part, we will be entitled to the insured's rights of recovery against any person or organization, and the insured will do whatever is necessary to secure such rights. Our right to recover is subordinate to the insured's right to be fully compensated.

CG 26 84 12 04
© ISO Properties, Inc., 2003

POLICY NUMBER: **HDO G24940214**

ENDT. #39

IL 02 77 09 08

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LOUISIANA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following, which applies unless Paragraph **B.** of this endorsement applies.

**2. Notice Of Cancellation**

**a.** Cancellation Of Policies In Effect For Fewer Than 60 Days Which Are Not Renewals

If this policy has been in effect for fewer than 60 days and is not a renewal of a policy we issued, we may cancel this policy for any reason, subject to the following:

**(1)** Cancellation for nonpayment of premium

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 10 days before the effective date of cancellation.

**(2)** Cancellation for any other reason

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 60 days before the effective date of cancellation.

**b.** Cancellation Of Renewal Policies And New Policies In Effect For 60 Days Or More

If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel only for one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** Fraud or material misrepresentation made by you or with your knowledge with the intent to deceive in obtaining the policy, continuing the policy, or in presenting a claim under the policy;

**(3)** Activities or omissions by you which change or increase any hazard insured against;

**(4)** Change in the risk which increases the risk of loss after we issued or renewed this policy including an increase in exposure due to regulation, legislation, or court decision;

**(5)** Determination by the Commissioner of Insurance that the continuation of this policy would jeopardize our solvency or would place us in violation of the insurance laws of this or any other state;

© ISO Properties, Inc., 2007

(6) The insured's violation or breach of any policy terms or conditions; or

(7) Any other reasons that are approved by the Commissioner of Insurance.

We will mail or deliver written notice of cancellation under Paragraph **A.2.b.**, to the first Named Insured at least:

(a) 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

(b) 30 days before the effective date of cancellation if we cancel for a reason described in Paragraphs **A.2.b.(2)** through **(7)** above.

B. Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following, which applies with respect to premium payments due on new and renewal policies, including installment payments.

   **2. Notice Of Cancellation**

     **a.** If your premium payment check or other negotiable instrument is returned to us or our agent or a premium finance company because it is uncollectible for any reason, we may cancel the policy subject to Paragraphs **B.2.b.** and **B.2.c.**

     **b.** We may cancel the policy effective from the date the premium payment was due, by sending you written notice by certified mail, or by delivering such notice to you within 10 days of the date that we receive notice of the returned check or negotiable instrument.

     **c.** The cancellation notice will also advise you that the policy will be reinstated effective from the date the premium payment was due, if you present to us a cashier's check or money order for the full amount of the returned check or other negotiable instrument within 10 days of the date that the cancellation notice was mailed.

C. Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

   **5. Premium Refund**

     If this policy is cancelled, we will return any premium refund due, subject to Paragraphs **C.5.a.**, **C.5.b.**, **C.5.c.**, **C.5.d.**, **C.5.e.** and **C.5.f.** The cancellation will be effective even if we have not made or offered a refund.

     **a.** If we cancel, the refund will be pro rata.

     **b.** If the first Named Insured cancels, the refund may be less than pro rata, and will be returned within 30 days after the effective date of cancellation.

     **c.** We will send the refund to the first Named Insured unless Paragraph **C.5.d.** or **C.5.e.** applies.

     **d.** If we cancel based on Paragraph **B.2.** of this endorsement, we will return the premium due, if any, within 10 days after the expiration of the 10-day period referred to in **B.2.c.** If the policy was financed by a premium finance company, or if payment was advanced by the insurance agent, we will send the return premium directly to such payor.

     **e.** With respect to any cancellation of the Commercial Auto Coverage Part, we will send the return premium, if any, to the premium finance company if the premium was financed by such company.

     **f.** When return premium payment is sent to the premium finance company or the agent of the insured, we will provide notice to you, at the time of cancellation, that a return of unearned premium may be generated by the cancellation.

D. The **Premiums** Common Policy Condition is replaced by the following:

**PREMIUMS**

   **1.** The first Named Insured shown in the Declarations is responsible for the payment of all premiums.

   **2.** We will pay return premiums, if any, to the first Named Insured, unless another person or entity is entitled to be the payee in accordance with Paragraph **C.** of this endorsement.

E. Paragraph f. of the **Mortgageholders** Condition in the Commercial Property Coverage Part, Standard Property Policy, and the Capital Assets Program (Output Policy) Coverage Part and Paragraph **4.f.** of the **Mortgageholders** Condition in the Farm Coverage Part are replaced by the following:

     If we cancel a policy that has been in effect for fewer than 60 days and is not a renewal of a policy we issued, we will give written notice to the mortgageholder, pledgee or other known person shown in the policy to have an insurable interest in any loss, at least:

     (1) 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

     (2) 60 days before the effective date of cancellation, if we cancel for any other reason.

© ISO Properties, Inc., 2007

IL 02 77 09 08

If we cancel a policy that has been in effect for 60 days or more, or is a renewal of a policy we issued, we will give written notice to the mortgageholder, pledgee or other known person shown in the policy to have an insurable interest in any loss, at least:

**(1)** 10 days before the effective date of cancellation, if we cancel for nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation, if we cancel for any other reason.

**F.** The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

**1.** If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured, mortgageholder, pledgee or other known person shown in the policy to have an insurable interest in any loss, at least 60 days before its expiration date, or its anniversary date if it is a policy written for a term of more than one year or with no fixed expiration date.

**2.** We need not mail or deliver this notice if:

**a.** We or another company within our insurance group have offered to issue a renewal policy; or

**b.** You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

**3.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured, mortgageholder, pledgee or other known person shown in the policy to have an insurable interest in any loss, at the last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**4.** Such notice to the insured shall include the insured's loss run information for the period the policy has been in force within, but not to exceed, the last three years of coverage.

© ISO Properties, Inc., 2007

POLICY NUMBER: **HDO G24940214**

ENDT. **#40**

IL 01 65 09 08

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NORTH DAKOTA CHANGES – EXAMINATION OF YOUR BOOKS AND RECORDS

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The **Examination Of Your Books And Records** Common Policy Condition is replaced by the following:

**EXAMINATION OF YOUR BOOKS AND RECORDS**

1.  Except as provided in **2.** below, we may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

2.  Any audit conducted to determine the premium due or to be refunded must be completed within 180 days after:

    **a.** The expiration date of the policy; or

    **b.** The anniversary date, if this is a continuous policy or a policy written for a term longer than one year;

    unless you agree in writing to extend the audit period.

IL 01 65 09 08

© ISO Properties, Inc., 2007

Page 1 of 1   □

**POLICY NUMBER: HDO G24940214**

ENDT. #41

IL 02 34 09 08

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NORTH DAKOTA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraphs **2.** and **3.** of the **Cancellation** Common Policy Condition are replaced by Paragraphs **2.** and **3.** below, except to the extent that Item **B.** of this endorsement applies.

2. **Policies In Effect:**

   a. **For Less Than 90 Days**

   If this policy has been in effect for less than 90 days, we may cancel the policy for any reason by mailing to the first Named Insured, and agent, if any, written notice of cancellation at least:

   (1) 10 days before the effective date of cancellation; or

   (2) Five days before the effective date of cancellation for any condition stated in Paragraph **B.** of this endorsement.

   b. **For 90 Days Or More Or Policies With Terms Longer Than One Year Or Continuous Policies**

   If this policy has been in effect for 90 days or more, is a renewal of a policy we issued, is a policy issued for a term longer than one year or is a continuous policy, we may cancel the policy only for one or more of the following reasons:

   (1) Nonpayment of premiums;

   (2) Misrepresentation or fraud made by the "insured" or with the "insured's" knowledge in obtaining the policy or in pursuing a claim under the policy;

   (3) The "insured's" actions that have substantially increased or substantially changed the risk insured;

   (4) The "insured's" refusal to eliminate known conditions that increase the potential for loss, after our notification that the condition must be removed;

   (5) Substantial change in the risk assumed, except to the extent that we should reasonably have foreseen the change or contemplated the risk in writing the contract;

   (6) Loss of reinsurance which provided us with coverage for a significant amount of the underlying risk insured;

   (7) A determination by the insurance commissioner that the continuation of the policy could place us in violation of North Dakota insurance laws;

IL 02 34 09 08

© ISO Properties, Inc., 2007

Page 1 of 3

(8) Nonpayment of dues to an association or organization, other than an insurance association or organization, where payment of dues is a prerequisite to obtaining or continuing such insurance. Cancellation for this reason does not apply to persons who are retired at 62 years of age or older or to any person who is disabled according to social security standards;

(9) A violation of any local fire, health, safety, building or construction regulation or ordinance with respect to Covered Property or the occupancy thereof which substantially increases any hazard insured against; or

(10) Certain conditions exist, as stated in Paragraph **B.** of this endorsement.

We will mail written notice of cancellation to the first Named Insured, and agent, if any, at least:

(a) Five days before the effective date of cancellation for any condition stated in Paragraph **B.** of this endorsement;

(b) 10 days before the effective date of cancellation for nonpayment of premium; or

(c) 30 days before the effective date of cancellation for any reason stated in Paragraphs **2.b.(2)** through **(9)** above.

However, for policies with terms longer than one year or continuous policies, notice of cancellation will be mailed at least 30 days prior to any anniversary date for any reason stated in Paragraphs **2.b.(1)** through **(9)** above.

If we cancel for a reason listed in Paragraphs **2.b.(1)** through **(9)** above, the notice of cancellation will state our reasons for cancellation.

3. We will mail our notice, by first-class mail, to the first Named Insured and agent, if any, at the last mailing address known to us.

B. We may also cancel the policy if one or more of the following conditions exist:

1. Buildings with at least 65% of the rental units in the building unoccupied.

2. Buildings that have been damaged by a covered cause of loss and the "insured" has stated or such time has elapsed as clearly indicates that the damage will not be repaired.

3. Buildings to which, following a fire, permanent repairs have not commenced within 60 days following satisfactory adjustment of loss.

4. Buildings that have been unoccupied 60 or more consecutive days, except buildings that have a seasonal occupancy, and buildings actually in the course of construction or repair and reconstruction which are properly secured against unauthorized entry.

5. Buildings that are in danger of collapse because of serious structural conditions or those buildings subject to extremely hazardous conditions not contemplated in filed rating plans such as those buildings that are in a state of disrepair as to be dilapidated.

6. Buildings on which, because of their physical condition, there is an outstanding order to vacate or an outstanding demolition order, or which have been declared unsafe in accordance with applicable law.

7. Buildings from which fixed and salvageable items have been or are being removed and the "insured" can give no reasonable explanation for the removal.

8. Buildings on which there is reasonable knowledge and belief that the property is endangered and is not reasonably protected from possible arson for the purpose of defrauding an insurer.

9. Buildings with any of the following conditions:

a. Failure to furnish heat, water, sewer service, or public lighting for 30 consecutive days or more.

b. Failure to correct conditions dangerous to life, health, or safety.

c. Failure to maintain the building in accordance with applicable law.

d. Failure to pay property taxes for more than one year.

10. Buildings that have characteristics of ownership condition, occupancy, or maintenance, which are violative of law or public policy.

C. The following is added and supersedes any provision to the contrary:

**NONRENEWAL**

1. If we elect not to renew this policy, we will mail to the last known address of the first Named Insured shown in the Declarations, and agent, if any, a notice of intention not to renew at least:

a. 60 days prior to the expiration date of the policy, except as provided in Paragraph **b.;** or

b. 90 days prior to the expiration date of the policy when the policy provides professional liability coverage for legal and medical services.

The notice of nonrenewal will state our reason for nonrenewal.

© ISO Properties, Inc., 2007

☐

2. We will mail our notice, by first-class mail, to the first Named Insured and agent, if any, at the last mailing address known to us.

3. We need not mail or deliver this notice if you have:

   a. Insured elsewhere;

   b. Accepted replacement coverage; or

   c. Requested or agreed to nonrenewal.

© ISO Properties, Inc., 2003

Case 6:23-cv-00491-PRS-CBW Document 8-1 Filed 01/10/22 Page 260 of 263 Page ID #: 1156

**POLICY NUMBER:  HDO G24940214**

ENDT.  #42

IL 02 98 09 08

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NEW MEXICO CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2. Permissible Reasons And Notice Period**

**a.** If this policy is in effect less than 60 days, we may cancel for any reason by mailing or delivering to the first Named Insured written notice of cancellation at least 10 days before the effective date of cancellation.

**b.** If this policy is in effect 60 days or more, we may cancel only for one or more of the following reasons:

(1) Nonpayment of premium.

(2) There has been a substantial change in the risk assumed by us since the policy was issued.

(3) The policy was obtained through material misrepresentation, fraudulent statements, omissions or concealment of fact material to the acceptance of the risk or to the hazard assumed by us.

(4) Willful and negligent acts or omission by the insured have substantially increased the hazards insured against.

(5) You presented a claim based on fraud or material misrepresentation.

**c.** If we cancel subject to **2.b.** above, we will mail or deliver to the first Named Insured written notice of cancellation at least:

(1) 10 days before the effective date of cancellation, for the reason set forth in **2.b.(1).**

(2) 30 days before the effective date of cancellation, for the reason set forth in **2.b.(2).**

(3) 15 days before the effective date of cancellation, for a reason set forth in **2.b.(3), 2.b.(4)** or **2.b.(5).**

The written notice will state the reason for cancellation, except that such statement may be omitted from a notice mailed to an additional insured or lienholder under this policy.

**B.** The following Condition is added:

**NONRENEWAL**

If we decide not to renew this policy, we will mail or deliver to the first Named Insured written notice of the nonrenewal not less than 30 days before the expiration date of the policy.

IL 02 98 09 08

© ISO Properties, Inc., 2007

POLICY NUMBER:  HDO G24940214

ENDT.  #43

COMMERCIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# KANSAS AND OKLAHOMA CHANGES – TRANSFER OF RIGHTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

Condition 8. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US (Section IV), does not apply to COVERAGE C. MEDICAL PAYMENTS.

Copyright, Insurance Services Office, Inc., 1984

POLICY NUMBER: HDO G24940214

ENDT. #44

IL 02 36 09 07

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# OKLAHOMA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

After coverage has been in effect for more than 45 business days or after the effective date of a renewal of this policy, no notice of cancellation will be issued by us unless it is based on at least one of the following reasons:

**(1)** Nonpayment of premium;

**(2)** Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted under it;

**(3)** Discovery of willful or reckless acts or omissions by you that increase any hazard insured against;

**(4)** The occurrence of a change in the risk that substantially increases any hazard insured against after insurance coverage has been issued or renewed;

**(5)** A violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any covered property or its occupancy that substantially increases any hazard insured against;

**(6)** A determination by the Insurance Commissioner that the continuation of the policy would place us in violation of the insurance laws of this state;

**(7)** Your conviction of a crime having as one of its necessary elements an act increasing any hazard insured against; or

**(8)** Loss of or substantial changes in applicable reinsurance.

**B.** The following are added to the Common Policy Conditions and supersede any provisions to the contrary:

© ISO Properties, Inc., 2006

## 1. Nonrenewal

**a.** If we elect not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured at least 45 days before:

  **(1)** The expiration date of this policy; or

  **(2)** An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.

**b.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured at the last mailing address known to us.

**c.** If notice is mailed:

  **(1)** It will be considered to have been given to the first Named Insured on the day it is mailed.

  **(2)** Proof of mailing will be sufficient proof of notice.

**d.** If notice of nonrenewal is **not** mailed or delivered at least 45 days before the expiration date or an anniversary date of this policy, coverage will remain in effect until 45 days after notice is given. Earned premium for such extended period of coverage will be calculated pro rata based on the rates applicable to the expiring policy.

**e.** We will **not** provide notice of nonrenewal if:

  **(1)** We, or another company within the same insurance group, have offered to issue a renewal policy; or

  **(2)** You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

**f.** If we have provided the required notice of nonrenewal as described in **B.1.a.** above, and thereafter extend the policy for a period of 90 days or less, we will **not** provide an additional nonrenewal notice with respect to the period of extension.

## 2. Premium Or Coverage Changes At Renewal

**a.** If we elect to renew this policy, we will give written notice of any premium increase, change in deductible, or reduction in limits or coverage, to the first Named Insured, at the last mailing address known to us.

**b.** Any such notice will be mailed or delivered to the first Named Insured at least 45 days before:

  **(1)** The expiration date of this policy; or

  **(2)** An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.

**c.** If notice is mailed:

  **(1)** It will be considered to have been given to the first Named Insured on the day it is mailed.

  **(2)** Proof of mailing will be sufficient proof of notice.

**d.** If the first Named Insured accepts the renewal, the premium increase or coverage changes will be effective the day following the prior policy's expiration or anniversary date.

**e.** If notice is **not** mailed or delivered at least 45 days before the expiration date or anniversary date of this policy, the premium, deductible, limits and coverage in effect prior to the changes will remain in effect until:

  **(1)** 45 days after notice is given; or

  **(2)** The effective date of replacement coverage obtained by the insured;

whichever occurs first.

If the first Named Insured then elects **not** to renew, the resulting extended period of coverage will be calculated pro rata at the lower of the new rates or rates applicable to the expiring policy.

**f.** We will **not** provide notice of the following:

  **(1)** Changes in a rate or plan filed pursuant to the Property and Casualty Competitive Loss Cost Rating Act applicable to an entire class of business;

  **(2)** Changes which are based upon the altered nature or extent of the risk insured; or

  **(3)** Changes in policy forms filed with or approved by the Insurance Commissioner and applicable to an entire class of business.

© ISO Properties, Inc., 2006

IL 02 36 09 07    □

**POLICY NUMBER: HDO G24940214**

ENDT. #45

COMMERCIAL GENERAL LIABILITY
CG 01 03 06 06

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** With regard to liability for Bodily Injury, Property Damage and Personal And Advertising Injury, unless we are prejudiced by the insured's or your failure to comply with the requirement, no provision of this Coverage Part requiring you or any insured to give notice of "occurrence", claim or "suit", or forward demands, notices, summonses or legal papers in connection with a claim or "suit" will bar coverage under this Coverage Part.

© ISO Properties, Inc., 2005

**POLICY NUMBER: HDO G24940214**

ENDT. #46

COMMERCIAL GENERAL LIABILITY
CG 01 86 12 04

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# UTAH CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** Any Condition titled:

Duties In the Event of An Electronic Data Incident
Duties in the Event of Occurrence, Offense, Claim or Suit
Duties in the Event of Occurrence, Claim or Suit
Duties in the Event of Injury, Claim or Suit
Duties in the Event of A Pollution Incident, Claim or Suit
Duties In the Event of A Claim Or Suit Or A Defect Or Product Withdrawal
Insured's Duties in the Event of a Loss
Duties in the Event of An Underground Storage Tank Incident

requiring notice to us is amended to include:

"Notice to our authorized representative is notice to us".

**B.** The **Legal Action Against Us** Condition does not apply.

POLICY NUMBER: HDO G24940214

ENDT. #47

IL 02 66 09 08

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# UTAH CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS COVERAGE PART

A. The following is added to the **Cancellation** Common Policy Condition:

7. If this policy has been in effect for more than 60 days or if this is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

   a. Nonpayment of premium;

   b. Material misrepresentation;

   c. Substantial change in the risk assumed unless we should reasonably have foreseen the change or contemplated the risk when entering the contract; or

   d. Substantial breaches of contractual duties, conditions or warranties.

   If we cancel for nonpayment of premium, notice of cancellation must state the reason for cancellation.

8. With respect to the Commercial Automobile Coverage Part, the following applies in addition to the provisions of Paragraph **7.** above:

   We may cancel this policy if your driver's license, or the driver's license of a person who customarily drives a "covered auto", is suspended or revoked.

9. Notice of cancellation must be delivered or mailed by first-class mail.

B. The following is added and supersedes any provisions to the contrary:

**NONRENEWAL**

1. If we elect to not renew this policy, we will mail, by first-class mail, written notice of nonrenewal to the first Named Insured, at the last mailing address known to us, at least 30 days before the expiration or anniversary date of this policy.

2. We need not mail this notice if:

   a. You have accepted replacement coverage;

   b. You have requested or agreed to nonrenewal; or

   c. This policy is expressly designated as nonrenewable.

3. If notice is mailed, proof of mailing is sufficient proof of notice.

IL 02 66 09 08

© ISO Properties, Inc., 2007

Page 1 of 1

**POLICY NUMBER: HDO G24940214**

ENDT. **#48**

COMMERCIAL GENERAL LIABILITY
CG 01 60 07 98

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WYOMING CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following is added to Paragraph **1.a.(2)** of Section I – **Coverage A – Bodily Injury And Property Damage Liability** and Section I – **Coverage B – Personal And Advertising Injury Liability:**

The tender of the limits of insurance before judgment or settlement does not relieve us of our duty to defend.

**B.** The following is added as the final full paragraph of Paragraph **1., Insuring Agreement** of Section I – **Coverage A – Bodily Injury And Property Damage Liability** and Section I – **Coverage B – Personal And Advertising Injury Liability:**

Damages include prejudgment interest awarded against the insured.

**C.** Paragraph **1.f.** dealing with prejudgment interest in Section I – **Supplementary Payments – Coverages A And B** is deleted.

CG 01 60 07 98

Copyright, Insurance Services Office, Inc., 1997

Page 1 of 1

**POLICY NUMBER: HDO G24940214**

ENDT. #49

IL 01 14 09 08

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WYOMING CHANGES – DEFENSE COSTS

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART – LEGAL LIABILITY COVERAGE FORM
COMMERCIAL PROPERTY COVERAGE PART – MORTGAGEHOLDER'S ERRORS AND OMISSIONS
COVERAGE FORM
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK COVERAGE PART

A. The provisions of Paragraph **B.** are added to all Insuring Agreements that set forth a duty to defend under:

1. Section I of the Commercial General Liability, Commercial Liability Umbrella, Employment-Related Practices Liability, Farm, Liquor Liability, Owners And Contractors Protective Liability, Pollution Liability, Products/Completed Operations Liability, Product Withdrawal, Professional Liability, Railroad Protective Liability and Underground Storage Tank Coverage Parts and the Farm Umbrella Liability Policy;

2. Paragraph **A.** in Section II – Liability Coverage under the Business Auto, Garage, Motor Carrier and Truckers Coverage Forms;

3. Section A – Coverage under the Legal Liability Coverage Form; and

4. Coverage **C** – Mortgageholder's Liability under the Mortgageholder's Errors And Omissions Coverage Form.

Paragraph **B.** also applies to any other provision in the policy that sets forth a duty to defend.

B. If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that none of the claims, for which we provided a defense or defense costs, are covered under this insurance, we have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement under this provision will only apply to the costs we have incurred after we notify you in writing that there may not be coverage and that we are reserving our rights to terminate the defense or the payment of defense costs and to seek reimbursement for defense costs.

IL 01 14 09 08

© ISO Properties, Inc., 2007

Page 1 of 1

POLICY NUMBER: HDO G24940214

ENDT. #50

IL 02 52 09 07

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WYOMING CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2. Cancellation Of Policies In Effect**

**a. Less Than 60 Days**

If this policy has been in effect for less than 60 days, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium;

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**b. 60 Days Or More**

If this policy has been in effect for 60 days or more, or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium.

**(2)** Material misrepresentation of fact which, if known to us, would have caused us not to issue the policy.

**(3)** Substantial change in the risk assumed, except to the extent that we should reasonably have foreseen the change or contemplated the risk in writing the policy.

**(4)** Substantial breaches of contractual duties, conditions or warranties.

If we cancel, we will mail or deliver to the first Named Insured and the agent, if any, written notice of cancellation, stating the reason for cancellation, at least:

**(a)** 10 days before the effective date of cancellation if cancellation is for the reason stated in b.**(1)** above; or

**(b)** 45 days before the effective date of cancellation if cancellation is for the reasons stated in b.**(3)** or **(4)** above.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**7.** If we cancel this policy in accordance with Paragraph **2.** of the **Cancellation** Common Policy Condition, any unearned premium will be refunded to the first Named Insured prior to the effective date of cancellation.

© ISO Properties, Inc., 2006


**C.** The following is added as an additional Condition and supersedes any other provision to the contrary:

**NONRENEWAL**

**1.** If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured and the agent, if any, at least 45 days before:

   **a.** The expiration date; or

   **b.** The anniversary date if this is a continuous policy.

**2.** Notice of nonrenewal will state the reason for nonrenewal.

**3.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured's and agent's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

© ISO Properties, Inc., 2006

IL 02 52 09 07 □

## SIGNATURES

| Named Insured | |
|---|---|
| Knight Oil Tools, Inc. | Endorsement Number 51 |

| Policy Symbol HDO | Policy Number G24940214 | Policy Period 03/31/2010 to 03/31/2011 | Effective Date of Endorsement |
|---|---|---|---|

Issued By (Name of Insurance Company)
ACE American Insurance Company

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA**
436 Walnut Street, P. O. Box 1000, Philadelphia, Pennsylvania 19106-3703

**BANKERS STANDARD FIRE AND MARINE COMPANY**
436 Walnut Street, P. O. Box 1000, Philadelphia, Pennsylvania 19106-3703

**BANKERS STANDARD INSURANCE COMPANY**
436 Walnut Street, P. O. Box 1000, Philadelphia, Pennsylvania 19106-3703

**ACE INDEMNITY INSURANCE COMPANY**
436 Walnut Street, P. O. Box 1000, Philadelphia, Pennsylvania 19106-3703

**ACE AMERICAN INSURANCE COMPANY**
436 Walnut Street, P. O. Box 1000, Philadelphia, Pennsylvania 19106-3703

**ACE PROPERTY AND CASUALTY INSURANCE COMPANY**
436 Walnut Street, P. O. Box 1000, Philadelphia, Pennsylvania 19106-3703

**INSURANCE COMPANY OF NORTH AMERICA**
436 Walnut Street, P. O. Box 1000, Philadelphia, Pennsylvania 19106-3703

**PACIFIC EMPLOYERS INSURANCE COMPANY**
436 Walnut Street, P. O. Box 1000, Philadelphia, Pennsylvania 19106-3703

**ACE FIRE UNDERWRITERS INSURANCE COMPANY**
436 Walnut Street, P. O. Box 1000, Philadelphia, Pennsylvania 19106-3703

GEORGE D. MULLIGAN, Secretary

JOHN J. LUPICA, President

**WESTCHESTER FIRE INSURANCE COMPANY**

1325 Avenue of the Americas, 19th Floor, New York, NY 10019

GEORGE D. MULLIGAN, Secretary

DENNIS A. CROSBY, JR., President

Authorized Agent

CC-1K11e (02/06) Ptd. in U.S.A.

## GENERAL ENDORSEMENT:

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Knight Oil Tools, Inc. | | | 52 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| HDO | G24940214 | 03/31/2010   to   03/31/2011 | 03/31/2010 |

Issued By (Name of Insurance Company)
ACE American Insurance Company

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

It is agreed that effective 03/31/2010 the Producer address is amended to read:

2014 W. Pinhook Rd., Suite 610
Lafayette, LA  70508

Authorized Agent

CC-3R19 Ptd. in U.S.A. 6/86

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **AIG SPECIALTY INSURANCE** | § | **NO: 6:21-CV-04191-RRS-CBW** |
| **COMPANY (f/k/a CHARTIS** | § | |
| **SPECIALTY INSURANCE** | § | **JUDGE ROBERT S SUMMERHAYS** |
| **COMPANY** | § | |
| | § | **MAG. CAROL B WHITEHURST** |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KNIGHT OIL TOOLS, INC.** | § | |
| | § | |
| | § | |
| | § | |

---

**ACE AMERICAN INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR LEAVE TO FILE COMPLAINT-IN-INTERVENTION**

---

ACE American Insurance Company ("ACE") submits this memorandum in support of its Motion for Leave to File Complaint-in-Intervention for Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201, 2202, in the Declaratory Judgment Action filed by AIG Specialty Insurance Company (f/k/a Chartis Specialty Insurance Company) ("ASIC") against Knight Oil Tools, Inc. ("KOT") under Civil Action No. 6:21-CV-04191-RRS-CBW. For the reasons discussed below, ACE submits that is should be permitted to intervene under Fed. R. Civ. Pro. 24(b)(1)(B) given the existence of common issues of law and fact present in ASIC's Complaint for Declaratory Judgment and ACE's proposed Complaint-in-Intervention.

**I.      Procedural Background**

On December 7, 2021, ASIC filed its Declaratory Judgment action in matter number 21-4191, seeking a determination of coverage under its Commercial Umbrella Liability Policy issued

to KOT for claims arising out of an incident on or about May 11, 2010, and the judgment rendered in favor of Rippy Oil Company ("Rippy Oil") against KOT in an underlying Texas state court action. [Rec. Doc. 1]. On January 18, 2022, Rippy Oil filed a motion to dismiss ASIC's Declaratory Judgement, or alternatively, to intervene pursuant to Fed. R. Civ. Proc. 24, arguing *inter alia*, that there was no case or controversy between ASIC and KOT. [R. Doc. 13]. ASIC filed a Motion to Strike Rippy Oil's Motion to Dismiss on February 1, 2022, [R. Doc. 15], in response to which this Court issued a Notice of Motion Setting on February 2, 2022. [R. Doc. 16].

Because there are common questions of law or fact regarding potential coverage under ACE's own policy issued to KOT, General Liability Policy No. HDO G24940214 ("Policy"), ACE seeks leave to intervene as an interested party in the disposition of this action. ACE requests a declaration of whether ACE has coverage or any obligation to indemnify or defend KOT under the Policy.

## II.    Law and Argument

Federal Rule of Civil Procedure 24 establishes the rules for interventions of right and permissive interventions. A party has a right to intervene when that party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impeded the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. Pro. 24(a)(2). Rule 24 alternatively enables a party who "has a claim or defense that shares with the main action a common question of law or fact" to permissively intervene. Fed. R. Civ. Pro. 24(b)(1)(B). ACE submits that is satisfies the requirements of Rule 24(b)(1)(B).

Permissive interventions are discretionary; however, such interventions are appropriate where – as here – the movant's claim and the main action present common issues of law and fact.

*Trans Chemical Ltd. v. China Nat. Machinery Import and Export Corp.*, 332 F.3d 815, 824 (5th Cir. 2003). Whether a common question exists should be construed liberally. *Miller v. Amusement Enterprises, Inc.*, 426 F.2d 534, 537 (5th Cir. 1970) ("[T]he right of intervention . . . is ordinarily accorded under liberalized circumstances."); *see also Bureerong v. Uvawas*, 167 F.R.D. 83, 96 (C.D. Ca. 1996) ("The existence of a 'common question' should be liberally construed."). If there is a common issue of law or fact, then the court must exercise discretion in determining whether to allow the intervention to proceed. *Graham v. Evangeline Parish Sch. Bd.*, 223 F.R.D. 407 (W.D. La. 9/1/04). In exercising that discretion, consideration must be given to whether the intervention will prejudice the rights of the original parties to the action. Fed. R. Civ. Pro. 24(b)(3).

Here, there are common issues of both law and fact, and ACE's intervention does not prejudice the original parties' rights. Specifically, ASIC seeks a declaration that it has no coverage obligation to its named insured, KOT, in connection with an underlying lawsuit. In support of its declaratory judgment action, ASIC submits that certain terms, conditions, limitations, and exclusions in its commercial umbrella liability policy preclude coverage. These exclusions include, *inter alia*: (1) Damage to Impaired Property or Property Not Physically Injured; (2) Expected or Intended Injury; and (3) Architects and Engineers Professional Liability Exclusion. ACE also issued a commercial general liability policy to KOT, containing exclusions for Damage to Impaired Property or Property Not Physically Injured, Expected or Intended Injury, as well as an Architects and Engineers Professional Liability Exclusion. The referenced provisions in ACE's policy are similar to those in ASIC's policy, and the evidence to consider in applying these policy provisions is the same. Therefore, both the facts and the law are common to claims under both policies.

In *Hanover Ins. Co. v. Superior Labor Servs.*, the Eastern District of Louisiana granted the

permissive intervention of an insurer under almost the exact same scenario as the one before this Court. 170 F. Supp. 3d 656. In *Hanover*, a common insurer to Masse Contracting, Inc., ("Masse") and Allied Shipyards, Inc. ("Allied"), filed a declaratory judgment seeking a declaration of no coverage under its policy for claims asserted against Masse and Allied in an underlying personal injury action. *Id*. at 665. Hanover Insurance Company, also an insurer of Masse, sought to intervene in the action, seeking judgment declaring that it had no obligation to defend or indemnify Masse in the underlying lawsuits. *Id*. Crucially, the policies issued by both insurers in *Hanover* contained substantially similar exclusions. *Id*.

After examining a similar case in which the District Court of Maryland allowed permissive intervention on largely similar grounds, the court in *Hanover* found "that judicial economy will be served by allowing Hanover to intervene in this action and that allowing Hanover's claim in intervention to proceed will not unduly delay or prejudice any parties." *Id*. at 667; *see also Pennsylvania Nat. Mutual Cas. Ins. Co. v. Perlberg*, 268 F.R.D. 218, 226 (D. Md. 2010). In reaching this conclusion, the court in *Hanover* noted that the "material factual disputes will most certainly overlap and the legal issues surrounding the application of the . . . exclusions in the policies will be substantially similar." *Id*. at 668. The court also concluded that "[i]ntervention will avoid a competing action in state court and will avoid inconsistent results on these disputed issues." *Id*.

Similarly, the proposed intervention by ACE in ASIC's declaratory judgment action also involves overlapping "material factual disputes" and "substantially similar" exclusions. Considering that ACE's policy was issued to KOT for the same policy period as ASIC's umbrella policy, the fact that both policies contain similar policy language, and that potential coverage under ACE's and ASIC's policies arise out of the same underlying litigation, this Court should allow

ACE's intervention to proceed as the Eastern District of Louisiana did in *Hanover*.

Finally, ACE submits that permitting this intervention to proceed is the most efficient use of judicial resources, will avoid duplicity of proceedings, ensure consistency and finality of outcomes for similarly situated parties, and promote procedural and substantial due process. Accordingly, ACE respectfully requests that it be allowed to proceed with its intervention.

Respectfully submitted,

**BROWN SIMS, PC**

BY: */s/ Thear J. Lemoine*
Thear J. Lemoine (# 26383)
Gregory M. Burts (#39133)
1100 Poydras St., 39th Floor
New Orleans, LA 70163
P: (504) 569-1007
F: (504) 569-9255
E: *tlemoine@brownsims.com*
*gburts@brownsims.com*
**Attorneys for ACE American Insurance Company**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served on all counsel of record by the court's electronic notification system, or by fax, email, United States Mail (postage prepaid) and/or hand delivery on February 10, 2022.

*/s/ Thear J. Lemoine*
Thear J. Lemoine

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| AIG SPECIALTY INSURANCE | § | NO: 6:21-CV-04191-RRS-CBW |
| COMPANY (f/k/a CHARTIS | § | |
| SPECIALTY INSURANCE | § | JUDGE ROBERT S SUMMERHAYS |
| COMPANY | § | |
| | § | MAG. CAROL B WHITEHURST |
| | § | |
| | § | |
| v. | § | |
| | § | |
| KNIGHT OIL TOOLS, INC. | § | |
| | § | |
| | § | |
| | § | |

---

## ORDER

Considering the Motion for Leave to File Complaint-in-Intervention of ACE American Insurance Company:

**IT IS HEREBY ORDERED** that the Motion is GRANTED, and ACE American Insurance Company is granted leave to file its Complaint-in-Intervention against Knight Oil Tools, Inc. The clerk is instructed to accept the Complaint-in-Intervention for filing and to issue all appropriate process forthwith.

Lafayette, Louisiana, this ___ day of _____, 2022.

_____

UNITED STATES DISTRICT JUDGE